UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

HI-LEX CONTROLS INCORPORATED,
HI-LEX AMERICA, INCORPORATED and
HI-LEX CORPORATION HEALTH AND
WELFARE PLAN,

Case No: 11-12557

     Plaintiffs,

v.

Hon. Victoria A. Roberts

BLUE CROSS AND BLUE SHIELD OF
MICHIGAN,

     Defendant.
_____/

## CORRECTED FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.   TABLE OF CONTENTS     1

II.  INTRODUCTION     4

III. FINDINGS OF FACT     6

    A.    PLAINTIFFS RETAIN BCBSM TO ADMINISTER THEIR
          SELF-FUNDED HEALTH BENEFIT PLAN     6

    B.    BEFORE 1993: BCBSM UNDER PRESSURE TO
          INCREASE REVENUE; CUSTOMERS BALK
          WHEN BCBSM IMPLEMENTS NEW FEES     7

    C.    1993-94: BCBSM PLAN TO CHANGE ITS DISCLOSURES     8

    D.    1994-PRESENT: BCBSM EMPLOYS ARTIFICES TO
          HIDE THE DISPUTED FEES     12

        1.  MONTHLY CLAIMS REPORTS     12

        2.  QUARTERLY STATEMENTS     13

        3.  RENEWAL DOCUMENTS     14

    4.  ANNUAL SETTLEMENTS                            15

    5.  FORM 5500 CERTIFICATIONS              16

E.  1999 AND AFTER: THE NEW FEES WERE A SECRET
    EVEN TO BCBSM EMPLOYEES                   19

F.  EARLY 2000s: RUMORS OF DISPUTED FEES EMERGE,
    BUT BCBSM DENIES THE EXISTENCE OF DISPUTED FEES    20

G.  2003: BCBSM INITIALLY IGNORES HI-LEX'S INQUIRY
    ABOUT THE DISPUTED FEES AND THEN COVERS UP
    THEIR EXISTENCE                         22

H.  2003-2007: BCBSM DEBATES WHETHER TO DISCLOSE
    THE DISPUTED FEES FOR FIVE YEARS AND THEN
    DECIDES NOT TO                      27

I.  2006-2007: BCBSM'S OWN INVESTIGATION CONCLUDED
    THAT HI-LEX (AND MOST OTHER CUSTOMERS) DID NOT
    KNOW ABOUT THE DISPUTED FEES            30

J.  THE MISLEADING CONTRACT DOCUMENTS DID NOT
    DISCLOSE THE DISPUTED FEES               31

    1.  THE SCHEDULE As ARE MISLEADING        31

    2.  THE 2002 ASC WAS MISLEADING           32

K.  PLAINTIFFS LACKED KNOWLEDGE OF THE DISPUTED    34
    FEES UNTIL 2007

    1.  PLAINTIFFS EXERCISED DUE DILIGENCE
        UNTIL 2007                        37

     a. PLAINTIFFS DID NOT HAVE A BROKER
        DURING ANY RELEVANT TIME PERIOD        38

    2.  A HYPOTHETICALLY DILIGENT COMPANY WOULD
        NOT HAVE DISCOVERED THE DISPUTED FEES
        UNTIL 2007                      38

L.  WITH THE EXERCISE OF DUE DILIGENCE, PLAINTIFFS
    SHOULD HAVE BEEN ON SUFFICIENT NOTICE OF THE
    DISPUTE FEES IN 2007, THROUGH THE VALUE OF

2

BLUE CHART                                                           40

M.   PLAINTIFFS ARE ENTITLED TO DAMAGES                             41

IV. CONCLUSIONS OF LAW                                              42

A.   BCBSM IS AN ERISA FIDUCIARY (PREVIOUSLY
     DECIDED IN 9/7/2012 SUMMARY JUDGMENT ORDER)                    42

B.   BCBSM VIOLATED ITS FIDUCIARY OBLIGATIONS
     (COUNT I)                                                      44

C.   BCBSM VIOLATED ERISA's PROHIBITION OF
     SELF-DEALING (COUNT II) (PREVIOUSLY DECIDED
     IN 9/7/2012 SUMMARY JUDGMENT ORDER)                            47

D.   PLAINTIFFS TIMELY FILED THEIR ERISA CLAIMS
     (STATUTE OF LIMITATIONS)                                       47

     1.  NEITHER THE STANDARD SIX-YEAR
         LIMITATIONS PERIOD NOR THE THREE-YEAR
         LIMITATIONS PERIOD FOR "ACTUAL
         KNOWLEDGE" APPLIES                                         48

     2.  THE SIX-YEAR DISCOVERY RULE FOR "FRAUD
         OR CONCEALMENT" APPLIES AND ALLOWS
         PLAINTIFFS TO RECOVER DAMAGES FROM
         1994 THROUGH 2011                                          51

         a. THE APPLICABLE STANDARD FOR THE
            APPLICATION OF "FRAUD OR
            CONCEALMENT" IS AN OPEN QUESTION
            IN THE SIXTH CIRCUIT                                    51

         b. PLAINTIFFS PROVE BSBSM ENGAGED IN
            FRAUDULENT CONDUCT                                      56

         c. PLAINTIFFS PROVE BCBSM ENGAGED IN
            FRUADULENT CONCEALMENT                                  58

E.   BCBSM CANNOT ESTABLISH A STATUTE OF LIMITATIONS
     DEFENSE BASED ON ALLEGED IMPUTED KNOWLEDGE
     FROM MARSH                                                     59

     1.  BCBSM MAY NOT SEEK TO IMPUTE KNOWLEDGE

3

       IN ORDER TO SHIELD ITS ERISA VIOLATIONS       59

F.    PLAINTIFFS ARE ENTITLED TO A RETURN OF THE
       DISPUTED FEES, WITH INTEREST       60

    1.  DAMAGES       60

    2.  PREJUDGMENT INTEREST       61

    3.  POST-JUDGMENT INTEREST       63

    4.  ATTORNEY FEES       63

V.  CONCLUSION       63

## I.    <u>INTRODUCTION</u>

This is an action for alleged violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs filed suit on June 13, 2011. It is one in a series involving Administrative Service Contracts ("ASC") with Blue Cross and Blue Shield of Michigan ("BCBSM") for claims administration services and network access for self-funded employee health benefit plans. Under the ASCs, BCBSM serves as third-party administrator for Plaintiffs' employee health benefit plans. It processes and pays employee health claims; provides access to its network of physicians, hospitals, pharmacies, etc. for covered employees; and negotiates with hospitals and health care providers throughout the state. Plaintiffs reimburse BCBSM for claims paid on their behalf.

This case concerns certain fees that BCBSM allocated to itself as additional compensation ("Disputed Fees"). In essence, Plaintiffs argue that they did not know about the Disputed Fees until recently, and that BCBSM employed different ways to hide them. BCBSM says that it did not breach any duties in collecting the disputed fees because they were fully disclosed and Plaintiffs agreed to pay them.

4

Plaintiffs allege violations of §1104(a)--breach of fiduciary duty (Count One)--and § 1106(b)--self dealing (Count Two)—under ERISA.

On September 7, 2012, the Court issued an order addressing the parties' cross-motions for summary judgment. The Court found that BCBSM is a fiduciary under ERISA, that the Disputed Fees were paid from plan funds, and that relief is available to Plaintiffs under ERISA.

The Court granted summary judgment to Plaintiffs on Count Two--ERISA prohibited transaction (self-dealing)--finding that BCBSM committed a *per se* breach of Section 1106(b)(1) when it allocated Disputed Fees to itself. The Court held that the self-dealing claim would proceed to trial on damages. It also held that Count One--ERISA breach of fiduciary duty--would proceed to trial because several issues of material fact remained regarding whether BCBSM breached its fiduciary duty.

In its September 7, 2012 ruling, the Court found genuine issues of fact related to BCBSM's statute of limitations defense. It recognized that resolution of the statute of limitations was necessary to determine the extent of BCBSM's liability under Count II, and the extent of its liability, if any, under Count I. The applicable statute of limitations also governs the amount of damages Plaintiffs would be able to collect from BCBSM.

BCBSM filed a second motion for summary judgment grounded on a statute of limitations affirmative defense. The Court denied it on April 17, 2013; it held numerous issues of material fact had to be decided before the Court could determine the appropriate statute of limitations.

The Court conducted a bench trial. It began on April 23, 2013 and continued for nine non-consecutive days, ending on May 8, 2013.

## II.   FINDINGS OF FACT

### A.   PLAINTIFFS RETAIN BCBSM TO ADMINISTER THEIR SELF-FUNDED HEALTH BENEFIT PLAN

1. Since at least 1991, BCBSM has served as the third party administrator of Plaintiffs' self-insured employee benefit plan, the Hi-Lex Corporation Health and Welfare Benefit Plan (the "Plan"). (Stipulated Fact ("SF") 2).

2. The terms under which BCBSM served as the Plan's third-party administrator are set forth in the parties' 1991 and 2002 ASCs. (SF 3).

3. The parties renewed the ASCs each year from 1991 through 2011 by executing a Schedule A document (the "Schedule As"). (SF 3). The ASCs and Schedule As are boilerplate documents created by BCBSM and used by BCBSM for the vast majority of its self-insured ASC customers. *Id.*

4. The Court admitted into evidence as joint exhibits, the 2002 ASC and a number of the Schedule As. Neither party can locate the 1991 ASC and certain Schedule As, but the parties crafted a stipulation concerning the relevant aspects of the Schedule As. (SF 4).

5. Pursuant to the ASCs and Schedule As, BCBSM administered the health care claims on behalf of the Plan from the Plan's assets. (SF 5).

6. The Plan's assets were pre-supplied by Plaintiffs; BCBSM wired funds to a BCBSM bank account. (Joint Trial Exhibit ("JTE") 1 at 8-9). That bank account and the Plan assets held in that account were under BCBSM's sole control.

7. The monies Plaintiffs provided to BCBSM also included employee contributions to their health care coverage under the Plan.

8.      In exchange for its services to the Plan, BCBSM received an administrative fee in a per employee, per month amount set forth in the Schedule As ("Administrative Fee"). (JTE 2 – 11).

**B.      BEFORE 1993:  BCBSM UNDER PRESSURE TO INCREASE REVENUE; CUSTOMERS BALK WHEN BCBSM IMPLEMENTS NEW FEES**

9.      In 1987 and 1988, BCBSM was in poor financial shape.  (Testimony of John Paul Austin, BCBSM's former chief actuary ("Austin Test.")).

10.      To regain financial stability, BCBSM started charging various fees of its self-funded customers such as Plaintiffs: the "Plan-Wide Viability Surcharge," "Other Than Group Subsidy," and "Group Retiree Surcharge."  (*See id.*; JTE 80 at 276, ¶1).

11.      BCBSM received "tremendous complaints from customers" in response to the new fees.  (Austin Test.) This stemmed, in part, from the fact that "[t]he billing of these amounts to customers was an add-on to the bill, *highlighted for all to see* . . . ." (JTE 80 at 276, ¶2) (emphasis added).

12.      BCBSM was unable to convince customers that the subsidies were fair:

> *The advent of self-funding as an alternative to insured programs has highlighted administrative fees as a cost and a concern to customers purchasing a BCBSM ASC plan.  Citing BCBSM's high costs, many customers have complained and have threatened to leave if relief was not provided.  Indeed, some customers have cancelled BCBSM coverage for this reason*.  Many arguments have been presented to customers dissatisfied with our administrative costs.  The costs of managing a network of hospitals and doctors as large as the Blue network, focusing on total costs and not just the small percentage reflective of administrative costs and the wide range of services provided by BCBSM have all been used at various stages to address case specific concerns.  *These arguments have been met with moderate success*.

(JTE 80 at 277, ¶1) (emphasis added).

13.      The charges were so unpopular that, in 1989 alone, BCBSM lost 225,000 members.  (Austin Test.).

7

2:11-cv-12557-VAR-PJK   Doc # 246   Filed 05/23/13   Pg 8 of 63   Pg ID 15417

14.     Many other customers refused to pay the fees.  Mr. Austin confirmed that roughly half of these "add-on" fees were **not** being paid; it was BCBSM's policy not to sue customers.  (*Id.*)

15.     BCBSM was under enormous financial pressure.  (Austin Test.).

16.     According to BCBSM, these fees made it a "challenge to maintain customer relationships."  (JTE 80 at 276, ¶2).  By disclosing the fees, BCBSM was "its own worst enemy."  (*Id.*)

C.     **1993-94:  BCBSM PLANS TO CHANGE ITS DISCLOSURES**

17.     In 1993, BCBSM Executives suggested replacing the fees it disclosed with a "hidden" administrative fee buried in marked-up hospital claims.  (*See id.*; Austin Test.).

18.     The decision was made for this pricing arrangement to become effective for customers with their first renewal after October, 1993.  The renewal was selected as the effective date for each group because that is when the group would sign a new Schedule A, which was revised to make Disputed Fees a contractual obligation.  (JTE 81 at 219-220).

19.     This solution offered several advantages to BCBSM:

Reflecting certain BCBSM business costs in hospital claim costs will provide long-term relief to the problems detailed above and will also satisfy short-term objectives of enhancing customer relationships while cutting operational costs.  Inclusion of these costs in our hospital claim costs is actually more reflective of the actual savings passed on to customers as it will now include the hospital savings net of the costs incurred to provide these savings.  This will also improve our operations efficiencies since mass mailings for subsidy amount changes will no longer be necessary.  ***Changes to these costs will be inherent in the system and no longer visible to the customer.  The same argument applies to risk charges and provider related expenses***.

(JTE 80 at 3, ¶2) (emphasis added).

8

22.     BCBSM's senior management approved this proposal, known as "Retention Reallocation."  (Austin Test.).  It went into effect in October, 1993.  (*Id.*)

23.     Because the events pertinent to this lawsuit occurred over a time period of more than two decades, the terminology relevant to the dispute changed over time.  The term "Disputed Fees" is synonymous with the terms "Retention Reallocation Fees" and "Access Fees."

24.     However, the Access Fee terminology used to describe "Disputed Fees" is different from "Access Fee" as defined in the ASC.  The ASC, Article VI, Section B is labeled "Access Fee," and is unrelated to the "Access Fee" which is subject to this litigation. In the ASC, "Access Fee" is explained as:

> If an access fee is charged by the Host Plan, the amount of the fee may be up to (10) percent of the negotiated savings obtained by the Host Plan from its providers but not to exceed Two Thousand ($2,000) Dollars. Access fees will be charged only if the Host Plan's arrangements with its participating providers prohibit billing the Enrollee for amounts in excess of the negotiated rate.  However, providers may bill for deductibles and/or copayments.

(JTE 1 at 13).

25.      The Disputed Fees have the following components:

a.     A charge for access to the Blue Cross participating provider and hospital networks (also described as "provider network access" and "Provider Network Fee");

b.     A contribution to the Blue Cross contingency reserve (also described as "contingency" and "contingency/risk");

c.     Other Than Group, or OTG subsidy;

d.     Retiree surcharge (only for certain employers); and

e.      Plan-Wide Viability, or PWV surcharge.

Items (c) and (d), and (e) are often referred to generally as "other subsidies" or "subsidies and surcharges."  Item (e) has been set at zero since 1991 and so is not relevant to this case. (Austin test.; testimony of Cindy Garofali, BCBSM's manager in underwriting ("Garofali test."); Defendant's Trial Exhibit ("DTE") 1005 at 235).

26.     The term "retention" refers to money BCBSM retains, as opposed to money used to pay medical claims.  (Testimony of Paula Brawdy, former BCBSM Regional Sales Manager ("Brawdy Test.").

27.     BCBSM continued to charge the "Other Than Group Subsidy" and "Retiree Surcharge."  Austin Test.  The "Retiree Surcharge" was assessed to customers who did not cover retirees health care, *id.*; Hi-Lex never covered retirees.  (Testimony of John Flack, Hi-Lex's Director of Finance ("Flack Test.")).

28.     After 1993, whenever BCBSM used the term "Hospital Claims" in contract documents, it intended that the term have the following components:

   a.  Charge for provider network access;

   b.  Contribution to contingency reserve;

   c.  OTG subsidy;

   d.  Retiree surcharge; and

   e.  PWV surcharge (0 since '91)

29.     The Post-1993 components under the heading "Hospital Claims" in contract documents are collectively referred to in this litigation as "Disputed Fees."

30.    The term "Retention Reallocation" refers to the new pricing arrangement developed and implemented by BCBSM in 1993; then, Disputed Fees became part of the calculation for amounts to be billed for Hospital Claims.  (JTE 80).

31.    The Retention Reallocation fees were decided unilaterally by BCBSM; cost accountants and actuaries decided what expenses BCBSM wanted to recoup through the Disputed Fees.  They then decided how much Hospital Claims had to be marked up to reach that goal.  The percentages used to determine the fees are referred to as "Factors".  (James Patrick Bobak Deposition, BCBSM's senior underwriting analyst, at 14:4-12; Austin Test.).

32.    The Disputed Fees Factors were not reported to customers, but were known to BCBSM in advance of customer renewals.  (Austin Test.; Plaintiffs'  Trial Exhibit ("PTE") 580).

33.    Internal documents from BCBSM confirm that BCBSM had complete discretion to determine the amount of the Disputed Fees, as well as which of its customers paid them.  (PTE 561, Garofali Email ("[I]ndividual underwriters will have the flexibility to determine how we charge . . . access fee on group"); PTE 562, Ken Krisan, BCBSM's senior underwriter, Email (explaining that trust funds have a unique arrangement)).

34.    Under Ms. Garofali's oversight, the following strategy was developed in 1993 to educate groups about the new pricing arrangement:

a.    Revised Schedule A included a new disclosure: "Effective with your current renewal, your hospital claims cost will reflect certain charges for provider

11

network access, contingency, and other subsidies as appropriate." (JTE 81 at 220; testimony of Ken Krisan (" Krisan Test.")).

b.      A tri-fold color brochure entitled "A new pricing arrangement" was created for the customer. (DTE 1008). This brochure was to be left with the customer at a meeting where the new pricing arrangement was explained. (Garofali Test.). The brochure identifies certain components of the Disputed Fee and explains that as a result of the new pricing arrangement, the fixed Administrative Fee would go down and the hospital differential would also decrease. (DTE 1008).

**D.      1994-PRESENT:  BCBSM EMPLOYS ARTIFICES TO HIDE THE DISPUTED FEES**

35.      Following the implementation of "retention reallocation," BCBSM went to great lengths to ensure that the Disputed Fees were not disclosed to the customer.

**1.      Monthly Claims Reports**

36.      On a monthly basis, BCBSM provided Hi-Lex with detailed claims reports for every claim incurred. (Flack Test.)

37.      Hi-Lex relied on this claims data, reviewed it, and incorporated it (manually in earlier years) into a master spreadsheet used for budgeting and internal auditing purposes. (Thomas Welsh Deposition, Hi-Lex's former Director of Finance, at 203:18-204:15; Flack Test.; PTE 594).

38.      The claims data did not mention Disputed Fees; the Disputed Fees paid to BCBSM were actually included in the Hospital Claims numbers provided. (Austin Test.; Krisan Test.; Flack Test.).

2.      **Quarterly Settlements**

39.      BCBSM sent the Plaintiffs quarterly reports containing details about the plan's performance.  (JTE 23-51).  The parties do not have every quarterly settlement statement, but have stipulated to the content of them.  (JTE 77).

40.      The quarterly reports did not show customers the amount of Disputed Fees collected for each quarter, nor did they identify under what category or heading they were included.  (Austin Test.; Testimony of Sophia Quinn ("Quinn Test."); Chris Winkler Deposition at 105:2-20).

41.      In reality, the amount of Disputed Fees was added to the facility or hospital charges and altogether reported as Hospital Claims.  (*Id.*)

42.      This made it appear to customers, like Plaintiffs, that the savings from using BCBSM as its administrator were smaller than they truly were.

43.      The amount of Disputed Fees was included in the line for "TOTAL CLAIMS EXPENSE."  (Austin Test.; Quinn Test.)

44.      This made it appear to customers, like Plaintiffs, that the claims paid to providers were higher than they truly were.

45.      The amount of Disputed Fees also was excluded from the line for "TOTAL ADMINISTRATIVE FEE EXPENSE."  (*Id.*)

46.      This made it seem to customers that they were paying less Administrative Fees than they, in fact, paid.

47.      Only beginning in April, 2011 did BCBSM refer to the Disputed Fees as "administrative compensation."  (PTE 581).  It was in a responsive letter from BCBSM to Plaintiffs.

13

48.     Before then, BCBSM, through the quarterly settlements, represented to Plaintiffs that plan assets were only being used to pay: (1) actual claims, (2) disclosed Administrative Fees, and (3) stop loss premiums.

49.     BCBSM had the technical capability to provide quarterly reports which specified the amount paid in the various subsidies and surcharges.  (Austin Test.; Krisan Test.).  BCBSM did make other projections that it shared with Plaintiffs.

50.     BCBSM knew these reports were false when it gave them to Plaintiffs, and gave them to Plaintiffs with the intent to deceive them.  (Austin Test.; Winkler Deposition at 87:2-14; Quinn Test.).

### 3.     Renewal Documents

51.     In addition to the quarterly reports, BCBSM provided claims information at the time of renewal.

52.     The first page purported to show claims amounts "passed on" to Hi-Lex by BCBSM.  This promoted the belief that claims reports related to actual claims and nothing else.

53.     Additionally, the "Benefit and Savings Review Summary" was given in two formats.  (JTE 52-63).

54.      Both formats showed amounts for either "Approved Charges and Payments" or "Amounts Billed" which consisted of actual claims plus the Disputed Fees. Similarly, both formats showed either the "Hospital Savings" or "Provider Reimbursement Savings" that were reduced by the Disputed Fees.  (Austin Test.)

55.     BCBSM provided misleading claim information in the "Provider Contract Savings" report supplied with each renewal.  (JTE 52-63).

14

56.     Those reports indicated amounts for "BCBSM Provider Savings" and "Total BCBSM Payments."  The savings number, however, was not the full savings, but rather the savings reduced by the Disputed Fees; correspondingly, the "Total BCBSM Payments" were not the total payments actually paid by BCBSM, but rather that amount plus the Disputed Fees kept by BCBSM.  (Austin Test.)

57.     BCBSM also represented in the Renewals that its "Administrative Fee is all-inclusive." (JTE 52 at 819).  That was not true; BCBSM also charged the Disputed Fees, a second form of administrative compensation, but not described as such before 2011.

58.     BCBSM knew these reports were false when it gave them to Plaintiffs and gave them to Plaintiffs with the intent to deceive them.

59.     In later years, BCBSM inserted an asterisk with misleading language into a claims projection.  (JTE 58).  These were not reviewed by Mr. Flack because BCBSM's claims projections were notoriously unreliable and Mr. Flack made his own projections.  (Flack Test.).

### 4.     Annual Settlements

60.     Roughly six months after the close of each plan year, BCBSM sent self-funded customers an annual settlement statement.  The annual reports did not show customers the amount of Disputed Fees collected for each year, but they did show other fees collected.  There was an "Administrative Fee Settlement," a "POS Incentive Fee Settlement," and a "Stop Loss Premium Settlement."  But there was no "Disputed Fees / Retention Reallocation Fees Settlement."  (JTE 12 – 22).

61.     In some years, the amount of Disputed Fees was included (but not identified) on the line for "ACTUAL CLAIMS PAID BY BCBSM : FACILITY" in the "Stop

15

Loss Premium Settlement."  This was false and misleading because the Disputed Fees were compensation to BCBSM, not "Claims Paid by BCBSM."

62.    The amount of Disputed Fees was not included in the "Administrative Fee Settlement" either.  This was false and misleading because the Disputed Fees were "administrative compensation."  (PTE 581).

63.    According to BCBSM's own underwriter, Chris Winkler:

Q.    And this heading A. [of the annual settlement] . . . refers to claims paid by BCBSM, correct?

A.    Correct.

Q.    And the access fee is not a claim that is paid by BCBSM, correct?

A.    Correct.  ***

Q.    So the number provided by Blue Cross on the annual settlement for actual claims paid overstates what the actual claims paid to providers by Blue Cross was?

Q.    Correct?

A.    The number of actual claims paid includes the access fee. ***So, yes, it would be overstating true cost of claim.***

(Winkler Deposition at 85:1-10, 19-25; 86:1-4, 13-21) (emphasis added).

64.    Reviewing this report, a reader could not determine whether Disputed Fees were charged, or in what amount.  (*Id.* at 106:5-8).

65.    BCBSM knew these reports were false when it gave them to Plaintiffs and gave them to Plaintiffs with the intent to deceive.

### 5.    Form 5500 Certifications

66.    At or around the time that BCBSM sent its annual settlements to the Plaintiffs, BCBSM also provided a completed certification for the preparation of Form

5500 Schedule A, which is filed with the U.S. Department of Labor.  (Austin Test.; Winkler Deposition at 10:22-11:4; Flack Test.).

67.     Forms 5500 were developed by the Department of Labor, the Internal Revenue Service, and the Pension Benefit Guaranty Corporation to satisfy annual reporting requirements under ERISA's Titles I and IV and under the IRS Code. They are "intended to assure that employee benefit plans are operated and managed in accordance with certain prescribed standards and that participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries under employee benefit plans." (Annual Return/Report 5500 Series Forms and Instructions, United States Department of Labor, http://www.dol.gov/ebsa/5500main.html (last visited May 17, 2013)).

68.     The Form 5500 certifications did not show customers the amount of Disputed Fees collected for each year.  Rather, the amount of Disputed Fees was added to the amount of claims paid to providers and included in the line for "CLAIMS PAID."  (JTE 15 at 032); Winkler Deposition at 95:21-25.

69.     The amount of Disputed Fees should have but was not reported in the lines for "ADMINISTRATION," "OTHER EXPENSES (MANDATED SUBSIDY)," "RISK AND CONTINGENCY," "OTHER RETENTION (LATE FEE, STOP LOSS PREMIUM), or "TOTAL RETENTION INCLUDING STOP LOSS PREMIUM."  (JTE 12-22).

70.     The line for "ADMINISTRATION" included only the disclosed Administrative Fees, not the Disputed Fees.  (Austin Test.; Winkler Deposition at 96:1-5).

17

71.     The lines for "OTHER EXPENSES (MANDATED SUBSIDY)" and "RISK AND CONTINGENCY" were either a zero (0) or "not applicable" in each year.  (JTE 12-22).  The Disputed Fees included charges for subsidy and risk/contingency.  (PTE 592; Austin Test.; Winkler Deposition at 92:19-93:1, 94:6-16).  The line for "OTHER RETENTION" included only a customer's stop loss premium and applicable late fees. (JTE 12-22).

72.     A reader reviewing this report could not determine whether Disputed Fees were charged, or in what amount.  (Winkler Deposition at 106:9-21).

73.     The Form 5500 certifications were false and misleading because (1) the amount reported as claims was over-stated, (2) the amount reported as Administrative Fee was under-stated, and (3) the subsidies and risk/contingencies that were collected by BCBSM as part of the Disputed Fees were reported as zero or "not applicable." (Winkler Deposition at  95:14-96:15, 94:6-16).

74.      Hi-Lex was misled into believing that BCBSM was paid less in Administrative Fees than it actually retained, because of the Disputed Fees.  (Flack Test.).

75.     To the extent BCBSM claims that contract documents gave Plaintiffs notice of what it *might* do in the future, the Form 5500 certifications were understood by Plaintiffs to show what BCBSM was *actually* doing: not charging additional administrative fees.

76.     BCBSM knew the Form 5500 Certifications were false when it gave them to Plaintiffs, and gave them to Plaintiffs with the intent to deceive them.

E.      **1999 AND AFTER:  THE NEW FEES WERE A SECRET EVEN TO BCBSM EMPLOYEES**

77.      Sandy Ham became a BCBSM account representative in 1999, and began handling the Hi-Lex account in 1999. She testified that the training she received included several references to and an explanation of Disputed Fees.  (DTE 1186 at 2625, 2642).  Ms. Ham was able to identify her handwriting on her personal copy of the 1999 training presentation.  She noted that Disputed Fees are a "small charge when your people access our providers to enjoy the discounts."  (DTE 1186 at 2642; testimony of Sandy Ham ("Ham Test.")).

78.      However, Ms. Ham's deposition testimony--taken before trial and read at trial--was unequivocal:

> Q.      When you started in 1999, did you, fairly early on, learn about access fees?
>
> A.      Not that I recall.
>
> Q.      Was it 2005 when you first learned about access fees?
>
> A.      Yes.
> * * *
> Q.      Am I correct in understanding that the first time you learned about access fees was in connection with training that was done in 2005?
>
> A.      Correct.
>
> Q.      For example, you could have heard about access fees from a colleague and then coincidentally, at some later date in the same year, been trained about access fees.  But if I'm understanding you, you're saying, I learned about access fees because I had training about access fees?
>
> A.      Correct.

 (Sandy Ham Deposition at 19).

79.     Ms. Ham's lack of knowledge explains, in part, why according to a BCBSM commissioned survey, **none** of her customers knew about the Disputed Fees as of 2007.  (PTE 524-527).

80.     Ms. Ham was still confused as late as 2009, when she described the Disputed Fees as something "the provider [meaning the hospital, not the self-funded group] pays … based on the experience of the group."  (PTE 535).

81.     Given the foregoing, it is not reasonable to: (1) conclude that Plaintiffs would have obtained any meaningful information about the Disputed Fees from their own BCBSM account executive, or (2) expect Plaintiffs to have learned about the Disputed Fees from the same documents that Ms. Ham reviewed, signed, but did not understand.

###    F.    EARLY 2000S; RUMORS OF DISPUTED FEES EMERGE, BUT BCBSM DENIES THE EXISTENCE OF DISPUTED FEES

82.     In the early 2000s, Todd Stacy of ASR, a BCBSM competitor, told certain brokers that BCBSM had "hidden fees."  (Wally Martyniek Deposition at 20:9-21:15). According to one broker, Wally Martyniek, those rumors led him to call a face-to-face meeting with BCBSM sales manager, Steve Hartnett.  Mr. Hartnett denied the existence of Disputed Fees.  (*Id.* at 40:2-15).  Mr. Hartnett said that BCBSM self-funded customers get 100% of the hospital discounts:

Q.     What did you say at that face-to-face meeting?

A.     I said at the meeting that the reason that we're here is that I want to hear it from Steve Hartnett . . . an employee [of BCBSM], that basically what Todd Stacy is saying about the access fee is not correct, because you had told me that it wasn't correct, but I wanted him to tell the client, I didn't want it coming from me.

Q.     What did Steve say?

> A.    Steve said that there was no – that the hospital discount is the full discount that the client gets, that Blue Cross does not hold anything back.

(*Id.* at 40:2-15).

83.    Jeffery Liggett also attended the meeting with Mr. Martyniek and corroborated this BCBSM representation.  (Stipulation of Counsel on May 7, 2013).

84.    Mr. Martyniek's experience mirrored that of an unrelated broker, David Young.  Young recounted a presentation made by BCBSM, at which BCBSM falsely represented that it passed on 100% of the provider discounts to customers:

> A.    I said, I hear out in the market that you don't pass along one hundred percent of your discounts, and I said, can you respond to that? And the response back was, that's not true, we absolutely pass one hundred percent of our discounts.
>
> Q.    Who said that?
>
> A.    Steve Hartnett.

(Dave Young Deposition at 53 line 1-6).

85.     BCBSM told Mr. Young that its Administrative Fee was "all inclusive" as well.  (*Id.* at 81:15-22).

86.    Similarly, an internal BCBSM report acknowledged that BCBSM "traditionally markets the Administrative Fees as all inclusive."  (PTE 529).

87.    BCBSM management described the Administrative Fees as "all inclusive:"

- "We have used the term "all-inclusive" when describing our Administrative Fee."  (PTE 545: 2007 Ken Krisan Email).

- "Contributions to reserves, the Medicare subsidy and claims processing are part of this Administrative Fee."  (PTE 533: 2008 Kathleen McNeill Email).

21

88.     BCBSM made similar misrepresentations to Hi-Lex in annual renewal documents.  (JTE 52 at M00819: Hi-Lex ASC Renewal ("Your BCBSM Administrative Fee is all-inclusive.")).

89.     Brokers understood BCBSM's Administrative Fee to be "all-inclusive," including Denise Sherwood, a former BCBSM employee and then later a broker with Spectrum Benefits and Aon.  She testified:

A.      All I know is Blue Cross's admin fee was comprehensive, everything was included in it.

Q.      What's your basis for saying that?

A.      Just experience.  That's how Blue Cross marketed itself.

(Sherwood Deposition at 107:8-13).

90.     BCBSM's representations to brokers and its description of its Administrative Fee as "all-inclusive" were false and misleading.  BCBSM secretly charged a second fee--Disputed Fees--in exchange for its services.

## G.     2003:  BCBSM Initially Ignores Hi-Lex's Inquiry About the Disputed Fees and Then Covers Up Their Existence

91.     In 2003, Hi-Lex hired health care consultant Marsh to review its benefit plan.  This was a review of benefits, not of claims payments or monies paid to BCBSM.  (PTE 503; testimony of Christine Warren ("Warren Test.").

92.     One of Marsh's employees, Dave Mamuscia, noted the ambiguous language in paragraph 11 of the Schedule A and suggested "the Blues should demonstrate how this works…."  (JTE 83 at 557).

93.     Paragraph 11 states: "Your Hospital Claims cost reflects certain charges for provider network access, contingency, and other subsidies as appropriate."  (JTE 2-4).

94.     Mr. Mamuscia's reference to paragraph 11 was mentioned in a single paragraph of a larger six-page memo.  (JTE 63 at 557-562).

95.     The memo also came less than a month before Hi-Lex had to renew the ASC with BCBSM.  With no other alternative claims administrators available, Hi-Lex's renewal was a foregone conclusion, regardless of what paragraph 11 meant.  (Welsh Deposition at 168:16-170:1; Warren Test.).

96.     Hi-Lex CFO, Tom Welsh, signed the May 1, 2003 Schedule A without any revision to the Disputed Fee disclosure.  (JTE 3-4; per the stipulation in JTE 77 at ¶2, JTE 4 at 2 is the same as the missing page 2 of JTE 3).

97.     Mr. Welsh forwarded Mr. Mamuscia's memo to BCBSM, which garnered this response, memorialized in an email written by a BCBSM sales manager:

> Dave Mamucia [sic] wants disclosure, or a more detailed explanation regarding line 11 of the Schedule A.  That is 'your hospital claims cost reflects certain charges for provider network access, contingency, and other subsidies as appropriate. ***You had warned us that this question was coming***.  We did tell the account that there is retention reallocation that reduces the net hospital discount.  We do not want to respond with an inappropriate answer and would like support from your area as to what exactly we can say.  ***We realize that Marsh is going to share our answer with all their consultants and we want to give a well measured response***.  Please provide us with underwriting's suggestion to this question.

(JTE 84: 2003 Dave Gay Email) (emphasis added).

98.     BCBSM's reaction to Marsh's request for information demonstrates that it knew that neither Plaintiffs nor their consultant knew about Disputed Fees, and that disclosure of the fees would damage its business.

99.     BCBSM did not adequately respond to Mamuscia's inquiry, prompting Marsh to email:  "You haven't answered our question."  (JTE 86).

100.    Mr. Welsh forwarded Marsh's comment to BCBSM's account executive, Deborah Dickson; she does not remember responding.  (Testimony of Deborah Dickson ("Dickson Test.")).  The emails indicate that she would visit Hi-Lex in the next couple days, but Ms. Dickson's meeting notes reflect no conversation about Disputed Fees.  (*Id.*; JTE 90 – 95).

101.    Ms. Dickson does not recall discussing the memo with anyone, including anyone at Hi-Lex.  (Dickson Test.).

102.    Mr. Welsh denies being told about Disputed Fees.  *(*Welsh Deposition at 163:1-164:8; PTE 603).

103.    Ms. Dickson confirmed at trial that she could not recall a single instance when she provided Hi-Lex with any information about Disputed Fees, and her practice when meeting with Mr. Welsh was to review any changes in the quarterly or annual settlements from the prior year.  (Dickson Test.).  Ms. Dickson testified that she never received training on how to tell customers about Disputed Fees.  (*Id.*)

104.    According to Ms. Dickson, Mr. Welsh was a "financially savvy" CFO who was interested in the cost of the health plan.  (*Id.*)  He regularly negotiated over the disclosed Administrative Fees charged by BCBSM.  (*Id.*)

105.    BCBSM's own client profile reflects that Mr. Welsh was "close on numbers" and kept his own claims spreadsheet.  *(*JTE 87).

106.    Ms. Dickson admitted at trial that she never explained to Mr. Welsh that the "claims" reported in the quarterly settlements included Disputed Fees, despite having four meetings a year with him.  (Dickson Test.).

107.    Mr. Welsh was adamant that he had no knowledge of the Disputed Fees:

24

Q.    Did you ever have any understanding that the administrative services contract between Blue Cross and either Borroughs or Hi-Lex allowed Blue Cross to mark up hospital claims?

A.    No.

Q.    Did you ever have any understanding that the amounts reported by Blue Cross as claims were anything other than actual claims paid to health care providers?

A.    No.
* * *
Q.    Did you understand paragraph 11 [of the Schedule A] to refer at all to administrative compensation that was going to be retained by Blue Cross in addition to the base admin. fee on the first page?

A.    ***No, because the way I read that and I read it today it still seems like it's hospital costs.  It doesn't say anything about being paid to Blue Cross Blue Shield.***

(Welsh Deposition at 183:16-184:2, 186:20-187:4) (emphasis added).

108.    In the fall of 2003, Marsh put out a Request for Proposal ("RFP") on Hi-Lex's behalf for its Plan.  (PTE 505; Warren Test.).  BCBSM was asked to respond to the RFP by September 15, 2003.  (PTE 505 at 322).

109.    The RFP specifically asked BCBSM to identify any "network access/management fees."  (JTE 97 at 93).  Indeed, Christine Warren testified that the purpose of page M00093 of the RFP was to understand the costs of the programs offered by the recipients of that RFP.  (Warren Test.).

110.    Generally speaking, "Access Fees" are not uncommon in the industry because many third-party claims administrators lack their own network; they lease one that causes them to incur access fees.  (Warren Test.).  BCBSM, however, owns its own network, and as one broker confirmed, BCBSM was thus presumed not to have such fees.  (Sherwood Deposition at 16:15-17:18).

25

111.    BCBSM responded to the Marsh RFP in September by denying there

were Access Fees.  (PTE 505 at 392) (responding that network access fees were "N/A"

and that there were no other fees); Warren Test.; Garofali Test. (testifying about PTE

505 and explaining that BCBSM personnel were "discouraged" from providing any

information if nothing was requested)).

112.    BCBSM's RFP response was false and misleading, and created the

illusion that BCBSM was more cost competitive than the other third party administrators

who responded to the RFP.  In fact, Ms. Dickson testified that the completed bid form

RFP response was not correct.  (Dickson Test.).

113.    Marsh took the false information provided by BCBSM and incorporated it

into its marketing results summary on October 10, 2003.  (PTE 507 at 261).  In that

summary, Marsh compares four potential claims administrators. With respect to BCBSM

reports, the summary says, "access fees included in administration fee."  (*Id.*)

114.    Marsh's description of "access fees" as "included in administrative fee"

was false.  The access fees (Disputed Fees) were in addition to the Administrative Fee.

Marsh, an expert in the field of self-insured health plans, was misled by BCBSM's

response to the RFP.

115.    Ms. Warren delivered her marketing results summary to Hi-Lex.  (Warren

Test.).

116.    BCBSM intentionally misrepresented to Plaintiffs and Marsh that there

were no Disputed Fees charged.  This misrepresentation was material, and relied upon

by Plaintiffs to their detriment.

117.    BCBSM argues on one hand that the RFP response is not from it, but on the other hand that the RFP is correct because BCBSM did not charge the Disputed Fees on a "per employee per month" ("PEPM") basis.  That argument is unavailing for two reasons: (1) the RFP asked whether there were any Access Fees, and, if so, asked that they be expressed on a PEPM basis, and (2) if BCBSM was not going to express the Access Fees on a PEPM basis, it should have explained how it did express them, just as BCBSM did in a similar RFP response six years later.  (PTE 506).

118.    Making BCBSM's argument all the more implausible is the fact that it regularly expressed Disputed Fees on a PEPM basis.  (PTE 564-568).

119.    BCBSM's misrepresentation that it did not charge separate access fees had the effect of dramatically understating the administrative costs associated with its proposal.  According to page 18 of the RFP summary prepared by Marsh, (PTE 507 at 263), BCBSM was the second lowest cost bidder, with a total Administrative Fee expense of $505,068.  If, however, BCBSM had disclosed that it was going to charge $460,698, in Disputed Fees in 2004 (stipulated in Joint Final Pre-Trial Order), then it would have been the most expensive bidder at ***$965,766***, with the next lowest cost bidder at $532,192.  (*Id.*)

**H.    2003-2007:  BCBSM DEBATES WHETHER TO DISCLOSE THE DISPUTED FEES FOR FIVE YEARS AND THEN DECIDES NOT TO**

120.    Starting around 2003, a few BCBSM executives raised concerns about the lack of disclosure surrounding Disputed Fees, which according to former BCBSM Regional Sales Manager Paula Brawdy, led to an internal debate about what to do. (Brawdy Test.).

121.    This debate was sparked by the City of Grand Rapids in 2004, which discovered the Disputed Fees and demanded disclosure.  BCBSM ultimately developed Schedule A language that disclosed Disputed Fees in detail for the City, but refused to include this disclosure in other contracts.  (PTE 512; Brawdy Test.).

122.    A snapshot of this debate was captured in a 2004 email from Michael O'Neil to Ms. Garofali.  Mr. O'Neil explained, "If we want to counter that perception [that we hide fees] and retain our credibility, we must be willing to disclose all our fees and stand behind them."  (PTE 513).

123.    Ms. Brawdy explained that she favored disclosing the amount of the Disputed Fees, but Mr. Austin and the new business sales staff did not want to do so because the Administrative Fees would be too high and BCBSM could not compete. (Brawdy Test.).  This was because self-funded customers were focused on their fixed costs, namely the amount of the Administrative Fee. (*Id.*)

124.    Ultimately, BCBSM rejected Ms. Brawdy's position.

125.    BCBSM's true intentions are shown by the evolution of a proposed renewal exhibit that starts with a numeric disclosure of the Disputed Fees and is watered down over time to the point where all line items for Disputed Fees and any monetary reference are removed.  (PTE 508-510).

126.    BCBSM senior underwriter, Ken Krisan, was in charge of the strategy for "disclosing" the Disputed Fees without customers noticing.  Mr. Krisan's emails confirm that actual disclosure of the Disputed Fees was not BCBSM's intent:

- "I think there is a need [to] ***downplay*** this [Disputed Fees] with respect to the outside world … [corporate communications] may be helpful in

28

developing some internal training materials or job aids that puts the proper 'spin' on what we want to say."  (PTE 538: 2007 Email to Greg Mays) (emphasis added).

- "We want to keep this a little on the **understated** side so we don't want to include this in any mass communications.  ***In many cases this is not going to [be] good news.***"  (PTE 540: 2007 Email to Kathleen McNeill) (emphasis added).

- In referring to the "Talking Points" memo, "because we want to **downplay** the release of this information, it was decided that Agents and Customers should not receive any written materials."  (PTE 543: 2007 Email to Kathleen McNeill) (emphasis added).

- "The Access Fee portion of the discussion is intended to be **downplayed** to the customer. … There is no plan to provide anything to customers or agents on this topic." (PTE 546: 2007 Email to Karen Butterfield) (emphasis added).

- "We want to stay away from identifying what is in the fee." (PTE 550: 2007 Email to Kathleen McNeill)

131.   On August 21, 2007, Ms. Ham presented the 2006 annual settlement to Hi-Lex representatives John Flack, Mitch Freeman, and Liza Walling.  (Ham Test.; DTE 1189).  Ms. Ham presented the 2006 "Value of Blue" pie chart and pointed out to Mr. Flack a portion entitled "Access Fee," as well as the notation at the bottom of the chart showing the Disputed Fees as a percentage of total cost. (Ham Test.; JTE 17).

29

132.   The Value of Blue charts were only provided at the time of annual settlement.  This is significant because annual settlement occurs approximately six months after a plan year closes.

**I.**   **2006-2007:  BCBSM'S OWN INVESTIGATION CONCLUDED THAT HI-LEX (AND MOST OTHER CUSTOMERS) DID NOT KNOW ABOUT THE DISPUTED FEES**

133.   In connection with the anticipated release of the Value of Blue, BCBSM undertook an investigation to determine which customers would be surprised to learn that they had paid the Disputed Fees the year before.  (PTE 524-527).

134.   The investigations resulted in detailed spreadsheets that identified whether BCBSM's customers, or their brokers, knew about the Disputed Fees.  (*Id.*)

135.   Hi-Lex is identified in at least four different spreadsheets, the latest of which was from December 14, 2007.  Each one indicates that Hi-Lex did not know about the Disputed Fees.  (PTE 527).  They also indicated that Hi-Lex could not have been informed about the Disputed Fees through a broker because Hi-Lex did not have a broker.  (*Id.*)

136.   The results of BCBSM's formal investigation were consistent with anecdotal accounts from BCBSM employees:

- "The [Value of Blue] report will identify the ASC Access Fee which for most groups is something new." (PTE 542: 2007 Ken Krisan Email).

- "[N]ot all ASC groups are aware of BCBSM's Retention Reallocation Policy."  (PTE 544: 2007 Kenneth Bluhm Email).

- "I know many of the smaller [groups] aren't aware [of access fees]."  (PTE 532: 2007 James Bobak Email).

- "I agree that there is overwhelming confusion on access fees internally (and externally)."  (PTE 537: 2009 Christine Farah Email).

- "[I]t is not certain [some accounts] were aware of the access fees when entering into the arrangement."  (PTE 536: 2010 Ken Krisan Email).

**J.    THE MISLEADING CONTRACT DOCUMENTS DID NOT DISCLOSE THE DISPUTED FEES**

137.   BCBSM has not produced an ASC signed before 2002, nor did it offer any evidence that such an ASC would have contained any language that would have allowed it to charge the Disputed Fees.

### 1.    The Schedule As Are Misleading

138.   The parties stipulated that the 1994 Schedule A to the ASC would have been the same as the 1994 Borroughs Corporation ("Borroughs") Schedule A.  (JTE 77 at ¶ 2).  That Schedule A does not contain language related to Disputed Fees.  (JTE 64).

139.   The parties stipulated that the 1995-2000 and 2002 Schedule As would have been the same as the Borroughs Schedule As for the same years. (JTE 77 at ¶ 2). The Borroughs Schedule As contain a single sentence on the second page that reads: "Your hospital claims cost reflects certain charges for provider network access, contingency, and other subsidies as appropriate."  (JTE 65-70).

140.   This sentence is false and misleading, and did not disclose the Disputed Fees:

- The Schedule As have a heading entitled "Administrative Charge."  It was under this heading that BCBSM's administrative compensation was to be disclosed.  Hi-Lex expected all fees paid to BCBSM to be included in this

31

section of the Schedule As. The Disputed Fees were "administrative compensation", (PTE 581), and were not noted under "Administrative Charge."

- The sentence omits the critical fact--that Plaintiffs would pay these fees as additional administrative compensation to BCBSM. Just the opposite, the language stated that the identified items would be "reflected" in the "hospital claims cost." "Hospital claims cost" is the cost paid **to** hospitals for services rendered. Thus, the "disclosure" represented that the amounts "ordered by the Insurance Commissioner" would be ***paid to*** the hospitals. In reality, the fees were ***not*** included in the claims paid to the hospitals – they were additional administrative compensation ***retained by BCBSM***.

141. BCBSM recognized that its contracts were confusing and that its "customers probably don't completely understand the Access Fees." (PTE 516: 2004 Jack Gray Email) .

### 2.    The 2002 ASC Was Misleading

142. BCBSM did change the ASC language in 2002, but it, too, was misleading:

> The Provider Network Fee, contingency, and any cost transfer subsidies or sur-charges ordered by the State Insurance Commissioner as authorized pursuant to 1980 P.A. 350 will be reflected in the hospital claims cost contained in Amounts Billed.

143. The ASC contains a heading called "Financial Responsibilities," under which it says the customer will "pay BCBSM the total of the following amounts…." The "following amounts" are then identified in a ***numbered list*** of specific obligations (*e.g.*,

32

administrative fees, late fees, and interest). **Not one of the nine enumerated obligations includes Plaintiffs paying Disputed Fees**. By not including Disputed Fees in the enumerated list of financial obligations of the customer, BCBSM effectively represented that the Hidden Fees were NOT something to be paid by the customer to BCBSM. (Burgoon Deposition at 36:12-37:17) (emphasis added).

144.    The "disclosure" represented the fees as "ordered by the State Insurance Commissioner." This was a misrepresentation in three respects: (1) it is untrue; the Insurance Commissioner never ordered any BCBSM customers to pay these fees,[1] nor would the Insurance Commissioner have had that authority in the first place;[2] (2) by characterizing the fees as something "ordered" by state government, BCBSM represented that these were NOT any kind of compensation for it, but rather some kind of fee imposed by the State. As it turned out, these Disputed Fees were kept by

---

[1] BCBSM offered a 1992 Order of the Michigan Insurance Commissioner as its only evidence of this alleged obligation. (DTE 1002). But the Order contains no such requirement. On the contrary, in the Order, the Insurance Commissioner advised BCBSM to *pursue collection* of any *contractually agreed-upon* payments to meet the OTG Subsidy. (*Id.* ¶¶ 106 – 108). Nothing in that Order tells BCBSM that it must collect an OTG Subsidy Fee, in what amount it should collect the Fee, or from whom it should collect the Fee. Further, this alleged obligation rings hollow, as BCBSM did not uniformly levy or collect OTG Subsidy Fees from its customers. (Garofali Test.) (Trust Funds were not charged OTG). Moreover, there was no contractual agreement to pay OTG.

[2] Any such order by the Insurance Commissioner would have been preempted by ERISA. ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a); *see also Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 97 (1983); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990). That includes state laws that "(1) mandate employee benefit structures or their administration . . . or (3) bind employer or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself." *Briscoe v. Fine*, 444 F.3d 478, 497 (6th Cir. 2006). Such an order by the Insurance Commissioner, regulating BCBSM's ERISA customers, would fall into both of these categories.

BCBSM as additional administrative compensation, (*Id.* at 39:22-40:22); and (3) BCBSM recently disavowed any claim that it was ordered to collect the OTG subsidy from Plaintiffs in a brief to the Sixth Circuit.  *See Response in Opposition to Leave to File Amicus Brief, Pipefitters Local 636 v. BCBSM*, No. 12-2265, Doc. 6111635985, at 15-17 (6th Cir. March 27, 2013).

145.    This language also refers to "Amounts Billed."  "Amounts Billed" is defined as "the amount the Group owes in accordance with BCBSM's standard operating procedures **for payment of Enrollees' claims**."  (JTE 1 at 1) (emphasis added).  The definition of "Amounts Billed" does not include fees paid to BCBSM.

146.    The ASC, at Art. IV, B1 "Scheduled Payments," identifies seven payments to be made pursuant to the Schedule A.  None of the seven includes the Disputed Fees. Further, by itemizing payments "listed in Schedule A," BCBSM represented that there were no other payments, and consequently, Plaintiffs would not have understood the language in the Schedule A to refer to more Administrative Fees.

K.    PLAINTIFFS LACKED KNOWLEDGE OF THE DISPUTED FEES UNTIL 2007

147.    BCBSM alleges that Plaintiffs were told about BCBSM's plan to charge the Disputed Fees in a meeting between former BCBSM account manager, Ron Crofoot, and former Hi-Lex CFO, Tony Schultz, in 1994.  Mr. Crofoot's account of his conversation with Mr. Schultz cannot be believed for several reasons:

- The entire point of the Disputed Fees, according to BCBSM's own internal memo, was to obtain additional administrative compensation without customers knowing or, in BCBSM's own words--to charge fees that were "no longer visible to the customer."  Since BCBSM just established a plan

to charge hidden fees, it stretches credulity to think BCBSM would then tell its customers about that plan.

- BCBSM acknowledged that charging the Disputed Fees required a change in the ASC.  Mr. Crofoot does not allege any amendments or modifications to the ASC were ever discussed, and testified at trial that he "did not have a lot of detail [about the Disputed Fees], frankly."  (Crofoot Test.).  If Mr. Crofoot had actually explained the Disputed Fees as a change to the way BCBSM was compensated, a conversation about contract terms would necessarily have followed.

- Mr. Crofoot carried a pre-printed form with him to confirm he had a conversation with Mr. Schultz.  The existence of this form suggests BCBSM knew it may need "cover" sometime in the future about whether it verbally disclosed the Disputed Fees.  That creates a strong inference that BCBSM knew what it was doing was subject to disagreement or challenge at some point in the future; if the fees were fully disclosed and agreed to as BCBSM contends, then there would have been no concern about future disagreements.  Indeed, Cindy Garofali testified that she never saw anything like these forms in her 10 years before the Disputed Fees, and never in the 20 years since.  (Garofali Test.).

- The timing of the alleged meeting is suspect.  BCBSM began charging Hi-Lex the Disputed Fees on May 1, 1994. (SF 6).  The 1994 Schedule A did not contain language related to the Disputed Fees.  (JTE 64, 77).  The alleged meeting with Mr. Crofoot did not happen until August 1994.  This

four month gap demonstrates that BCBSM intended to obtain the Disputed

Fees without Plaintiffs' consent.

- Mr. Schultz denies that the Disputed Fees were explained to him.

    (Testimony of Tony Schultz ("Schultz Test.")).  Mr. Schultz testified that he

    is a detail-oriented person and focused on the financial aspects of the

    Plan.  (*Id.*)  Mr. Schultz says he would never have agreed to the Disputed

    Fees and, in fact, would have objected to them.  He also would have

    required that the Disputed Fees be memorialized in a contract

    amendment.

148.    Even if Mr. Crofoot's testimony is accepted at face value, he apparently

represented to Mr. Schultz that the "new pricing arrangement" would be "revenue

neutral."  That was false.  According to Mr. Austin the whole point of "Retention

Reallocation" was to get BCBSM out of financial trouble (i.e., more revenue).  (Austin

Test.).

149.    BCBSM does not allege any further mention of the Disputed Fees by its

representatives until almost ten years later--in 2003.  BCBSM alleges that Hi-Lex was

told about the Disputed Fees in 2003.  The evidence does not support BCBSM:

- Plaintiffs' consultant, Marsh, raised a question about paragraph 11 of the

    Schedule A.  Marsh's inquiry, buried in a single paragraph of a six-page

    memo (which itself was one of at least three other exhibits), was

    forwarded to BCBSM.  BCBSM's reaction to the email revealed its great

    concern over discovery of Disputed Fees and potential disclosure by

    Marsh to other consultants and customers.  There is no evidence that

36

BCBSM ever disclosed the Disputed Fees in response to these email inquiries. (Paragraphs 84-94; JTE 86).

- Shortly after this above email exchange, Plaintiffs issued a formal RFP to BCBSM that asked for disclosure of any "network access/management fees." BCBSM responded by indicating there were none.  This response was interpreted by Marsh to mean Access Fees, if any, were included in the disclosed Administrative Fee.  BCBSM's response was false and misled both Plaintiffs and their consultant, Marsh. (Paragraphs 108-119; JTE 97 at 093).

### 1.    Plaintiffs Exercised Due Diligence Until 2007

150.    Mr. Welsh carefully reviewed all financial reports from BCBSM and included the financial data in a master spreadsheet.  (Welsh Deposition at 203:18-204:15).  None of those reports gave any indication that claims included administrative fees paid to BCBSM.  (Winkler Deposition at 45:6-25).

151.    Hi-Lex hired a consultant, Marsh, to review its plan.  When Marsh raised a question about paragraph 11, Mr. Welsh diligently followed up with BCBSM, only to never get a response. (Welsh Deposition at 165:7-166:14; JTE 86).

152.    Shortly thereafter, Hi-Lex, through Marsh, issued an RFP that expressly asked whether BCBSM charged Disputed Fees.  (JTE 97).  BCBSM answered "N/A." (PTE 505).   Hi-Lex's expert interpreted BCBSM's response to mean there were no Disputed Fees in addition to the disclosed Administrative Fee.  (PTE 507).  Hi-Lex was reasonable in relying on its expert.

153.    When John Flack took over as CFO, he continued his predecessors' practices of carefully reviewing all financial reports provided by BCBSM.  (Flack Test.).

He also continued keeping the master spreadsheet of every single claim handled by

BCBSM.  (*Id.*)  Again, none of these reports indicated there was a problem.

154.   When John Flack took over as CFO, he had no reason to question the

long-standing relationship between Hi-Lex and BCBSM.  Hi-Lex had already asked

about Disputed Fees through the RFP and had been told they were not applicable.  The

contract documents remained identical for several years, giving Mr. Flack no reason to

question BCBSM.

> **a.   Plaintiffs Did Not Have a Broker During Any Relevant Time Period**

155.   From 1994 until 2003, it is undisputed that Plaintiffs did not have an

insurance broker or "agent of record."  In 2003, Hi-Lex retained Marsh to conduct a

health benefit review.  (PTE 503).  This was a limited scope project and Hi-Lex did not

retain Marsh to be its "agent of record."  (Warren Test.).

> **2.   <u>A Hypothetically Diligent Company Would Not Have Discovered the Disputed Fees until 2007.</u>**

156.   Even if the Court concluded that Plaintiffs were not diligent--despite having

carefully and fully reviewed every financial report from BCBSM--that does not end the

inquiry.  The question remains whether a reasonably diligent company in Hi-Lex's

position would have discovered that BCBSM was taking a greater Administrative Fee

than it reported, more than six years before Plaintiffs filed suit:

- No one could tell from the monthly claims reports, quarterly reports, annual settlements and Form 5500 certifications that BCBSM kept part of the money reported as claims for itself.  (Winkler Deposition at 45:6-25).

38

- Mr. Flack was fully justified in not reading the boilerplate of the Schedule As, given the longstanding relationship between the parties and his understanding of the program based on his own historic involvement. Even if he had read the contracts, it would not have made a difference:

  a) The contract documents are misleading.  (Part III, Section J).

  b) BCBSM's own account manager, Sandy Ham, read and signed numerous Schedule As over a six year period (1999 to 2005) and testified she did not understand anything about the Disputed Fees (including their existence).  (Part III, Section E; Ham Test.).  If BCBSM's trained account managers-- charged with explaining the Schedule As to Hi-Lex-- did not understand the contracts, then a "reasonably diligent" CFO could not be expected to understand them to authorize the Disputed Fees.

  c) Not only did BCBSM's own employees not understand the contracts; neither did any of the six brokers who testified at trial.  As noted more fully below, all brokers (each with years of experience dealing with BCBSM self-funded customers), testified that they had no understanding of these fees until around 2007/2008

(or in some cases after that).   A "reasonably diligent"
CFO cannot be expected to understand the contracts
better than industry experts.

**L.** **WITH THE EXERCISE OF DUE DILIGENCE, PLAINTIFFS SHOULD HAVE BEEN ON SUFFICIENT NOTICE OF THE DISPUTED FEES IN 2007, THROUGH THE VALUE OF BLUE CHART**

157.   Beginning in 2007, BCBSM produced yearly Value of Blue charts.  [JTE 17-22].

158.   In June, 2007, Plaintiffs received a 2006 annual settlement from Blue Cross that included the new "Value of Blue" report.  This report disclosed the precise dollar amount of Disputed Fees paid in 2006.  (JTE 18 at 2304).

159.   The Value of Blue pie chart was developed in response to customer requests that BCBSM report the precise dollar amount of Disputed Fees.  (Krisan Test.). The pie chart format was selected to show the customer the relationship between what it paid and the savings it received, hence the title "Value of Blue."  (*Id.*)  It took several years to finalize the Value of Blue format after a decision was made to develop such a report.  (*Id.*)

160.   Sales staff received training on the Value of Blue report in 2005.  (*Id.*; DTE 1015 at 259, 1010).

161.   On August 21, 2007, Ms. Ham presented the 2006 annual settlement to Hi-Lex representatives John Flack, Mitch Freeman, and Liza Walling.  (Ham Test.; DTE 1189).  Ms. Ham specifically recalled presenting at that meeting the parts of the 2006 Value of Blue pie chart in a clockwise direction, and that she pointed out to Mr. Flack the portion entitled "Access Fee," as well as the notation at the bottom of the chart showing the Disputed Fees as a percentage of total cost. (Ham Test.; JTE 17).

40

162.    This Value of the Blue chart disclosed the precise amount of Disputed Fees paid in 2006. (JTE 17; SF 7).

163.    Mr. Flack explained that he did not read the Value of Blue pie charts because they were "pictorial graphs."  (Flack Test.).

164.    No one at Blue Cross ever told Mr. Flack not to read the Value of Blue pie charts.  To the contrary, Sandy Ham presented each and every page of the renewal packets to Mr. Flack and testified that she walked him through each "slice" on the Value of Blue pie charts.  (Ham Test.).

165.    Mr. Flack testified that if he had read the Disputed Fee disclosure in the renewal packets, (JTE 58–63), projections disclosures, and the Schedule A disclosures, he would have been "aware" of the Disputed Fee pricing arrangement and would have "asked questions" and "taken action" in response to those disclosures.  (Flack Test.).

166.    The Value of Blue chart was a sufficient change from other documents and an adequate disclosure of the Disputed Fees that BCBSM was charging.  But, it only disclosed the fees for the prior year and is irrelevant to notice of Disputed Fees charged prior to 2006.

167.    BCBSM has provided Value of Blue charts to Plaintiffs continuously since 2007.

**M.    PLAINTIFFS ARE ENTITLED TO DAMAGES**

168.    Plaintiffs are entitled to restitution in the amount of all Disputed Fees paid, beginning in 1994 to 2011.

169.    The parties have stipulated that the Disputed Fees charged by BCBSM to Plaintiffs from 2002 – 2011 were **$4,035,134**.  (SF 7).

41

170.    BCBSM has not produced any data to establish what the Disputed Fees were for years 1994 through 2001.

171.    Plaintiffs' damages expert, Neil Steinkamp, calculated estimated Disputed Fees using claims data and other documents provided by BCBSM or otherwise historically maintained by Hi-Lex.  Using this data and Disputed Fee factors provided by BCBSM, Mr. Steinkamp estimates the Disputed Fees for years 1994 through 2001 to be $1,076,297.  The estimates provided by Mr. Steinkamp are the result of reliable principles and methods and were accurately calculated.  BCBSM failed to offer contrary evidence or otherwise dispute Mr. Steinkamp's estimates.  Accordingly, the Court accepts Mr. Steinkamp's estimate of **$1,076,297** as a fair, reasonable, and accurate approximation of the Disputed Fees for 1994 through 2001.  (PTE 582).

172.    Plaintiffs are entitled to total damages in the amount of **$5,111,431**.

173.    Plaintiffs are entitled to recovery of prejudgment interest, to compensate them fully for the loss of the Disputed Fees. Prejudgment interest shall be calculated pursuant to the rate under 28 U.S.C. § 1961.

174.    Plaintiffs are entitled to post-judgment interest, calculated under 28 U.S.C. § 1961.

## III.    CONCLUSIONS OF LAW

### A.    BCBSM IS AN ERISA FIDUCIARY
### (PREVIOUSLY DECIDED IN 9/7/2012 SUMMARY JUDGMENT ORDER)

175.    ERISA provides that a third-party administrator of an employee benefit plan is a fiduciary when it exercises any authority or control over the disposition of plan assets:

"[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting

42

> management of such plan **or exercises any authority or control respecting management or disposition of its assets**, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

Summary Judgment Order [Doc. 112] at 10 (quoting 29 U.S.C. § 1002(21)(A) (emphasis added).

176.    Thus, under § 1002(21)(A), "any person or entity that exercises control over the assets of an ERISA-covered plan, **including third-party administrators**, acquires fiduciary status with regard to the control of those assets."  *Briscoe v. Fine*, 444 F.3d 478, 494 (6th Cir. 2006) (emphasis added).

177.    "The Sixth Circuit employs a 'functional test' to determine fiduciary status." Summary Judgment Order, at 10 (citing *Briscoe*, 444 F.3d at 486).

178.    "The relevant question is 'whether an entity is a fiduciary with respect to the particular activity in question.'"  *Id.* (quoting *Guyan Int'l Inc. v. Prof'l Benefits Adm'rs, Inc.*, 689 F.3d 793, 797 (6th Cir. 2012).

179.    "The Sixth Circuit holds that a third-party administrator such as Blue Cross 'becomes an ERISA fiduciary when it exercises 'practical control over an ERISA plan's money.'"  *Id.* (quoting *Guyan*, 689 F.3d at 798).

180.    Funds deposited by an employer with a third-party administrator of a self-funded employee benefits plan are "plan assets" under ERISA.  Summary Judgment Order, at 17 (citing *Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mutual of Ohio*, 982 F.2d 1031 (6th Cir. 1993) and *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618,  626 (6th Cir. 2011); *see also Briscoe*, 444 F.3d 478.

181.   "BCBSM was a fiduciary when it allocated the Disputed Fee from plan assets itself.  By accepting regular deposits from Plaintiffs for the purpose of paying health claims, Blue Cross exercised 'practical control over an ERISA plan's money.'" Summary Judgment Order, at 12 (citing *Guyan*, 689 F.3d at 798).

182.   BCBSM was also a fiduciary because it exercised discretion over Plaintiff's Plan Assets when it determined the amount of any fees it would allocate to itself. Summary Judgment Order, at 14; *see also Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189, 197 (D. Mass. 2008).

## B.   BCBSM VIOLATED ITS FIDUCIARY OBLIGATIONS (COUNT I)

183.   "ERISA is a 'comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans.'"  Summary Judgment Order, at 9 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)).

184.   It was "designed to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.'"  *Akers v. Palmer*, 71 F.3d 226, 229 (6th Cir. 1995) (quoting 29 U.S.C. § 1001(b)).

185.   ERISA accomplishes its purposes by imposing "strict fiduciary standards of care in the administration of all aspects of pension plans and promotion of the best interests of participants and beneficiaries.'"  *Id.* at 229 (quoting *Berlin*, 858 F.2d at 1162).

186.   Indeed, "the crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and . . . ERISA was designed to

44

prevent these abuses in the future." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985).

187.   "Fiduciaries are assigned a number of detailed duties and responsibilities, which include 'the proper management, administration, and investment of plan assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest.'" *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251-52 (1993) (quoting *Mass. Mut. Life Ins.*, 473 U.S. at 142-43 and citing 29 U.S.C. § 1104(a)).

188.   "Clearly, the duties charged to an ERISA fiduciary are 'the highest known to the law.'" *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)); *see also* Summary Judgment Order, at 9.

189.   ERISA fiduciaries owe the Plan, the participants, and beneficiaries an undivided duty of loyalty under 29 U.S.C. § 1104(a)(1).

190.   The duty "requires that 'all decisions regarding an ERISA plan must be made with an eye single to the interests of the participants and beneficiaries.'" *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999) (quoting *Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1162 (6th Cir. 1988)).

191.   It encompasses a number of obligations, including the duty to avoid giving "misleading or inaccurate information," *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996), and to "inform when the trustee knows that its silence might be harmful," *Krohn*, 173 F.3d at 551.

45

192.    "[A] fiduciary may not materially mislead those to whom the duties of

loyalty and prudence . . . are owed."  *Berlin*, 858 F.2d at 1163; *see also Varity*, 516 U.S.

at 506 ("lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified

in [Section 1104(a)(1)] of ERISA").

193.    A fiduciary breaches its duty of loyalty by providing misleading information

regarding the costs of its services.  *Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833,

844 (6th Cir. 2003); *Frulla v. CRA Holdings, Inc.*, 596 F. Supp. 2d 275, 284-86 (D.

Conn. 2009).

194.    An ERISA fiduciary has a duty under § 1104(a)(1) to disclose information

to the principal about its compensation.  *See Krohn*, 173 F.3d at 547 ("The duty to

inform . . . entails . . . an affirmative duty to inform when the trustee knows that silence

might be harmful.").

195.    BCBSM violated its duty under § 1104(a)(1) to avoid supplying the

Plaintiffs with misleading or inaccurate information about its administration of the self-

funded ERISA plans. It did this by supplying false and misleading information to

Plaintiffs about the nature and extent of the Disputed Fees.  *Gregg*, 343 F.3d at 844;

*Berlin*, 858 F.2d at 1163; *Frulla*, 596 F. Supp. 2d at 284-86.

196.    BCBSM also violated its fiduciary duty under § 1104(a)(1) to disclose

information to the Plaintiffs about its compensation, which necessarily included

information about the Disputed Fees,  even if Hi-Lex did not make a specific request for

information.  *See Krohn*, 173 F.3d at 547.

197.    BCBSM knew that Plaintiffs were required to file Form 5500s to the

Department of Labor, and BCBSM was required under ERISA to provide the necessary

information to Plaintiffs, so that Plaintiffs could supply accurate information to the DOL.

29 U.S.C. §§ 1021, 1023; 29 C.F.R. § 2520.103-4; 29 C.F.R. § 2520.103-5.

198.    BCBSM violated its fiduciary duty under ERISA by supplying false

information in Form 5500s to Plaintiffs.  *See Frulla*, 596 F. Supp. 2d at 288.

### C.    BCBSM VIOLATED ERISA'S PROHIBITION OF SELF-DEALING (COUNT II) (*PREVIOUSLY DECIDED IN 9/7/2012 SUMMARY JUDGMENT ORDER*)

199.    A third-party administrator engages in self-dealing when it marks up

insurance premiums when charging expenses to an ERISA plan.  Summary Judgment

Order, at 20 (citing *Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (9th Cir. 2001)).

200.    A fiduciary also engages in self-dealing by "determin[ing] his own

administrative fees and collect[ing] them himself from the Plan's funds, in violation of §

1106(b)(1)."  *Patelco*, 262 F.3d at 911; *see also* Summary Judgment Order, at 20.

201.    BCBSM determined its own administrative fees by acting unilaterally with

respect to the Disputed Fee; this type of self-dealing is a *per se* breach of Section

1106(b)(1).  *See* Summary Judgment Order, at 21.

### D.    PLAINTIFFS TIMELY FILED THEIR ERISA CLAIMS (STATUTE OF LIMITATIONS)

202.    The statute of limitations for ERISA claims under § 1104(a) and § 1106(b)

is set forth in 29 U.S.C. § 1113:

**§ 1113. Limitation of actions**

> No action may be commenced under this subchapter with respect
> to a fiduciary's breach of any responsibility, duty, or obligation under this
> part, or with respect to a violation of this part, after the earlier of—
>> (1) six years after (A) the date of the last action which
>> constituted a part of the breach or violation, or (B) in the case of an
>> omission the latest date on which the fiduciary could have cured the
>> breach or violation, or
>> (2) three years after the earliest date on which the plaintiff
>> had actual knowledge of the breach or violation;

*except that in the case of fraud <u>or</u> concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.*

29 U.S.C. § 1113 (emphasis added).

203.    Under § 1113, if the case involves "fraud or concealment," then the limitations periods set forth in Subsections 1 and 2 will not apply.  In that case, the limitations period is "six years after the date of discovery of such breach or violation." *Id.*

### 1.    Neither The Standard Six-Year Limitations Period Nor The Three-Year Limitations Period for "Actual Knowledge" Applies

204.    A claim for a fiduciary breach or violation as claimed here will be time barred upon the earlier expiration of two alternative time periods.  One period expires six years from the last act constituting a part of the breach or violation; the other is for a period of three years from the earliest date on which the Plaintiff had actual knowledge of the breach or violation.  29 U.S.C. §1113.

205.    That a claim is time barred under 29 USC §1113 is an affirmative defense; BCBSM raises it and has the burden of proof.  *Blanton* v. *Anzalone*, 760 F.2d 989, 991-92 (9th Cir. 1985).

206.    BCBSM does not argue that the "standard" six year statute of limitations is in play here, only to say that "Even under a six year limitations period; Plaintiffs' claims were time barred in either 2000 or 2009."  (Defendant's Proposed Conclusions of Law, ¶ 8).  Hence, the Court focuses on BCBSM's actual knowledge argument.

207.    In interpreting and applying § 1113, courts refer to the broad remedial purposes of ERISA; they express the view that "A fiduciary who violates the trust placed in him by the plan will not easily find protection from a time bar."  *Useden v. Acker*, 734

F. Supp 978, 979-80 (S.D. Fla 1989), 947 F.2d 1563 (11th Cir. 1991), cert. denied, 508 U.S. 959 (1993).

208.    In keeping with the broad remedial purpose of ERISA, the standard six year limitations period provides potential litigants with a long period of time from commission of a breach or violation, in which to file suit.  However, to prevent litigants from unreasonably delaying the filing of suit once they have knowledge of the facts underlying their claims, §1113 provides that a fiduciary claim will be time barred if it is not filed within three years after Plaintiff has actual knowledge of the breach or violation, even if the six year period has yet to expire.  29 U.S.C. §1113(2).

209.    As outlined above, the preponderance of the evidence shows that Hi-Lex:

(1)    Did not have actual knowledge of the breach or violation until **August 21, 2007**, when the Value of Blue chart was presented by Ms. Ham to Hi-Lex representatives.  So-called disclosures made by Mr. Crofoot in 1994 did not give Plaintiff's actual knowledge of Disputed fees. Nor did the audit and RFP process in 2003.

(2)    So-called disclosures made in the 2002 ASC, 1995 through 2008 Schedule As, and the renewal packages for 2006 through 2008, did not unambiguously disclose the Disputed Fees.

210.    The relevant "actual knowledge" "required to trigger the statute of limitations under 29 USC §1113(2) is knowledge of the facts or transaction that constituted the alleged violations; it is not necessary that the Plaintiff also have actual knowledge that the facts establish a cognizable legal claim under ERISA in order to

2:11-cv-12557-VAR-PJK   Doc # 246   Filed 05/23/13   Pg 50 of 63   Pg ID 15459

trigger the running of the statute." *Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003); *Bishop v. Lucent Techs, Inc.*, 520 F.3d 516, 519-20 (6th Cir. 2008).

211.    While the failure to read plan documents will not shield Plaintiffs from actual knowledge of the documents terms, *Brown v. Owens Corning Inv. Review Comm.*, 622 F.3d 564, 571 (6th Cir. 2010), the documents that BCBSM say Plaintiffs should have read and which would have given them so called actual knowledge, failed to set forth Disputed Fees as an Administrative Fee, or in a manner which would have caused Plaintiffs to question the Disputed Fees.  Further, the documents BCBSM relies upon do not clearly set forth the essential facts of the transaction or conduct which constitutes BCBSM's breach of duty. BCBSM's breach was supplying false, misleading, and inaccurate information to Plaintiffs about the nature and extent Disputed Fees, (s*ee* Part IV, Sections B and C). The manner in which the contract documents were written did not disclose all material facts necessary to understand that BCBS breached its duty or otherwise violated the statute.

212.    As the Eleventh Circuit held and the Sixth Circuit recognized, it is not enough that an ERISA Plaintiff "notice that something was awry; he must have had knowledge of the actual breach of duty upon which he sues."  *Brock v. Nellis*, 809 F.2d 753 (11th Cir.), cert. dismissed, 483 U.S. 1057 (1987); *see Rogers v. Millan*, 902 F.2d 34 (6th Cir. 1990).

213.    Based on the foregoing, the Court finds that BCBSM failed to meet its burden to prove that Plaintiffs gained actual knowledge of the Disputed Fees in 1994, 2002, 2003, or from 1995 up to August 21, 2007.

2. **The Six-Year Discovery Rule for "Fraud or Concealment" Applies and Allows Plaintiffs to Recover Damages From 1994 Through 2011**

a. **The applicable standard for the application of "Fraud or Concealment" is an open question in the Sixth Circuit**

214. Under ERISA § 1113, neither the expiration of six years from the last act constituting a fiduciary breach or violation, nor three years from actual knowledge of the breach or violation, will bar a claim where fraud or concealment is proven.   29 U.S.C. § 1113.

215. In the case of fraud or concealment, § 1113 gives a plaintiff six years after the date of discovery of the breach to file suit.  *Id.*

216. Accordingly, Hi-Lex can preserve any claims that might otherwise be time barred under the normal three year limitations period, if it can show that BCBS engaged in conduct that constitutes fraud or concealment.

217. In a claim of breach of fiduciary duty based on fraud or concealment, the Circuits are not unanimous on what the elements are for such a cause of action; there are two approaches on this issue.

218. First, various Circuits hold that the "fraud or concealment" language cannot be read literally, and that the cause of action incorporates the federal concealment rule, or the "fraudulent concealment" doctrine.

219. The concealment rule was established by the Supreme Court in *Bailey v Glover*, 88 U.S. 342 (1874). It grew from equitable estoppel principles, and provides that when a defendant's wrongdoing "has been concealed, or is of such character as to conceal itself, the statute [of limitations] does not begin to run" until the plaintiff discovers the wrongful acts. *See id.* at 349-50.

51

220.    Thus, to invoke the "fraud or concealment" limitations period, the Circuits that rely upon the concealment rule require that a plaintiff--in addition to alleging a breach of fiduciary duty (based on fraud or anything else)--must prove that the defendant committed either: (1) a self-concealing act, i.e., an act that has the effect of concealing the breach from the Plaintiff; (or) "active concealment"--an act distinct from and subsequent to breach, intended to conceal it. *See Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1552 (3d Cir.1996); *J. Geils Band Employee Benefit Plan v. Smith Barney*, 76 F.3d 1245, 1252 (1st Cir. 1996); *Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1401–02 (9th Cir. 1995); *Larson v. Northrop Corp.*, 21 F.3d 1164, 1172–1173 (D.C. Cir. 1994); *Radiology Ctr. v. Stifel Nicolaus & Co.*, 919 F.2d 1216, 1220 (7th Cir. 1990); *Schaefer v. Arkansas Med. Soc'y*, 853 F.2d 1487, 1491–1492 (8th Cir. 1988).

221.    A different approach in applying the "fraud or concealment" limitations period has been articulated in *Caputo v. Pfizer*, 267 F.3d 181 (2d Cir. 2001). It does not require a plaintiff to prove fraudulent concealment. The Second Circuit declined to follow its sister Circuits on this issue, holding that "[t]he six-year statute of limitations should be applied to cases in which a fiduciary:  (1) breached its duty by making a knowing misrepresentation or omission of a material fact to induce [a plaintiff] to act to his detriment; *or* (2) engaged in acts to hinder the discovery of a breach of fiduciary duty." *Id.* at 190 (emphasis in original).

222.    *Caputo* breaks from the other Circuits for three reasons.

a.    "[T]he genesis of this uniformly adopted theory is a footnote in a district court opinion that cites no legal support for the proposition."

*Id.* at 189 (explaining that "The First, Third, Seventh, Ninth, and D.C. Circuits all cite the Eighth Circuit decision in *Schaefer*, 853 F.2d at 1491–1492, which, in turn, relied on *Foltz v. U.S. News & World Report, Inc.*, 663 F.Supp. 1494, 1537 n. 66 (D.D.C.1987) (noting that 'any claim under ERISA § 502(a)(3) may [ ... ] be tolled under the fraudulent concealment doctrine incorporated in section 413, 29 U.S.C. § 1113.')").

b.    "[T]he 'fraud or concealment' provision does not 'toll' the otherwise applicable six-or three-year statute of limitations established in § 413(1) or (2); rather, it prescribes a separate statute of limitations of six years from the date of discovery."  *Id.*

c.    "[P]rinciples of statutory interpretation counsel strongly against merging" the terms "fraud" and "concealment," and each term should be given "independent significance" pursuant to their definitions and the provision's legislative history. *See id.* at 189-90.

223.    BCBSM argues that the Court should follow the First, Third, Seventh, Eighth, Ninth, and D.C. Circuits, and directs the Court to *Larson v. Northrop*, 21 F.3d 1164 (D.C. Cir. 1994), which held that that a plaintiff invoking the special fraud limitations period must prove that the defendant engaged in actual, fraudulent concealment.  *See id.* at 1172-74.

224.    In addition, BCBSM claims that this Court is bound to apply the majority of the Circuits' approach because *Brown v. Owens Corning Inv. Review Committee*, 622

F.3d 564 (6th Circuit 2010)--a Sixth Circuit case--allegedly mandates it because *Brown*
quoted *Larson*.

225.    The language to which BCBSM directs the Court's attention in *Brown* is:
"ERISA's fraud exception to the statute of limitations 'requires the plaintiffs to show (1)
that defendants engaged in a course of conduct designed to conceal evidence of their
alleged wrong-doing and that (2) [the plaintiffs] were not on actual or constructive notice
of that evidence, (3) despite their exercise of diligence."  *Brown*, 622 F.3d at 573
(quoting *Larson*, 21 F.3d at 1172) (alteration in original).

226.    However, a more recent Sixth Circuit case, *Cataldo v. U.S. Steel Corp.*,
676 F.3d 542 (6th Cir. 2012), held that "whether a six-year limitations period applies in
instances where the claim is based upon fraud and there are no allegations of separate
conduct undertaken by the fiduciary to hide the fraud is an open question" in the Sixth
Circuit.  *Id.*at 550.

227.    *Cataldo* held that *Brown* was dictum to the extent that it purported "to set
forth the entire set of circumstances in which [the six year statute of limitations] can
apply." *Cataldo* stated this because it believed the Sixth Circuit did not have to consider-
-for the ultimate holding in *Brown*--"whether a claim of fraud, by itself, would be subject
to the six-year period because plaintiffs never pressed such a claim; they claimed . . .
*non-fraudulent* breach of fiduciary duty."  *Id.* at 550-51.

228.    *Cataldo* went on to find the *Caputo* approach persuasive. *Id.* ("[T]he
Second Circuit has provided a persuasive contrary interpretation." (citing *Caputo* 267
F.3d at 188-190)). However, the *Cataldo* court did not pronounce it as Sixth Circuit
authority because it was not necessary to the holding in *Cataldo*; the court found that

the plaintiffs failed to plead fraud sufficiently, and concluded that any discussion on that issue would have been dictum. *Cataldo*, 676 F.3d at 550-51 ("[W]e assume, but do not decide, that a claim of fiduciary fraud not involving separate acts of concealment is subject to a six-year limitations period that begins to run when the plaintiff discovered or with due diligence should have discovered the fraud.").

229.   Accordingly, neither *Brown* nor *Cataldo* binds this Court on the applicable statute of limitations.

230.   The Court concludes that--pursuant to *Cataldo*--if the Sixth Circuit adopted a standard on this issue, it would follow the *Caputo* approach for the same reasons that *Caputo* rejected its sister Circuits' approach: (1) "fraud" and "concealment" are used in the disjunctive in the statute; (2) the "fraud or concealment" provision has its own statute of limitations running from the date of discovery, and is not intended to toll another statute of limitations; and (3) the majority of Circuits relied upon a district court decision which erroneously merged the term "fraud" and "concealment" to require an ERISA plaintiff to prove "fraudulent concealment" in a breach of duty claim before the plaintiff could reap the benefit of the longer statute of limitations.

231.   In addition, several judges in this district have either used the *Caputo* standard for analyzing the fraud or concealment exception in § 1113 or cited it with approval. *See, e.g., East Jordan Plastics, Inc. v. Blue Cross & Blue Shield of Mich.*, No. 12-cv-15621, Dkt. No. 27, at Page ID 937 (E.D. Mich. May 3, 2013) (applying *Caputo*); *McGuire v. Metro. Life Ins. Co.*, 899 F. Supp. 2d 645, 659 (E.D. Mich. 2012) (citing *Caputo* with approval).

232.   Nonetheless, the Court finds that whether the burden on Plaintiffs is to prove simple "fraud" or "fraudulent concealment" is of no moment; Plaintiffs satisfy their burden under either *Caputo* or the various other Circuits.

> **b.   Plaintiffs Prove BCBSM Engaged in Fraudulent Conduct**

233.   *Caputo* allows the application of the "fraud or concealment" limitations period under § 1113 when, in relevant part, a defendant: "(1) breached its duty by making a knowing misrepresentation or omission of a material fact to induce [a plaintiff] to act to his detriment."  267 F.3d at 190.

234.   Furthermore, under *Frulla v. CRA Holdings Inc.*, 596 F. Supp. 2d 275 (D. Conn. 2009), a plan administrator is guilty of fraud under § 1113 if it made "knowing omissions of material facts" that "misled plan participants" into believing facts that were not true. *Id.* at 288.  *Frulla* involved ERISA claims under § 1104(a) that "in the course of administering the Plan . . ., defendants engaged in actions that violated their fiduciary duties, failed to disclose material information to Plan participants, and concealed material information from them." *Id.* at 278.

235.   The Court finds the rule in *Caputo* and the holding in *Frulla* applicable to whether BCBSM engaged in fraud for the purpose of § 1113.

236.   Plaintiffs prove that BCBSM engaged in knowing misrepresentations and omissions of Disputed Fees in the contract documents, which misled Plaintiffs into thinking that the disclosed Administrative Fees were the only compensation that BCBSM retained.  (*See* Part III, Sections D - J).

237.   To comply with the particularity requirement of Federal Rule of Civil Procedure 9(b), "[w]ith regard to misrepresentations, a plaintiff must identify the time, place, speaker, and content of the alleged misrepresentations."  *Frulla*, 596 F. Supp. 2d

at 288 (citing *Caputo*, 267 F.3d at 191). "With regard to omissions, a plaintiff must detail

the omissions made, state the person responsible for the failure to speak, provide the

context in which the omissions were made, and explain how the omissions deceived the

plaintiff." *Id.* (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,

375 F.3d 168, 187 (2d Cir. 2004)). Plaintiffs met these requirements at trial, and

BCBSM waived the particularity requirements under Rule 9(b). (*See* Paragraph 238).

238.    BCBSM argues that Plaintiffs did not sufficiently plead fraud (or fraudulent

concealment) under Rule 9(b), and should be foreclosed from trying these issues now.

This argument is unavailing. BCBSM's main defense at trial was based on an absence

of fraud. "When an issue not raised by the pleadings is tried by the parties' express or

implied consent, it must be treated in all respects as if raised in the pleadings. A party

may move--at any time, even after judgment--to amend the pleadings to conform them

to the evidence and to raise an unpleaded issue. But failure to amend does not affect

the result of the trial of that issue." Fed. R. Civ. P. 15(b)(2).

239.    "When a 'discovery rule' [such as that in § 113] applies, the statute of

limitations begins to run from the date on which the plaintiff discovers, or with due

diligence reasonably should have discovered, that he has suffered an injury." *Frulla*,

596 F. Supp. 2d at 289; *see Caputo*, 267 F.3d at 190 ("[T]he final version of the statute

adopted a six-year term and a discovery rule (i.e., the limitations period begins to run

when the employee discovers or with due diligence should have discovered the breach).

. . .").

240.    When "discovery" is used in a statute, courts typically interpret the word to

refer not only to actual discovery, but also to the hypothetical discovery of facts a

57

reasonably diligent plaintiff would know.  *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 130 S. Ct. 1784, 1794 (2010).

241.   Plaintiffs did not discover BCBSM's fraud until August 21, 2007.  (*See* Part III, Section K).

242.   Plaintiffs did not discover BCBSM's fraud until August 21, 2007, through their own exercise of due diligence.  Importantly, a hypothetical diligent company would not have discovered BCBSM's fraud until August 21, 2007.  (*See* Part III, Section K).

243.   Accordingly, Plaintiffs had until August 21, 2013 to file their suit. Their claims are timely, and they are entitled to damages from 1994 through 2011.

### c.   Plaintiffs Prove BCBSM Engaged in Fraudulent Concealment

244.   To rely on the "fraud or concealment" limitations period under *Larson*, Plaintiffs must show: (1) that BCBSM engaged in a course of conduct designed to conceal evidence of their alleged wrong-doing and that (2) Plaintiffs were not on actual or constructive notice of that evidence, despite (3) their exercise of diligence.  *Larson*, 21 F.3d at 1172.

245.   Under *Larson*, Plaintiffs must--in addition to proving a breach of fiduciary duty based on a failure to disclose--show that BCBSM engaged in a "course of conduct designed to conceal evidence of [BCBSM's] wrongdoing."  *Id.* at 1172.  "'There must be actual concealment—i.e., some trick or contrivance intended to exclude suspicion and prevent inquiry.'"  *Id.* at 1173 (quoting *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1095 (7th Cir.1992)).

58

246.   Plaintiffs prove that BCBSM actively concealed their knowing misrepresentations and omissions in the contract documents in order to allay Plaintiffs' suspicion and prevent inquiry into Disputed Fees.  (*See* Part III, Sections D - J).

247.   Plaintiffs were not on actual or constructive notice of the evidence of BCBSM's wrongdoing until August 21, 2007. (*See* Part III, Section K).

248.    Plaintiffs exercised due diligence until August 21, 2007.  (*See* Part III, Section K).

249.   Accordingly, Plaintiffs had until August 21, 2013 to file their suit. Their claims are timely, and they are entitled to damages from 1994 through 2011.

**E.   BCBSM CANNOT ESTABLISH A STATUTE OF LIMITATIONS DEFENSE BASED ON ALLEGED IMPUTED KNOWLEDGE FROM MARSH**

**1.   BCBSM may not seek to impute knowledge in order to shield its ERISA violations.**

250.   The Court has found "that agency law is applicable in the context of ERISA, and adopt[ed] the imputed knowledge doctrine and its exception."  (April 19, 2013 Order on Motions in Limine (Doc No. 235) ("Order on Motions in Limine")).

251.   Thus, "[t]he rule imputing an agent's knowledge to the principal is designed to protect only those who exercise good faith, and is not intended to serve as a shield for unfair dealing by the third person."  *Id.* (quoting 3 Am. Jur. 2d Agency § 284); *see also, e.g.*, *First Ala. Bank v. First State Ins. Co.*, 899 F.2d 1045, 1060 n.8 (11th Cir. 1990) (acknowledging the "universally accepted" rule); *Mut. Life Ins. Co. v. Hilton-Green*, 241 U.S. 613, 623 (1916) ("The rule [of imputation] is intended to protect those who exercise good faith, and not as a shield for unfair dealing"); *Armstrong v. Ashley*, 204 U.S. 272, 283 (1907) (explaining that the rule of imputation applied because defendants did not have any connection with the agents' frauds); *Bass v.*

59

*Equitable Life Assurance Soc'y of the U.S.*, 72 F. App'x 401, 404 (6th Cir. Aug. 13, 2003).

252.   "The Court interprets this doctrine to require the party invoking it to have acted in good faith."  (Order on Motions in Limine).

253.   "Defendant [BCBSM] has the burden to prove imputed knowledge and that it acted in good faith."  (*Id.*)

254.   Dave Mamuscia, who was not a subagent working with Hi-Lex in 2003, never testified at trial.  There is no evidence as to what he knew about the Disputed Fees in 2003.

255.   Accordingly, no knowledge regarding the Disputed Fees can be imputed to Hi-Lex.

256.   BCBSM violated ERISA's prohibition against self-dealing and also breached its fiduciary duties.  It also engaged in fraud and concealment to hide its violations from Plaintiffs.  BCBSM exhibited bad faith that precludes imputation for the purpose of its statute of limitations defense or otherwise.

F.   **PLAINTIFFS ARE ENTITLED TO A RETURN OF THE DISPUTED FEES, WITH INTEREST**

257.   Under ERISA:

[a] fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate . . . .

29 U.S.C. § 1109.

1.   **Damages**

60

258.    "Section 1109, in turn, makes any person found to be a fiduciary personally liable to the ERISA-covered plan for any damages caused by that person's breach of fiduciary duties." *Briscoe*, 444 F.3d at 486.

259.    "[I]n measuring a loss, the burden of persuasion should be placed on the breaching fiduciary." *Sec'y of the U.S. Dep't of Labor v. Gilley*, 290 F.3d 827, 830 (6th Cir. 2002).

260.    Further, "to the extent that there is any ambiguity in determining the amount of loss in an ERISA action, the uncertainty should be resolved against the breaching fiduciary." *Id.*

261.    The Court accepts the well-founded damage opinions set forth in Mr. Steinkamp's expert report (PTE 582 and 587) and awards the Plaintiffs the full amount of Disputed Fees, **$5,111,431**, pursuant to 29 U.S.C. § 1109.

## 2.    Prejudgment Interest

262.    There is no fixed interest rate for prejudgment interest under ERISA. Rather "the determination of the pre-judgment interest rate [is] within the sound discretion of the district court." *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998).

263.    BCBSM offered no testimony – expert or otherwise – on this issue.  Its critiques of Mr. Steinkamp's expert opinion (DTE 1240) fall flat in light of John Flack's testimony that BCBSM's attorneys' summary exhibit (DTE 1240) is entirely incorrect. Flack Test.

264.    The goal of the district court in setting the rate should be to adhere to "ERISA's remedial goal of simply *placing the plaintiff in the position he or she would have occupied but for the defendant's wrongdoing*."  *Id.* at 618 (emphasis added).

265.    Prejudgment interest should "compensate a beneficiary for the lost interest value of money wrongfully withheld from him or her."  *Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 985 (6th Cir. 2000) (quoting *Ford*, 154 F.3d at 618).

266.    "An award that fails to make the plaintiff whole due to an inadequate compensation for her lost use of money frustrates the purpose of ERISA's remedial scheme."  *Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, --- F.3d ----, 2013 WL 1235624, at *8 (6th Cir. Mar. 28, 2013) (published, pagination forthcoming).

267.    The Sixth Circuit has cited with approval, decisions that utilize expert testimony in determining the appropriate prejudgment interest rate under ERISA. *Rybarczyk*, 235 F.3d at 986 (citing *Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir. 1984)).

268.    Equity requires that Plaintiffs be awarded prejudgment interest dating back to the date the Disputed Fees were kept by BCBSM.  *See Ford*, 154 F.3d at 618 ("awards at pre-judgment interest . . . compensate a beneficiary for the lost interest value of money wrongfully withheld from him or her"); *Bricklayers' Pension Trust Fund v. Taiariol*, 671 F.2d 988 (6th Cir. 1982) (awarding interest to ERISA-plan plaintiff).

269.    Plaintiffs' damages expert, Neil Steinkamp, testified as to the interest rate which he believes would place Plaintiffs in the position they would have been in, had BCBSM not taken the Disputed Fees.  (Steinkamp Test.)  The Court does not accept the interest rate set forth in Mr. Steinkamp's expert report.

270.    The Court applies the interest rate under 28 U.S.C. § 1961, and awards Plaintiffs prejudgment interest under § 1967.

### 3.    Post-judgment Interest

271.    The Court awards Plaintiffs post judgment interest according to 28 U.S.C. § 1961.

### 4.    Attorney Fees

272.    The Court will entertain a petition for Attorney Fees.

## IV.    CONCLUSION

These are the Findings of Fact and Conclusions of Law.  Judgment enters in the amount of **$5,111,431**, together with costs, interest, and attorney fees.


**IT IS ORDERED.**



s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  May 23, 2013

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on May 23, 2013.

s/Linda Vertriest
Deputy Clerk

63