```
                 UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
                     SOUTHERN DIVISION


HI-LEX CONTROLS INCORPORATED,
HI-LEX CORPORATION,

                  Plaintiffs.

     v.                         Case No. 11-12557
                                Detroit, Michigan

BLUE CROSS BLUE SHIELD OF
MICHIGAN,


                  Defendant.

_____/

               TRANSCRIPT OF TRIAL - VOLUME 2

        BEFORE THE HONORABLE VICTORIA A. ROBERTS
               United States District Judge
               Wednesday, April 24, 2013


APPEARANCES:

For the Plaintiffs:      Perrin Rynders
                         Aaron M. Phelps
                         Stephen MacGuidwin

For the Defendant:       Thomas VanDusen
                         G. Christopher Bernard
                         Rebecca D'Arcy O'Reilly


To Obtain a Certified Transcript:
Carol S. Sapala, RMR, FCRR
313.961.7552
www.transcriptorders.com




               Hi-Lex v Blue Cross 11-12557
```

C O N T E N T S

_____

IDENTIFICATION                                    PAGE

WITNESSES

DAVID YOUNG (Deposition Read)                      18


PAULA BRAWDY

Direct Examination by Mr. MacGuidan                21
Examination by The Court                           37
Direct Examination by MR. MacGuidan (cont.)        43
Examination by The Court                           59
Cross Examination by Ms. O'Reilly                  60
Redirect Examination by Mr. MacGuidan             108


WALTER MARTYNIEK (Deposition Read)                112


Certificate of Court Reporter                     112

Bench Trial 4-24-2013  Volume 2

E X H I B I T S

_____

| IDENTIFICATION | MARKED | RECEIVED |
|---|---|---|
| Joint Exhibit 511 | | 56 |
| 2004 email from Darryl Newsone | | |
| to Paula Brawdy | | |
| | | |
| Joint Exhibit 512 | | 32 |
| Email to Paula Brawdy from | | |
| Jack Gray | | |

Bench Trial 4-24-2013  Volume 2

1       Detroit, Michigan

2       Wednesday April 24, 2013

3       9:04 a.m.

4       THE LAW CLERK:  The Court calls the case of Hi-Lex versus

5  Blue Cross-Blue Shield of Michigan.  Case number 11-12557.

6       Counsel, state your name for the record.

7       MR. PHELPS:  Aaron Phelps, here with Perrin Rynders for

8  the plaintiffs.

9       MR. VAN DUSEN:  Good morning, Your Honor.  Thomas Van

10  Dusen along with Chris Bernard and Rebecca O'Reilly on behalf

11  of defendants.

12       THE COURT:  Good morning, everyone.  We're starting today

13  with?

14       MR. PHELPS:  We have the deposition we propose to read of

15  Dave Young.

16       MR. BERNARD:  One housekeeping matter about exhibits.

17       THE COURT:  Yes?

18       MR. BERNARD:  Your Honor, yesterday there was a motion

19  granted to move the admission of the joint exhibits.

20       And we looked back at that, realized there was a

21  controversy involving one of the stipulations or the

22  stipulation within there and one small piece of it.  It deals

23  with a 1994 form of a Schedule A.

24       THE COURT:  Yes.

25       MR. BERNARD:  In close review, we realize that was not

Bench Trial 4-24-2013  Volume 2

1    correct to stipulate that the '94 Form that was part of that

2    stipulation was the form that would have been used in the

3    Hi-Lex case.

4          THE COURT:  So you're removing one of the joint

5    stipulations?

6          MR. BERNARD:  We're requesting, Your Honor, Joint Exhibit

7    Number 64 be removed from the joint to go to plaintiff's side.

8          We do not object to authenticity.  We would reserve any,

9    I'm sorry, objections, based on relevance and anything else

10   depending on how the exhibit will be used for the witness.

11         THE COURT:  As it stands now, you're proposing that Joint

12   64 move to the plaintiff's list.

13         And it is currently not in as an exhibit?

14         MR. BERNARD:  That's my request, Your Honor.

15         THE COURT:  Yes.

16         MR. PHELPS:  Your Honor, we oppose that.  It's a little

17   bit more complicated.

18         About six or seven months ago, the parties were trying to

19   figure out what to do about these older documents, where they

20   were missing documents.

21         The parties, over probably a six to seven month period,

22   negotiated a separate stipulation and that stipulation was to

23   resolve this very issue about what did documents back in the

24   1990's say, what did they look like.

25         In fact, we'd asked for discovery on exemplars that they

Bench Trial 4-24-2013   Volume 2

1  may have had that the contents of those documents.  This

2  stipulation was a way to resolve that.

3       And so Joint Exhibit, I believe it's 77, is a signed

4  stipulation of counsel of the parties as to the contents of

5  the missing contract and settlement documents.

6       So the parties, through it's Joint Exhibit 77, have

7  already stipulated that the 1994 Hi-Lex Schedule A would have

8  been the same as a 1994 Borroughs Schedule A.  That was also

9  made, as I just said, a joint exhibit, the stipulation itself.

10      And then, of course, the Borroughs 94 Schedule A was also

11 made a joint exhibit as just indicated.

12      I might add that this 94 Borroughs Schedule A is

13 something that they attach to their motion for summary

14 judgment.

15      So we not only had a stipulation that we signed back in

16 March as to what the contents were of these missing documents,

17 that's a stipulation they've already used in the case.  And

18 they've submitted to the Court the '94 Borrough's as

19 representative of the '94 Hi-Lex.

20      THE COURT:  So the '94 Borrough's is Joint Exhibit 64?

21      MR. BERNARD:  It is, Your Honor.  If I --

22      THE COURT:  Okay.  What I want to do, counsel, I need to

23 look at your stipulation on Number 77.

24      Is this pertinent to the depositions we're reading this

25 morning?

Bench Trial 4-24-2013   Volume 2

1       MR. PHELPS:  It is not.

2       MR. BERNARD:  It is not, Your Honor.

3       THE COURT:  Let me look at your Joint 77 and this one and

4   anything else you think I need to look at to resolve it.

5       MR. BERNARD:  I think, Your Honor, we need to double

6   check that exhibit on the summary judgment motion.  I think

7   were used the 95 Schedule A not the 94.  It's not part of the

8   stipulation that we have an issue with.  It's just the '94.

9       We have raised this a couple weeks ago.  It wasn't

10  resolved by the conference.  Lot of things were going on.

11      We do want to also advise the Court that there is a form

12  that is in evidence for that time period and we'd be able to

13  have testimony about what that form looked like, what it was

14  and the -- for the relevant time period.

15      THE COURT:  Okay.  So you all will give me what I need to

16  resolve this or point out to me other than -- do I need to

17  look at anything other than Joint 77 and --

18      MR. BERNARD:  You can look at the actual Exhibit 64.

19      THE COURT:  64, yeah.

20      MR. BERNARD:  The form we're talking about Joint Exhibit

21  80 which was part of the exhibit yesterday, there was a

22  Schedule A in there which is the one that would be correct.

23      THE COURT:  And so defendant would propose that I look at

24  the Form Schedule A that is attached to Joint 80 rather than

25  what was deemed Joint 64?

Bench Trial 4-24-2013  Volume 2

1      MR. BERNARD:  As part of the background of why we have a

2  dispute, Your Honor, why the stipulation is just wrong.

3      THE COURT:  Okay.

4      MR. PHELPS:  We would we, of course, refer the Court to

5  the 77 stipulation.

6      And I might add, the Joint Final Pretrial Order where

7  there are, in the stipulated facts of that order, there is

8  reference made to the stipulation on missing exhibits.

9      So this has actually been stipulated to two times and

10  it's also been made an order of the Court.

11      THE COURT:  All right.  All right.  Thank you.

12      All right.  We're ready.  Who's Mr. Young?

13      MR. PHELPS:  Your Honor, Kyle Kowinski, an associate with

14  our office, he's volunteered to read the Dave Young testimony.

15      THE COURT:  Good morning.

16      THE WITNESS:  Good morning.

17      MR. BERNARD:  I thought we were going to read these from

18  counsel tables, then go back and forth as they came the

19  designation counter designation?

20      THE COURT:  Well, then who was reading the Mr. Young

21  part?

22      MR. BERNARD:  Well, Mr. Young is designated in two ways;

23  he's designated and counter-designated by both parties.

24      What we anticipated was that the plaintiff's designations

25  would be read by plaintiff.

Bench Trial 4-24-2013  Volume 2

1      Any objections would be posed by defendant.

2      And then when we got to a portion of the transcript that

3  became the counter designation or the designation of

4  defendant, we'd reverse roles.

5      So we'll just read the transcript in order and hit the

6  designations as we came to them.

7      MR. PHELPS:  Obviously, that wasn't -- our understanding

8  is that we would have somebody read for everybody like a real

9  witness, then we would -- I would read my questions, he would

10  read his questions.  But it's one person.  They're just

11  reading from the transcripts.

12      I don't want to read --

13      THE COURT:  Well, let's start with a witness here and see

14  how it goes if it's not working right --

15      MR. BERNARD:  All right.  So he's responsible then for

16  reading all of the designations.

17      MR. PHELPS:  Right.

18      THE COURT:  Yes.

19      MR. PHELPS:  Yes.

20      (Whereupon the witness was then sworn)

21      MR. PHELPS:  Your Honor, mechanically, we've given the

22  Court -- I believe everybody has a copy of the transcript and

23  the yellow portions are what we have offered to read.

24      And the blue portions are what Blue-Cross has offered to

25  read.

Hi-Lex v Blue Cross 11-12557

Bench Trial 4-24-2013  Volume 2

1      The green portions represent something we

2  counter-designated only as a result of what their designations

3  were.  So I suppose we'll read that too, if the blue is

4  allowed in.

5      Along the way, if we -- either side has an objection,

6  we'll make the objection as we're reading the testimony and

7  the Court can deal with it at that time.

8      To the extent they're, they're exhibits, we have

9  cross-referenced those to the actual trial exhibit number.

10      So it may be Dep Exhibit 50, for example, but we will say

11  Trial Exhibit 30.

12      And we've got a list we can provide the Court reporter so

13  she'll know which exhibits go with which portion of the

14  testimony; although I don't have any for this particular one,

15  but going forward they'll be trial exhibits.

16      We've, also -- the Dave Young testimony rather abruptly

17  just starts with the substantive pieces of the testimony

18  without much of an introduction as to who he is in the

19  transcript.

20      So Mr. Young signed a three-sentence affidavit.  They've

21  had a copy.  I don't know if they have an objection.  But that

22  can just be read so the Court knows initially exactly who he

23  is and where he worked.

24      THE COURT:  Okay.  What is it?  Why don't you just read

25  it in the record.

Bench Trial 4-24-2013   Volume 2

1        MR. PHELPS:  Okay.

2        My name is Dave Young and I currently work

3        for Lighthouse Insurance Group.

4        I previously worked at Shoreline Insurance

5        beginning in 1997 as an agent and I worked

6        there until September 2006.

7        In my capacity at Shoreline Insurance, I was

8        an agent of record for several companies that

9        had self-funded health benefit plans.

10       I specifically assisted some of those clients

11       in deciding whether to hire Blue Cross-Blue

12       Shield of Michigan as a third-party

13       administrator for their health benefit plans.

14       That's the introductory material to his deposition.

15       THE COURT:  All right.  Thank you.

16       MR. PHELPS:  Your Honor, I -- we have the Dave Young

17  testimony.  My quick count this morning is that we had around

18  10 pages designated.  They've designated around 60 pages.

19       We've objected to the vast majority of that on relevance

20  grounds.  I'm inclined to allow that to be read for some

21  period of time.  And I assume the Court won't be shy about

22  letting us know if whether that's helpful or not.

23       But at some point I make a relevance objection, but I'm

24  inclined to let this move along as quickly as possible.

25       THE COURT:  Tell me would you put on the record, please,

Bench Trial 4-24-2013  Volume 2

1   what your relevancy objection is a general one to most of what

2   they've designated, correct?

3        MR. PHELPS:  That's correct.

4        THE COURT:  What is it?

5        MR. PHELPS:  Dave Young had been offered for a limited

6   purpose.  He is to testify about conversation he had with Blue

7   Cross representatives about the existence or nonexistence of

8   the Access Fees in 2003.

9        We've offered it under Rule 404 to establish a common

10  scheme or plan.  That's the sum total of the relevance of his

11  testimony for this case.

12       He also happens to be an agent for another plaintiff in

13  another case.  And so they naturally and permissibly asked him

14  all kinds of questions about his involvement with that client,

15  what he knew or didn't know from that relationship, when he

16  eventually discovered the Access Fees which I think he said

17  was around 2008 or 2009 or thereabouts.

18       None of that has anything to do with this case.  It

19  doesn't prove whether high Hi-Lex knew or didn't know

20  anything.

21       And it certainly has nothing to do with his testimony

22  about -- that we've offered, which is what Blue Cross told him

23  when he asked about the Access Fees.

24       THE COURT:  And in 2003 you're asking what conversations

25  in Blue Cross in 2003?

Hi-Lex v Blue Cross 11-12557

Bench Trial 4-24-2013   Volume 2

1        MR. PHELPS:  Correct.

2        THE COURT:  Who was he working for then?

3        MR. PHELPS:  Shoreline Insurance.

4        THE COURT:  What is the relationship between Shoreline

5    Insurance and Hi-Lex?

6        MR. PHELPS:  There is no relationship.

7        THE COURT:  All right.

8        MR. PHELPS:  I said 2003.  The testimony may be '01-'02.

9    It's in that time period.

10       THE COURT:  So he had discussed with Blue Cross-Blue

11   Shield about the same thing at issue here --

12       MR. PHELPS:  Yes.

13       THE COURT:  -- but on behalf of his client Shoreline

14   Insurance.

15       MR. PHELPS:  On behalf of his client -- he worked for

16   Shoreline Insurance.  That was the company he worked for.  His

17   client was another entity.  It may have been -- one of the

18   other plaintiffs in one of the other cases.

19       THE COURT:  All right.  Response?

20       MR. BERNARD:  Your Honor, with respect to the other

21   testimony that we've designated there, it does show there was

22   knowledge in the marketplace, knowledge by Mr. Young and

23   others about the Access Fees and Blue Cross's practice of

24   charging them.  He also had particular knowledge with Eagle

25   Allow.

Hi-Lex v Blue Cross 11-12557

Bench Trial 4-24-2013   Volume 2

1        THE COURT:  He also had what?

2        MR. BERNARD:  He had particular knowledge of the Eagle

3    Allow client he was working with, Your Honor.  I'm sorry

4    Whitehall.

5        We have -- we've counter-designated this.  If indeed the

6    evidence comes in -- and just for the record we understand the

7    Court's ruling on our motion *in limine* regarding this and

8    whether there was relevance, whether there was the ability to

9    bring this in under some sort common scheme on the hearsay

10   exception, we believe that if that evidence is in to show a

11   common scheme to conceal, that means there's an opening of the

12   door to present evidence that there was knowledge outside of

13   this one particular incident and tends to show there was not a

14   common scheme and that there was not under the Access Fees.

15       So that's the purpose of most of the designations we

16   have.

17       THE COURT:  So what's wrong with that?

18       MR. PHELPS:  Well, the testimony will go well beyond,

19   first of all --

20       THE COURT:  So do you concede that testimony about this

21   is agreeable?

22       MR. PHELPS:  No.

23       Testimony about Mr. Young's knowledge of the Access Fee

24   in 2008 or '09 I don't believe is relevant.

25       Many of the questions relate to his interpretation of

Hi-Lex v Blue Cross 11-12557

Bench Trial 4-24-2013   Volume 2

1   documents from 2007 or 2008 and that may be relevant to what

2   he knew or understood later in time, it may be relevant to

3   those clients he represented, but it's not relevant to whether

4   Blue Cross misrepresented the Access Fee in 2001 or 2003.

5       Now as I said --

6       THE COURT:  Isn't there an allegation that it continued

7   to be misrepresented until you discovered in 2011?

8       MR. PHELPS:  It did to our client, yes.

9       THE COURT:  So why doesn't what happened between 2001 and

10  2011 become relevant?

11      MR. PHELPS:  I don't think it's relevant to us, to

12  Hi-Lex, because he didn't tell us anything.

13      THE COURT:  Did he tell Hi-Lex something back in --

14      MR. PHELPS:  He did not.  It shows they had a common plan

15  at that time.

16      If they want to offer testimony that eventually -- we're

17  not disputing that some people figured this out in 2008 or

18  2009 there was litigation with Oakland County.

19      The fact that that happened, that it became public

20  because of that litigation to some people, of course, but

21  Hi-Lex didn't know about that.  They'll be testimony about

22  that I'm sure as the week progresses.

23      We just don't think whether Dave Young figured something

24  out in 2008 or nine tends to prove anything relevant to this

25  case.  But...

Hi-Lex v Blue Cross 11-12557

Bench Trial 4-24-2013   Volume 2

1       THE COURT:  So, Mr. Bernard, excuse me.

2       Is Blue Cross in some way trying impute whatever

3   knowledge Mr. Young had in 2008 and 2009 to Hi-Lex?

4       MR. BERNARD:  No, Your Honor, it's not just 2008.

5       They're allegations about conversations regarding access

6   fees well before that in '04, anywhere after this 2001

7   incident leading up to 2008.

8       We don't see -- we're not attempting to show imputation

9   of knowledge through Mr. Young.

10      We're attempting to rebut the notion that there was a

11  scheme to conceal Access Fees by showing that there was

12  knowledge outside of whatever was told to him and any other

13  instances and any other customer relationships throughout the

14  period of time that's discussed in this deposition and that's

15  not limited to '07-08.

16      THE COURT:  But doesn't that, somehow, if you're

17  attempting to rebut -- Mr. Phelps, in offering Mr. Young's

18  testimony to show a common scheme to, to defraud or hide,

19  that's what you want to do.

20      MR. PHELPS:  Exactly.

21      THE COURT:  Blue Cross wants to show that it was sort of

22  public about this information.  That's what you want to do?

23      MR. BERNARD:  Yes, Your Honor, we do.

24      THE COURT:  So what's wrong with that?

25      MR. PHELPS:  To be perfectly frank, this is more of an

Hi-Lex v Blue Cross 11-12557

Bench Trial 4-24-2013   Volume 2

1   effort to save time.  We had 60 pages; if you want to us to

2   read it all, I can read it all.

3        THE COURT:  I would love to save time, but I don't want

4   to do that at the expense of keeping out evidence that should

5   come in.

6        But so if you want, you want to present a witness here

7   who had no connection to your client to show that there was a

8   scheme to conceal, why shouldn't Blue Cross be able to present

9   a witness, no connection to your client, to show that

10  everything was on the up and up?

11       MR. PHELPS:  Let's read it.  Let's, let it in and we'll

12  proceed that way.

13       I've read the testimony several times.  I don't mind the

14  Court reading it and hearing it.  I found it to be irrelevant.

15  If they insist that that be read and the Court is willing to

16  indulge that, we'll read it.

17       THE COURT:  So going forward then I just want to know how

18  you're going to do your objections.

19       A general relevancy objection to the nature of his

20  testimony, I don't accept that.

21       MR. PHELPS:  Okay.

22       THE COURT:  So can I say that you've got a continuation

23  objection on that or do you want to preserve your particular

24  objections and have me rule still?

25       MR. PHELPS:  I think I would be happy with the continuing

David Young - Deposition Read 4-24-2013 Vol. 2

1   objection to the relevance.

2        If I come to a point that's particularly highly

3   irrelevant and I can raise that specifically with the Court.

4        But, obviously, if the Court's finding the testimony

5   useful and relevant, let's just read it and get it over with.

6        THE COURT:  As a general principle, I don't see why they

7   shouldn't be able to present the reverse on what you're trying

8   to show through this witness.

9        MR. PHELPS:  That's fine.  I think there's a very

10  significant distinction in time as to what they were doing in

11  the early 2000 period in telling people and then what they

12  might have told people once the litigation came out and if

13  people knew about it and asked about the litigation and that.

14       So to me there is a fairly significant difference between

15  the relevance of what they knew or how they were acting during

16  different time periods.  But by all means, we'll read it in,

17  see what Mr. Young had to say.

18       THE COURT:  All right.  Thank you.

19       (Whereupon the deposition of David Young

20       was then read into the record)

21       MR. PHELPS:  Your Honor, I'm going to make an objection

22  at this point.  I think we're going to get into a whole series

23  of testimony about the contract documents between him and his

24  client, Eagle Alloy, his understanding of those contracts.

25       And for the reasons I said before, I don't think that's

David Young - Deposition Read 4-24-2013 Vol. 2

1    relevant to the purpose for which we offer his testimony or

2    the purpose for which they read most of this to establish

3    there wasn't a common scheme or plan.

4        MR. BERNARD:  Your Honor, in response to that, first of

5    all, we're talking about a proposal package that is the

6    standard format.

7        Also the contract documents and the language acknowledge

8    that the information that it passes onto is certainly part of

9    our case, that there was to the scheme to conceal.

10       So any witness's testimony about those documents and what

11   they red what they understood or not we think is relevant to

12   the question of whether there is a common scheme to conceal.

13       THE COURT:  This -- I'm sorry.  This renewal package that

14   you're about to ask about, is it similar to a renewal package

15   for Hi-Lex?

16       MR. BERNARD:  It is, Your Honor.

17       THE COURT:  Mr. Phelps?

18       MR. PHELPS:  Well --

19       MR. BERNARD:  If I may, this is our Defendant's Exhibit

20   1132 to 1136 are the documents that are being discussed here

21   in this deposition, particularly the Proposal Defendant's

22   Exhibit 1132.

23       THE COURT:  All right.  So is somebody -- 1132 is the

24   renewal package for Eagle Alloy?

25       MR. BERNARD:  I'll open it up and take -- make sure.  It

David Young - Deposition Read 4-24-2013 Vol. 2

1   should be.  Yes, ma'am, it is.

2       THE COURT:  All right.  And you've got an identical

3   renewal package in here for Hi-Lex some place?

4       MR. BERNARD:  We have Hi-Lex renewal packages that are

5   similar in the joint exhibits, Your Honor.

6       THE COURT:  Somebody's going to testify about that?

7       MR. BERNARD:  Your Honor, the joint exhibit is already in

8   evidence and it is -- it's a matter of comparison.

9       There was testimony about the proposals from Mr. Austin

10  and the language that was found in those.

11      So as far as a matter of comparison, just looking at the

12  document itself, comparing it to the joint exhibit, it is a

13  similar item.

14      THE COURT:  Okay.  I'm not sure that this witness's

15  testimony about his understanding, his client's understanding

16  of this renewal package is relevant to what I need to decide.

17      I understand the testimony about the conversations and

18  representations about common scheme and attempt to rebut

19  common scheme, but this is different.  I'm going to sustain

20  this objection.

21      (Whereupon the reading of the deposition resumed)

22      MR. BERNARD:  Your Honor, this was a renewal proposal

23  we're about to read on page 120, information about a Schedule

24  A.

25      THE COURT:  You want me to go up to page 120 now?

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1      MR. BERNARD:  Yes. All right.

2      (Whereupon the deposition continued to be read)

3      MR. PHELPS:  Your Honor, same objection.

4      THE COURT:  Sustained.

5      MR. BERNARD:  If that's the case, I believe what we have

6   then is the end of the reading, Your Honor, because the

7   remainder of designation that Blue Cross had, had to do with

8   this Schedule A.

9      THE COURT:  All right then, thank you.  You may step

10  down, sir.

11               (The witness was excused

12               at 10:18 a.m. and the reading

13               of the deposition then concluded)

14     MR. MACGUIDEN:  Your Honor, plaintiff's next witness is

15  Paula Brawdy, a live witness.

16     THE COURT:  All right.

17

18     (Whereupon the witness was then sworn)

19

20               DIRECT EXAMINATION

21  BY MR. MACGUIDEN:

22  Q    Good morning, Miss Brawdy.

23  A    Good morning.

24  Q    Could you please state your full name for the record.

25  A    Paula Brawdy.

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1   Q    And Ms. Brawdy, who's your current employer?

2   A    Priority Health.

3   Q    What is your connection to Blue Cross and Blue Cross of

4   Michigan?

5   A    I worked at Blue Cross for about 25 years.

6   Q    And when did you work for Blue Cross?

7   A    1989 to 2007.

8   Q    And what was your position with Blue Cross during that

9   time?

10  A    It was all in sales from being account manager to being

11  manager of an office to the last probably 18 years I was

12  Regional Sales Director for West Michigan.

13  Q    And when did you start working as the Regional Sales

14  Director for West Michigan?

15  A    Early 90's.  Somewhere between '92 and '94, I moved into

16  the director position.

17  Q    And what did you do as the Regional Sales Director for

18  Blue Cross?

19  A    I managed four offices encompassing 41 counties in

20  Michigan.  So the sales team reported up through me.

21  Q    And you said you managed four offices.  Where were those

22  offices?

23  A    Traverse City, Grand Rapids, Muskegon, Holland and

24  Kalamazoo, which is actually five.

25  Q    This would have been all on the west side of the state in

Hi-Lex v Blue Cross 11-12557

 1  Northern Michigan?

 2  A     Yes.

 3  Q     And how many customers were you responsible for?

 4  A     Actual employer groups, it was in the 20,000, 25,000

 5  employer groups were in that territory.

 6  Q     So these were 20 to 25,000 Blue-Cross customers?

 7  A     Correct.

 8  Q     Were any of these customers self-insured customers?

 9  A     Yes.

10  Q     And do you know about how many were?

11  A     That was a minority of groups.

12        I would estimate maybe 30 to -- 30 to 40 range.

13  Q     And was -- Hi-Lex, the plaintiff in this case, was that

14  one of the companies that fell within your territory?

15  A     Yes.

16  Q     Now what did you do as the Regional Sales Director?

17        What were your job responsibilities?

18  A     Daily, I oversaw the offices, the strategic sales plan.

19        And, also, I was involved in large customer requests or

20  issues, business sales, the larger meetings and then a lot of

21  corporate meetings as well.

22  Q     What interaction, if any, did you have with clients in

23  your capacity?

24  A     I went out on occasion to accounts as the need arose.

25        Certain accounts I went out for depending on the size and

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

 1   issues.  Some quarterly meetings I attended regularly and

 2   other accounts I saw as the need arose.

 3       So given the, you know, the size of the territory, I went

 4   out, really, on more significant account issues.

 5   Q    Could you give an example of what would be a significant

 6   account issue?

 7   A    A dispute over renewal would probably be one of the more

 8   common things or, as I said, a new business group that we were

 9   involved in presenting proposals to.

10       Sometimes the quarterly settlement meetings if, you know,

11   there was difficulty, I would attend.

12   Q    And you mentioned that you were responsible for 20 to

13   25,000 customers.

14       You didn't manage all those on your own, did you?

15   A    No.  Each office had a manager, sales manager over that

16   office and they really oversaw the day to day operations and

17   routine things that happened, went out on account calls with

18   sales staff as well.

19   Q    How large was your sales staff?

20   A    The total West Michigan office that I ran was about 100

21   people.

22   Q    Now there's a few technical terms in this case I want to

23   make sure we're on the same page with.

24       Do you recall ever hearing the term "retention

25   reallocation" while you were with Blue Cross?

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1    A    Yes.

2    Q    What do you understand this term to mean?

3    A    Retention was another word for administrative fee and it

4    was part of the, the reallocation was moving the

5    administrative fee or the provider contracting and provider

6    servicing, that portion of that administrative fee was

7    reallocated to the claims.  So, basically, it was labeled

8    retention reallocation.

9    Q    And have you ever heard of the term ASC Access Fee?

10   A    Yes.

11   Q    Do you know what that is?

12   A    I really think of them -- you know, again, as the cost of

13   the provider side to have the business.

14   Q    Okay.  And you mentioned that part of reality location

15   was taking certain things out of the administrative fee.

16        Did I understand that right?

17   A    Yes.

18   Q    Why was this -- do you remember why this was done?

19   A    At the time a lot of the competition was third-party

20   administrators or self-funded carriers like ASR, for example,

21   was a self-funded TPA; they were competition and really large

22   groups in the marketplace.

23        And the competition would have an administrative fee and

24   they would also contract with a separate network company.

25        And so those fees were separate and we would go up

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1   against a self-funded carrier.

2       There'd be two things; there'd be an administrative fee,

3   then there would be a Provider Access Fee.  And Blue-Cross had

4   one, everything combined.

5       So the rationale was to divide up the administrative fee

6   of Blue Cross so it was more of equal comparison of the

7   parts --

8   Q    Okay.

9   A    -- if that makes sense.

10  Q    Were there any other competitors in the market besides

11  ASR?

12  A    There were other third-party administrators, there were

13  other carriers as well.  So you had United Health Care, Aetna,

14  ASR.

15      At that time there were other third-party administrators

16  like ASC, but most of them have gone out of business now.

17  Q    Okay.  And these third-party administrators, you

18  mentioned that they had an administrative fee and a Provider

19  Network Fee.  What were these things?

20  A    Well, the administrative fee was basically to pay their

21  claims.  It was the, you know, the cost of paying the claims.

22      And the Provider Access Fee was the fee that the company

23  that had the network charged for contracting with the doctors

24  and the hospitals for discounts and, you know, better fees.

25      So they had administrative fee that was accordingly

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1   charged.

2   Q     So before retention reallocation, did Blue Cross have

3   both of these fees Administrative Fees and Provider Network

4   Fee?

5   A     Not separated, no.

6   Q     Then how did the retention reallocation change that?

7   A     It would -- it was divided up.

8         And the Administrative Fee, you know, was more comparable

9   to the Administrative Fee of competitors and the provider that

10  the cost of contracting servicing providers was putting the

11  claims cost was where it was bucketed.

12  Q     For these competitors, ASR and the like these other

13  TPA's, did they put their Provider Network Fee into their

14  claims cost?

15  A     Normally, you would see that the -- on a proposal

16  separately.

17  Q     So when you say you would see that fee on a proposal

18  separately, that you mean a proposal from the third-party

19  administrator?

20  A     Right.  They would share, you know.

21        The customer, at times, would share their or the agent

22  involved would share the competitive quote.  It would be

23  broken apart in Administrative Fee, Provider Network Fee.

24  Q     When Blue Cross provided proposals, would they similarly

25  put those two fees on the proposal?

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1    A    No.  It was the Administrative Fee that would show up on

2    a proposal.

3    Q    Before retention reallocation from a dollar prospective,

4    how does the Blue Cross Administrative Fee compare to, for

5    example, ASR's Administrative Fee?

6    A    Well, the Blue Cross admin fee was high compared to the

7    competition and which was the reason why it was broken up to

8    more evenly compare to the competition.

9    Q    It was high before retention Reallocation, what, before,

10   after?

11   A    It went down quite a bit.

12   Q    So would it be -- sorry.  Go ahead.

13   A    I would say probably about a third to a half.  It dropped

14   somewhere in that category.

15   Q    Now when we're talking about these Administrative Fees

16   and Provider Network Fees, we're talking about self-insureds,

17   right?

18   A    Yes.

19   Q    Are you familiar with -- we talked about ASR, are you --

20   who is PPOM?

21   A    It's a network.

22        As I referred earlier, it is absolutely a company that

23   contracts with providers for discounts.  And it's a network

24   management-type company.  They pair up with a TPA or insurance

25   company to provide the network to that company.

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1    Q    Now how did this Retention Reallocation Program affect

2    Blue Cross' sales?

3    A    It helped; it lowered the admin fee so Blue Cross was

4    much more competitive.

5    Q    Now while you're with Blue Cross, did any customers ever

6    raise a concern about the fact that these Retention

7    Reallocation Fees were hidden?

8    A    They -- I think the first time that I recall was the City

9    of Grand Rapids account raised the issue.

10   Q    Could you tell us a little bit about what happened with

11   the City of Grand Rapids?

12   A    Their agent raised the issue that, you know.

13        The fees weren't disclosed.  They wanted to know what the

14   fees were, how they were calculated and what they amounted to,

15   basically.

16   Q    And who all from Blue Cross was involved in these

17   discussions with the City of Grand Rapids?

18   A    Dale Robertson, who was the Vice-President of West

19   Michigan at that time was involved; Dave Gay who was the

20   underwriting manager was involved, myself and -- those are the

21   ones I recall.

22   Q    And what, what was Mr. Gay's position in relation to your

23   position with Blue Cross?

24   A    He was over all of the large group underwriters, so he

25   was involved in all the renewal and that business as well for

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

 1  West Michigan.

 2  Q    I'd like to unpackage this a little bit, I guess.

 3       How did this concern from the City of Grand Rapids come

 4  to Blue Cross's attention?

 5  A    Through the agent Pat Coleman.  He was an insurance agent

 6  who handled the City of Grand Rapids.

 7  Q    And what was said to Blue Cross by Mr. Coleman?

 8  A    Just basically he wanted to know what the fees were and

 9  he felt that they were hidden and that they should be

10  disclosed.

11       And he also wanted the fees to be fixed rather than at a

12  percentage or variable.  He wanted to know exactly what the

13  fees were and he wanted them fixed going forward and, you

14  know, not seen on the materials.

15       THE COURT:  Can I ask what timeframe we're talking about

16  here?

17       THE WITNESS:  It was in the 90's.  Let's see.  I'm

18  guessing, I don't know exactly, would be the late 90's.

19  BY MR. MACGUIDEN:

20  Q    Would it help to refresh your recollection if you took a

21  look at an email around that time?

22  A    Sure.

23  Q    I think to your left there's two binders up there.  What

24  I'm looking for is Plaintiff's Exhibit Number 512.

25       MR. PHELPS:  Those are joints up there.

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1    MR. MACGUIDEN:  Oh, those are joints up there.

2    Your Honor, may I approach?

3    THE COURT:  You may.

4              (After a short delay,

5              the proceedings continued)

6    THE COURT:  You said Plaintiff's 512?

7    MR. MACGUIDEN:  Yes, Your Honor.

8    THE WITNESS:  More like the mid 90's.  2004 is this

9  email.  But it was before that.

10  BY MR. MACGUIDEN:

11  Q    Does that help you at least to narrow the timeframe that

12  you recall this City of Grand Rapids incident?

13  A    Well they, they canceled shortly after that.  I'm trying

14  to recall the exact year.

15    I left in 2007.  It was when they opened the office

16  building in Grand Rapids.  I just don't recall the year the

17  office moved downtown.  I don't recall the exact year.

18  Q    So looking at Exhibit 512 and I'm looking in the middle

19  where Mr. Newsone is writing an email to you.

20    And it looks like one of the things he wrote at the very

21  third paragraph I guess of his email --

22    THE COURT:  Is this in evidence?

23    MR. MACGUIDEN:  No, Your Honor.  I think this one was

24  objected to.

25    THE COURT:  So are you offering it into evidence?

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1       MR. MACGUIDEN:  We'll be offering it into evidence, yes.

2       THE COURT:  But now?

3       MR. MACGUIDEN:  We can offer it into evidence.  I think

4  the only objection raised was relevance.

5       MS. O'REILLY:  We've no objection.

6       THE COURT:  All right.  It's in.

7       MR. MACGUIDEN:  Thank you, Your Honor.

8  BY MR. MACGUIDEN:

9  Q    I wanted both of you to know there's an agent or possibly

10 agents that have a copy of the proposed Schedule A language

11 for the City of Grand Rapids.

12      Do you see where it says that?

13 A    Yes.

14 Q    You recall when you received this email, don't you?

15 A    Yes.

16 Q    Do you recall if this is a reference to the City of Grand

17 Rapids' renewal you were just testifying to?

18 A    It is.  That's what they're referring to the City of

19 Grand Rapids, that was in 2004.

20      And this would have been after the meetings, you know,

21 that we had with the city.  So, obviously, it was before 2004.

22 Q    You mentioned a couple of names of individuals that were

23 involved with this situation.

24      Was there anybody hired at a higher level then you at

25 Blue Cross-Blue Shield that was also involved?

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1   A    Well, I think everybody, you know, in management.

2        Ron Wood was the director of underwriting.

3        Paul Austin was the Vice-President at the time and so

4   they were all involved in the, you know, corporately inside in

5   the discussions of the City of Grand Rapids.

6        It was a big account and it came at a time where Blue

7   Cross was making a big investment in downtown Grand Rapids by,

8   by fixing up a building and moving into it.

9        So it was kind of it was a -- very politicized, because

10  they were making that investment at that time to the downtown.

11  Q    You mentioned Paul Austin.

12       What do you recall about what Paul Austin said about this

13  situation?

14  A    Well, I mean just basically they, they gave, you know,

15  the calculations and disclosed what they were asking for as a

16  disclosure.

17       So it was really coming up with exactly what the fees

18  were, laying it out for the city.

19  Q    You said they wanted a disclosure?

20  A    The City wanted the disclosure of the calculation of the

21  Retention Reallocation Fee.

22       They wanted to know exactly what fee, how it was

23  calculated, what was involved in that fee.  And it was fairly

24  complex.

25       So it was -- they didn't, you know, it was put in writing

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1  and disclosed to the City at that time.

2  Q    And still looking at Exhibit 512, would you turn to the

3  fourth page, please.  It's a page that has a fax header at the

4  top of it.

5       At the very bottom there's also a page number.  It's page

6  number BCBM Borrough's 504426.

7  A    Uh-huh.

8  Q    You mentioned that the City of Grand Rapids was looking

9  for more information about exactly what these fees were and

10 how they were calculated?

11 A    Yes.

12 Q    Was this the explanation that Blue Cross had shared with

13 the City of Grand Rapids?

14 A    It was more detailed then this, you know, because they

15 wanted to know exactly how the Peer One, Peer Four hospital

16 claims were assessed and what was that calculation.  So it was

17 in more detail.  This would be a summary.

18 Q    Okay.  So it was actually more detailed then this.

19      Was the information given to the City of Grand Rapids?

20 A    Yes.

21 Q    And if we look at this exhibit -- I'm looking

22 specifically at paragraph six, the one that's circled and

23 stared.

24      Do you see where that is that one says -- I'm sorry.  You

25 have to give audible answers.

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1   A     Yes.

2   Q     Thank you.  Paragraph six.  It said:

3         Provider Network Fee, contingency fees and

4         cost transfer subsidies or surcharges.

5         The Provider Network Fee is a fee charged to

6         the City by Blue Cross-Blue Shield of

7         Michigan to recover.

8         Then there's portions that are struck out,

9         expenses incurred by BCBSM in the

10        establishment, management and maintenance of

11        its participating hospital physicians and

12        other health provider networks.

13        This fee is calculated as a percentage of the

14        total paid amount of the City's Peer One

15        through Four hospital claims.

16        The percentage as of July 1, 2003 is

17        16.24 percent.

18        Do you see where that is?

19  A     Yes.

20  Q     Was a percentage of this kind given to any customers

21  other than the City of Grand Rapids to your knowledge?

22  A     No.

23  Q     Was the Provider Network Fee ever explained in this way

24  to any of your other customers?

25  A     No.

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. MacGuiden 4-24-2013
Vol. 2

1  Q    Now further down I'm reading, what, two paragraphs down

2  from that the paragraph that starts with "the Contingency Fee

3  is an amount".

4       Do you see where that is?

5  A    Uh-huh.  Yes.

6  Q    It reads:

7       Contingency is an amount charged by BCBSM.

8       The city as contribution towards maintaining

9       BCBSM surplus at an appropriate level and in

10      compliance with regulatory and Blue Cross and

11      Blue Shield association standards.

12      In setting the fee for the group, the goal

13      for all groups is to set it at a level so it

14      will result in a fee of approximately

15      2 percent of the group's total costs.

16      Cost transfer subsidies or surcharges are so

17      authorized pursuant to 1980 PA 350.

18      The only cost transfer subsidy or surcharge

19      presently authorized by 1980 P.A. 350 and

20      charged to group is other than group subsidy

21      which is projected to be one percent of total

22      costs as identified in Section 609(5) of 1980

23      PA 350.

24      Did I read that correctly?

25  A    Yes.

Paula Brawdy-Examination/The Court 4-24-2013

1   Q    Did Blue Cross-Blue Shield ever give any of this

2   description to any of its other customers other than the City

3   of Grand Rapids?

4   A    I believe that this was noted on some of the financial

5   documents.

6   Q    Do you recall if the percentage, the 2 percent of group

7   totality costs and the 1 percent of total costs was ever put

8   on the documents?

9   A    I don't recall if the percentages were on the documents

10  or it was just on the statement about those fees.  I just

11  don't recall.

12  Q    Now what was the internal response to this City of Grand

13  Rapids incident?

14  A    By who?

15  Q    Just within Blue Cross, I suppose.

16       What, what happened with regards to these Retention

17  Reallocation Fees?

18                         EXAMINATION

19       THE COURT:  Before you move on, may I ask a question

20  about 512?

21       Ms. Brawdy, is any part of what we just went over in 512

22  intended to explain the Retention Reallocation Fee?

23       THE WITNESS:  It is related to that.

24       THE COURT:  Which, which paragraph?

25       THE WITNESS:  Well, the withholding fees inappropriately

Paula Brawdy-Examination/The Court 4-24-2013

1  at the end of the first paragraph.

2      THE COURT:  First paragraph.  Give me a number.  Where

3  are you?

4      THE WITNESS:  Give you a number?

5      THE COURT:  Well, these paragraphs are numbered, are they

6  not?  I just need a frame of reference.

7      THE WITNESS:  Mine are not numbered.  You're in 512,

8  correct?

9      THE COURT:  Yeah.

10      THE WITNESS:  At the end of the first paragraph, the

11  paragraph starts with "the attached fax document".

12      THE COURT:  Wait a minute.  The very first paragraph --

13      THE WITNESS:  Yes.

14      THE COURT:  -- of the first page?  Okay.  Email.

15      THE WITNESS:  Yes.

16      THE COURT:  All right.

17      THE WITNESS:  If you go to the end of that first

18  paragraph where it says:

19      I was told that a competing agent met with a

20      group and advised them that they were being

21      ripped off by Blue Cross withholding fees

22      inappropriately.

23      So they're talking about, you know, all the fees,

24  including retention reallocation.

25      THE COURT:  No.  I understand that.

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Examination/The Court 4-24-2013

1    But of the page we were just looking at that had the

2  numbered paragraphs, paragraph six, for example.

3    THE WITNESS:  I got you.  Okay.

4    THE COURT:  This page was intended as an explanation of

5  the fees?

6    THE WITNESS:  Well, I don't know what this page came out

7  of, but it is an explanation of the fees.

8    It looks to me like it, it was attached to an addendum

9  that probably went to the City of Grand Rapids explaining the

10 fees, but there's not the cover.

11   THE COURT:  But is anything on this page that these

12 numbered paragraphs intended to explain retention

13 reallocation?

14   THE WITNESS:  The Provider Network Fee is the same thing

15 as the retention reallocation.  That's what the Provider

16 Network Fee was.  It's one in the same.

17   THE COURT:  All right.  But Provider Network Fee was

18 never -- it was -- that terminology always appeared as the

19 Administrative Fee in contracts, right?

20   That terminology -- wasn't the Administrative Fee called

21 Provider Network Fee?

22   THE WITNESS:  They're really different.

23   Well, at one point it was all one fee called

24 Administrative Fee and then when it was divided up, the

25 Provider Network Fee was part of retention reallocation.  It's

Paula Brawdy-Examination/The Court 4-24-2013

1   in that bucket.

2      The Administrative Fee was the part of paying the claims

3   and all those things.  So they don't call it retention

4   Reallocation, but it is -- that is what the retention

5   reallocation was moving that Provider Network Fee into a

6   separate bucket.  I don't know if that makes sense.

7      It's the establishment, management, maintenance of its

8   participating hospital, physician other Provider Network Fees,

9   how it was calculated, that was retention reallocation.

10     THE COURT:  Grand Rapids felt that there wasn't full

11  disclosure of all of the Administrative Fees that it was being

12  charged, right?

13     THE WITNESS:  Correct.

14     THE COURT:  Okay.  So on whatever contract Grand Rapids

15  had that caused them to question, what was -- what was

16  Administrative Fees described as?  What was the terminology

17  for?

18     THE WITNESS:  Well, Administrative Fees were called

19  Administrative Fees.

20     THE COURT:  And what were the Retention Reallocation Fees

21  charged in the contract that they questioned or called?

22     THE WITNESS:  I'm not sure I'm understanding your

23  question.

24     THE COURT:  They thought some fees were hidden, not

25  accurately described as Administrative Fees.

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Examination/The Court 4-24-2013

1       THE WITNESS:  Correct.

2       THE COURT:  Did you agree with that that, they couldn't

3   look at what was in front of them and know?

4       THE WITNESS:  At that point in time, they could not.

5       THE COURT:  Okay.  What was that thing called that they

6   couldn't know was an Administrative Fee?

7       THE WITNESS:  It was called retention reallocation.

8       THE COURT:  In their contract?

9       THE WITNESS:  Oh.  No.

10       THE COURT:  What was it called in their contract that

11  they questioned?

12       THE WITNESS:  I don't know.  I mean, I can't answer that

13  without looking at the contract at that time.

14       THE COURT:  Was Provider Network Fee a terminology used

15  in the contract that they questioned?

16       THE WITNESS:  I really don't know from that time period

17  without seeing.

18       This -- you know, I don't know when this time period was

19  in terms of -- this looks to me like it came in after the

20  whole issue was raised, not before.

21       In other words, this -- the issue of these fees not being

22  in the contract was raised.  And then as a result of that,

23  Blue Cross clarified it and put it in writing.

24       And this, to me, is the after -- the result of that

25  discussion.

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1        THE COURT:  So this was the clarification?

2        THE WITNESS:  That's, to me, what it looks like.

3        THE COURT:  And this description of Provider Network Fee

4   was meant to tell them about what was called Administrative

5   Fees in their original contract and retention reallocation?

6        THE WITNESS:  Same thing.  Retention reallocation really

7   was the same thing.  It was the Provider Network Fees.

8        It was a term for taking -- retention is the same thing

9   as Administrative Fee at Blue Cross.

10        It's taking part of that Administrative Fee that belonged

11   to the provider costs and moving it over under the claims

12   cost.

13        And so it really is a Provider Network Fee or retention

14   reallocation to me is the same thing.

15        THE COURT:  All right, but to a customer.

16        I'm just trying to figure out what information was

17   intended as clarification when this term Provider Network Fee

18   came into being, because it was not part of the contract that

19   caused Grand Rapids to question you, was it?

20        THE WITNESS:  I'm sure it was not.  Just because if it

21   was in the contract before that, they wouldn't have raised the

22   issue.

23        MR. MACGUIDEN:  Your Honor, perhaps I can clarify if I

24   ask a few questions?

25        THE COURT:  All right.

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

 1  BY MR. MACGUIDEN:

 2  Q    Ms. Brawdy, was the City of Grand Rapids a self-insured

 3  client?

 4  A    Yes.

 5  Q    Did they -- self-insured clients, did they have

 6  standardized contracts?

 7  A    Yes.

 8  Q    So if you saw a contract from this same time period,

 9  would you be able to help better address the judge's

10  questions?

11  A    Yes.

12  Q    This was in 2003.

13       MS. O'REILLY:  What exhibit?

14  BY MR. MACGUIDEN:

15  Q    Ms. Brawdy, there's two binders to your left.  I'm going

16  to look at the Joint Exhibit Number 3.

17       THE WITNESS:  Is that in the one 155?

18       MR. MACGUIDEN:  That is, yes.

19                 (After a short delay,

20                 the proceedings continued)

21       THE WITNESS:  This is a Schedule A.  It is not the ASC

22  contract.  Its -- every year they get a new Schedule A.

23       So the actual contract is Evergreen, so-to-speak.  We

24  didn't do a new contract every year.

25

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1    BY MR. MACGUIDEN:

2    Q    So the language that you're looking for to help answer

3    the judge's question, would be in the ASC Agreement?

4    A    Yes.

5    Q    Well, perhaps I'll come at it a different way.

6         The Administrative Fee that we're talking about before

7    retention reallocation, what components went into that

8    Administrative Fee?

9    A    Basically paying the claims, salaries of people, the

10   normal administrative costs of paying the claims.  Everything

11   except for the administration of the provider, hospital, part

12   of the Administrative Fee.

13   Q    And so after retention reallocation takes place in 1992,

14   what happens to that all-inclusive Administrative Fee?

15   A    It's divided up.

16   Q    And so when we're talking about the City of Grand Rapids

17   in 2003 when you reference Administrative Fee, you're still

18   talking about the -- the line item for lack of a better term

19   on these proposals that says Administrative Fee?

20   A    Correct.

21   Q    And this Retention Reallocation Fee is something separate

22   from what's listed on proposal line item as Administrative

23   Fee?

24   A    Correct.

25   Q    Those are two different things?

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1   A    They are two different things.

2   Q    I think the judge's question was with regards to this

3   City of Grand Rapids information here, what, what does this

4   paragraph six, Provider Network Fee, what does that speak to?

5   A    It is the expenses of the provider network.

6        In other words, it is when we -- when Blue Cross took the

7   provider costs and moved them out of the Administrative Fee

8   into a separate Administrative Fee, they called it retention

9   reallocation.  And it is essentially -- the component of that

10  was the provider cost.

11  Q    So this was part of the Retention Reallocation Fee, not

12  what you've termed as the Administrative Fee?

13  A    Well, yeah.  It used to be part of the total

14  Administrative Fee and then it was divided out.

15       The provider cost of the Administrative Fee was divided

16  out and put into the retention reallocation bucket.

17       THE COURT:  This language Provider Network Fee of that

18  paragraph six on Exhibit 512, was that intended then to be an

19  all-inclusive capturing of all Administrative Fees including

20  what had before been termed Administrative Fees and retention

21  reallocation?

22       THE WITNESS:  No.  This would just be the provider

23  portion of the Administrative Fee.

24       It's like the Administrative Fee has different components

25  and one component is paying claims that's stayed in the

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1    Administrative Fee title of that.

2         Any part of the administrative costs, you know, hiring of

3    people to go out and contract with hospitals, providers,

4    service those providers, all of that administrative cost was

5    for the provider maintenance was put into this provider

6    network category thus called Retention Reallocation.

7         Because retention is the same as Administrative Fee.  We

8    reallocated part of the Administrative Fee and part

9    reallocated was the provider part of the Administrative Fee.

10        THE COURT:  What on this Exhibit 512 describes

11   Administrative Fee?

12        THE WITNESS:  Actually nothing on this page talks about

13   the rest of the Administrative Fee.

14        THE COURT:  So this still doesn't tell Grand Rapids about

15   all of the administrative frees it was paying?

16        THE WITNESS:  This page does not.

17        THE COURT:  All right.

18        So if I look at this Exhibit 3 that counsel directed to

19   that the, Schedule A as well as this page in 512, what on this

20   Schedule A is the Provider Network Fee described in Exhibit

21   512?

22        MS. O'REILLY:  Your Honor, I apologize.  I don't want to

23   seem like I'm objecting to your question, but this document

24   has a second page per the stipulation.

25        THE COURT:  What document?

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1      MS. O'REILLY:  The document you're talking about.

2      THE COURT:  I'm talking about two documents.

3      MS. O'REILLY:  It's an incomplete document described in

4  our stipulation.  The following exhibit contained the second

5  page of this document.

6      THE COURT:  Exhibit 4.

7      MS. O'REILLY:  Yes.  Is that right?  This is 2003.

8      And the 2004 document contains the second page we

9  stipulated that the missing page from 2003.

10     Is the same as the page that is in 2004?

11     THE COURT:  Are you telling me if she looked at Exhibit

12  4, she can answer my question?

13     MR. MACGUIDEN:  Right or Exhibit 2, either one.

14     THE COURT:  Or Exhibit 3.

15     MS. O'REILLY:  I think the witness said she needed to

16  look at the contract earlier.  I don't want to interfere with

17  the line of questioning.

18     THE COURT:  I'll let her answer.

19     Do you mean to say Exhibit 3?  You said Exhibit 2.

20     MR. MACGUIDEN:  I agree Exhibit 3 is missing a second

21  page.  Exhibits 2 or 4, both of them have second pages.

22     THE COURT:  Exhibit 2.  I don't see anything in Exhibit 2

23  that has a substantive second page.  I don't have anything.

24  I've a Page 1 and then I have a signature page.

25     MR. MACGUIDEN:  I think that -- right.

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1        Paragraph 11 I think is what defense counsel's referring

2    to as far as the Retention Reallocation Fees.

3        THE COURT:  All right.

4        Ms. Brawdy, would you look at Exhibit 2, 3, 4 and tell me

5    if between these three documents you can tell me what is the

6    Provider Network Fee.

7        Where is that encompassed on these documents?

8        THE WITNESS:  These are basically three different renewal

9    years.  The administrative -- the first one and two were

10   May 2001 to May 2002.

11       You'll see the cost for contract was $28.  Then if you

12   look at three, it went up to $34.  That's for May 2003 through

13   April 2004.

14       Then four again is moving up another time period to

15   January '04 to December '04.  They're essentially all three

16   the same thing.

17       THE COURT:  Does any one of two, three our four describe

18   the Provider Network Fee that is in Exhibit 512?

19       THE WITNESS:  No.

20       THE COURT:  All right.  Thank you.

21   BY MR. MACGUIDEN:

22   Q    Ms. Brawdy, in your personal opinion, did Blue Cross

23   adequately disclose the Retention Reallocation Fee to its

24   self-insured customers?

25   A    No.

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1    Q    Why do you say that?

2    A    Because it really was not -- it was a significant amount

3    of money in terms of the Administrative Fee and no where did

4    it say what that amount of money was.  For a long time, it

5    really wasn't referred to except in very general terms.

6         So there were a lot of internal discussions about it at

7    that time.  And it was felt that it was needed to be

8    competitive disclosing, you know, an amount of money would be

9    detrimental to the sales.

10   Q    How would disclosing this Retention Reallocation Fee be

11   detrimental to Blue Cross sales?

12   A    Because the Administrative Fee, in total, would have been

13   much higher.

14   Q    When you say a significant amount of money, do you still

15   have Joint Exhibit 4 in front of you?

16   A    Which one?

17   Q    Joint Exhibit 4.

18   A    Which is back to this?

19   Q    Well, don't, don't worry about that.

20        When you say it's a significant amount of money, this

21   Retention Reallocation Fee, how much money is it in relation

22   to the Administrative Fee dollar amount that's listed on the

23   Schedule A's?

24   A    Well, it probably is close to that same amount of money,

25   you know.

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1    I don't have any exact figures, but it was a significant

2  amount when you look at the -- it was a significant amount of

3  the admin fee.

4    You know, my recollection is it dropped about in half

5  when we moved it, you know, when we went to retention

6  reallocation.

7  Q   From the sales prospective, why would it be detrimental

8  to disclose the amount of this Retention Reallocation Fee?

9  A   When you're in the competitive bidding situation,

10 customers tend to focus on Administrative Fees.

11 Q   So when you're comparing Blue Cross-Blue Shield fee to

12 other third-party administrator fees, you mean?

13 A   Yes.

14 Q   Now you also mentioned just a minute ago there were

15 discussions, internal discussions within Blue Cross about

16 disclosing the amount of these fees.  Is that right?

17 A   Correct.

18 Q   And how did, how did these discussions go?

19 A   Well, particularly once the City of Grand Rapids raised

20 the issue, the issue escalated across the state in terms of

21 the agents making an issue of it.

22   Agents like to prove their worth by work looking into

23 another agent's account saying, hey, did you know about this.

24   So the agent involved in the City of Grand Rapids

25 actually kind of held almost a seminar on it.

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1       Pat Coleman did talking about how Blue-Cross was not
2   disclosing all their fees and so it escalated real quickly
3   across the state became a big issue.
4       And so there were a lot of internal discussions about
5   what to disclose, how it should be disclosed on documents,
6   should it be in detail or just stared, you know, as a general
7   term retention reallocation rather than actually disclosing
8   the amount of money that was involved.
9       So, you know, rather than have a line item as part of the
10  Administrative Fee is whatever it was $25 or whatever, the
11  discussion was to disclose the amount of money or just
12  disclose the term, you know, clearly retention reallocation or
13  Provider Network Fee in the contracts.
14  Q    And what was your opinion on what should have been
15  disclosed as part of --
16  A    Well, of course you know I was in the heat of the issue
17  being in West Michigan was the City of Grand Rapids.
18      My view was to disclose it in terms of the dollars
19  involved.  I mean put it out there and compete, you know, as
20  it is.
21      Others felt that that would be detrimental to new
22  business sales to disclose the amount.
23  Q    Who, specifically, thought that that would be detrimental
24  to disclose the amount of disputed fees?
25  A    Actually, Paul Austin who was over the issue at the top,

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1    Vice-President.  He felt it would be detrimental, would slow

2    down the new business sales and the new business sales staff

3    thought it would be detrimental.

4         So, you know, in different discussion and work groups

5    they talked about, you know if we did this what would happen

6    to the new business.

7    Q    You said Paul Austin said it would be detrimental.

8         What exactly do you remember Paul Austin saying about it?

9    A    That our Administrative Fees at Blue Cross would be too

10   high.  We would have a hard time competing.

11   Q    So he said that that they shouldn't be disclosed for that

12   reason?

13   A    He felt rather than disclosing the amount, it should be

14   disclosed just as a Retention Reallocation Fee not, you know,

15   with dollar or not with fixing it at a certain level versus

16   having it be a percentage of all claims.

17        The problem with the formula as it was being a percentage

18   of hospital claims, if hospital claims were high, this fee

19   went up with medical inflation versus Administrative Fee

20   usually doesn't go up at a rate of medical inflation.  Medical

21   inflation is much higher.

22        So, you know, this fee, taking it and fixing it and

23   putting an amount on it would be a whole different calculation

24   unless less money, basically.

25        So it's a long-winded way of saying that they really did

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1   not at that point in time want to go down the road of

2   disclosing a flat amount of money for Administrative Fees.

3   Q     When you said earlier you wanted to disclose it in terms

4   of the dollar amount involved, what did Paul Austin want to

5   communicate to Blue Cross customers?

6   A     At that time there was not agreement to disclose an

7   amount of money, it was more of a statement retention

8   reallocation, you know, asterisk at the bottom of a proposal

9   stating reallocation fees are included or something of that

10  nature.

11  Q     You said there would be an asterisk.

12        What document would that go on?

13  A     Any sort of proposal or could be a renewal as well.

14  Q     Was, was Paul Austin in favor of disclosing either the

15  percentage of fees or the actual dollar amount on these

16  documents?

17  A     Not, not the actual dollar amount.  More of a percentage,

18  you know, as is shown on this Document 512 where it says it's

19  X percent of the Peer One hospital claims.

20  Q     Do you remember there being emails exchanged within Blue

21  Cross about this topic?

22  A     Yes.

23  Q     If you would, I'd like to direct your attention to

24  Exhibit 511 it's in the Plaintiff's Exhibit binder.  5-1-1.

25        Are you on that page?

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1  A    Yes.

2  Q    Okay.  Do you remember us talking about this, this

3  exhibit during your deposition you gave in this case?

4  A    Yes.

5  Q    And what I'd like to direct your attention to is the very

6  last email in this exhibit.  It starts on Page 1 at the very

7  bottom.

8       Do you see where that is?

9  A    An email?

10  Q    Yes.  The exhibit is three pages in all of 511.

11  A    Just the one line.

12  Q    It starts on that email -- I want you to look at starts

13  on that first page, then continues on to the second and third

14  page.

15  A    You're in 510?

16  Q    511.

17  A    Oh, okay.  Okay.  I'm with you now.

18  Q    Okay.  You see that this was an email that was sent to

19  you by Jack Gray?

20  A    Yes.

21  Q    And who is Mr. Gray?

22  A    He was my counterpart.

23       He had the same position that I had in Southeast

24  Michigan.  He was Regional Sales Director of Southeast

25  Michigan.

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1   Q     For Blue Cross-Blue Shield?

2   A     Yes.

3   Q     This email is sent to a number of individuals Donald,

4   Witford, Gillespie, Phillip?

5   A     Yes.

6   Q     Ron Crofoot?

7   A     Yes.

8   Q     Who do those folks work for?

9   A     Who do they work for?

10  Q     At the time.

11  A     At the time -- well, they were all sales directors.

12        At that particular time, I believe they were reporting to

13  Bev Stovall who reported to Cathy Elstom as Vice-President who

14  reported to Paul Austin as Senior Vice-President.

15  Q     And if you turn to the second page of that exhibit,

16  that's the part of the email that I have up on the screen.

17        Yours isn't highlighted the way mine is.

18        But do you see where that is in the book?

19  A     Yes.

20  Q     And the subject of the email is Renewal Exhibits Redo.

21  Do you see that?

22  A     Uh-huh.

23  Q     What was going on at this time?

24        MS. O'REILLY:  Your Honor, I'm going to object just

25  because if we're going to read the subject line we're going to

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

 1  read, this document hasn't been placed in evidence yet.  So --
 2        MR. MACGUIDEN:  Your Honor, I move its admission.
 3        THE COURT:  All right.
 4        MS. O'REILLY:  No objection.
 5        THE COURT:  All right.  It's in.
 6  BY MR. MACGUIDEN:
 7  Q    Subject line is Renewal Exhibit Redo.
 8        What is renewal exhibit?
 9  A    It is what we do the account, annual renewal of their
10  administrative fees and claims.
11  Q    So by "account", you mean a customer of Blue Cross?
12  A    Yes.  Uh-huh.
13  Q    And it says:
14        I met last week with Ken Krisan, Cheryl
15        Lewis, Mike O'Neil and Tim Goins to discuss
16        the Redo of our ASC and ERS renewal exhibits.
17        Are those Blue Cross employees?
18  A    They are.
19  Q    What is an ASC renewal exhibit?
20  A    Self-funded ASC is another word for self-funded customer.
21        ERS is experience rated customer wholly insured.
22        You would say self-funded and fully insured are the
23  explanations of those terms.
24  Q    And how often are these renewal exhibits sent to
25  customers?

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1   A   Annually.

2   Q   To continue reading it says:

3       Be sure everyone is on the same page, I was

4       asked to review three main things.

5       First, to more fully disclose the Retention

6       Reallocation Fees, now referred to as Access

7       Fees.

8       Do you see were it says that?

9   A   Yes.

10  Q   Then later on in the email it says:

11      What probably can be done is that a statement

12      can be added to the Renewal Exhibit stating

13      something to the effect, quote, BCBSM in

14      exchange for a lower Administrative Fee

15      granted to and agreed to by the group, will,

16      as additional administrative compensation,

17      retain X percent of each hospital/facility

18      and professional claims cost contained in

19      amounts billed.

20      This is a variable cost, close quote.

21      Ken we rework the language to be consistent

22      with our contract.

23      This language is something National uses now.

24      Did this proposal from Mr. Gray ever get adopted by Blue

25  Cross?

Paula Brawdy-Direct Exam/Mr. Macguiden 4-24-2013

1  A    I don't believe in that format that is not something that

2  I recall coming out.

3  Q    Do you ever recall Blue Cross and Blue Shield telling it

4  self-funded customers the percentage of each hospital facility

5  professional claims costs that they were paying inRetention

6  Reallocation Fees?

7  A    I don't recall the percentage because it's variable.  The

8  percentage is almost calculated on the back end because it

9  varies.

10      So I don't recall anything coming out in advance which

11  the renewal would be in advance saying it's going to be X

12  percent.

13  Q    Based on your experience as a regional sales manager, how

14  important were the amount of Administrative Fees that were

15  paid by self-funded customers to them?

16  A    Well, they were very important.  That's really what they

17  focused on was Administrative Fee costs and so your

18  administrative fees weren't competitive.  They were looking at

19  other carriers.

20  Q    You mentioned that you left Blue Cross in 2007?

21  A    I did.

22  Q    Was this debate about how to disclose the Retention

23  Reallocation Fees resolved by the time you left?

24  A    It wasn't resolved in a way that customers knew exactly

25  what they were paying when I left.

Paula Brawdy-Examination/The Court 4-24-2013 Vol. 2

1   Q    So by the time you left Blue Cross in 2007, it's your

2   testimony that customers still didn't know how much they were

3   paying these Retention Reallocation Fees?

4   A    No.

5        MR. MACGUIDEN:  That's all I have, Your Honor.

6                      EXAMINATION

7        THE COURT:  All right.  Thank you.  We'll take a break.

8        Ms. Brawdy, I wonder if I show you on Exhibit 4 -- could

9   you look at it, please?

10       THE WITNESS:  That's in -- one to four book.

11       THE COURT:  Exhibit 4 on the second page paragraph 11.

12       THE WITNESS:  Second page is signature page.

13       THE COURT:  Yes.  Paragraph 11.  It says:

14       Your hospital claims costs reflect certain

15       charges for provider network access

16       contingency and other subsidies as

17       appropriate.

18       What was intended to be conveyed to the customer by that

19  paragraph?

20       THE WITNESS:  They are talking about the Provider Network

21  Access Fees there, which is retention reallocation the same

22  thing as so it is a general statement that the claims costs

23  reflect that Provider Network Access Fee.

24       THE COURT:  Was this in line -- you said Mr. Austin

25  wanted something more, a statement on a proposal.

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1    Was this intended to be that, do you know?

2    THE WITNESS:  It was intended to convey that, yes.

3    THE COURT:  And what's your view of whether it conveyed?

4    THE WITNESS:  Well, it does say that there were certain

5    charges.  What it doesn't say is how much, you know.  It

6    doesn't really tell them what that's worth in terms of money.

7    And a self-funded client wants to know what all the costs

8    are, that's why they're self-funded.  So it's a general

9    statement to sort of, you know, make a statement that they're

10   other fees.

11   THE COURT:  Was this Schedule A intended to tell the

12   customer in broad headings what all of costs were?

13   THE WITNESS:  Yes.

14   THE COURT:  It should have told them that?

15   THE WITNESS:  Yes, it would say that they're other fees.

16   THE COURT:  All right.  Thank you.  Let's take a break

17   please.  15 minutes.

18   (Whereupon court was in recess 11:18 a.m.

19    and court was back in session at 11:40 a.m.)

20   THE COURT:  Ms. O'Reilly.

21                    CROSS   EXAMINATION

22   BY MS. O'REILLY:

23   Q   Good morning, Ms. Brawdy.  I'm Rebecca O'Reilly.  I'm an

24   attorney for Blue Cross.

25   We've never net before; is that correct?

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   A    No.

2   Q    We've never communicated by email or phone or otherwise?

3   A    No.

4   Q    And my colleagues that are here today, Mr. Bernard and

5   Mr. VanDusen from my law firm; you've never met them either?

6   A    No, I have not.

7   Q    Other than Mr. Retner there who examined you at your

8   deposition, he's from my law firm, you've never spoken to or

9   met with any of the other attorneys for Blue Cross involved in

10  this litigation?

11  A    No, I have not.

12  Q    Okay.  And at the time of your deposition, I think you

13  had testified that you had not spoken to anybody from the

14  Varnum firm save for arranging for the date of your

15  deposition.  Is that still true?

16  A    That is true.

17  Q    And have you spoken to -- at this point, have you spoken

18  to anybody from Hi-Lex Corporation about this litigation?

19  A    No.

20  Q    Okay.  Did you do anything to prepare for today?

21  A    I did not.

22  Q    So you didn't read anything or --

23  A    I did not.

24  Q    Okay.  Did anybody provide you with a copy of your

25  deposition transcript?

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   A    No.

2   Q    And I -- I mean no disrespect from this question, but I

3   feel I have to ask it.

4        Nobody from your current employer, Priority Health,

5   provided you with any instruction about how you're to testify

6   today?

7   A    No.

8   Q    Okay.  Thank you.

9        And am I correct you came over from BCN back in the late

10  1980's to Blue Cross-Blue Shield of Michigan?

11  A    That's correct.

12  Q    BCN is the HMO side of Blue Cross business?

13  A    It is.

14  Q    I think you testified earlier today that as of the very

15  early 1990's, you were a Regional Sales Director for Blue

16  Cross-Blue Shield of Michigan?

17  A    Correct.

18  Q    At the time you were a Regional Sales Director is when

19  this Retention Reallocation Program we've discussed today

20  came -- was rolled out to the self-funded group; is that

21  correct?

22  A    Yes.

23  Q    Okay.  And I think you, you testified at your deposition

24  and today that one of the purposes for the retention

25  reallocation was to be able to compare Blue Cross'

1  Administrative Fees to competitors.

2      I think the term you used at your deposition was "apples

3  to apples", am I correct about that?

4  A    Correct.

5  Q    Can you explain to me what you meant by apples to apples

6  comparison?

7  A    Because competitors are used ASR as an example was a

8  self-funded TPA by the administrator.  They, they contracted

9  separately with another company that provided the network and

10 so there would be two fees on a proposal from ASR.

11     One would be administrative costs to pay claims and the

12 second fee would be the Provider Network Fee cost.

13 Q    So why would TPA like ASC need a network in order to

14 compete with Blue Cross for self-funded business?

15 A    The network management company negotiated discounts with

16 hospitals and providers so they provided, you know, quite a

17 bit of savings by having the network company do that.

18 Q    So the absence of contracting with a network, a TPA like

19 ASR would only be able to provide claims administrative

20 services.

21     There would be no discounts on the actual claims for that

22 self-funded group; is that correct?

23 A    That's correct.

24 Q    I think you just testified a moment ago as to one manner

25 in which a TPA might quote an Administrative Fee, a network

1   access charge to a self-funded group.

2       But in your deposition, tell me if I'm wrong.  I believe

3   you also testified that back in the early 1990's, that there

4   were some networks that included their network access charges

5   and their claims.  Am I correct about that?

6   A    Yes.

7   Q    And as a PPOM, one of the networks that was around back

8   then early 1990's that would have contracted with such a TPA?

9   A    Yes.

10  Q    And do you recall whether or not back in the early

11  1990's, whether PPOM included its network access charges and

12  claims?

13  A    You know, I don't know particularly if PPOM did.

14      I know that some included it in claims and some of them

15  showed it on their proposal itself as a, you know, flat dollar

16  amount.  So there were various ways it was -- it could have

17  been in a proposal.

18  Q    Okay.  I want to ask you one more question about PPOM

19  that's going to require you to open one of the plaintiff's

20  binders that has Exhibit 511 in it.  You looked at it earlier.

21      Are you at Exhibit 511?  It begins with a series of

22  emails.  The font is larger on the second page.

23      Do you see that at the very -- we're not going to do it

24  on the screen.  Is that okay?

25  A    Yeah.

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   Q     Thanks.

2         At the very bottom of that second page the very last

3   sentence, sorry, very last in the second last line which is

4   the middle of last sentence says:

5         It appears PPOM had contacted our legal

6         department to ask us to cease and desist

7         doing these comparisons.

8         Do you see that language?

9   A     Yes.

10  Q     And I think that the beginning of the paragraphs said

11  that it talks about discounts related to PPOM.

12        Do you see that?

13  A     Yes.

14  Q     So do you understand that to mean that somebody from PPOM

15  contacted Blue Cross Legal and asked them to cease and desist

16  seeking out discount information about PPOM?

17  A     Okay.

18  Q     Is that your understanding of the paragraph?

19  A     Can you restate the question?

20  Q     Sure.

21        Based on this paragraph, does it sound like somebody from

22  PPOM had reached out to Blue Cross Legal and asked Blue Cross

23  to stop seeking out PPOM discounts, its own discounts?

24  A     Uh-huh, yes.

25  Q     Those discounts are what you described earlier; the

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   network, the negotiated discounts with the providers.

2        Am I right about that?

3   A    Yes.

4   Q    So why would PPOM want -- why would PPOM direct another

5   carrier not to seek out its discount information?

6        MS. RYNDER:  Objection.  Foundation.

7        THE COURT:  Sustained.

8   BY MS. O'REILLY:

9   Q    Do you have any understanding why one carrier would not

10  want another carrier to know what its discount information is?

11  A    Well, I understand in general why they don't, because

12  it's competitive information that, you know, what your

13  discounts are.

14  Q    Does PPOM or Blue Cross or Priority Health for that

15  matter disclose its negotiated provider hospital discounts to

16  the public?

17  A    I guess I'm not sure how to answer that.

18       Carriers do discount in the aggregate.  The discounts

19  like the hospital discount averages X percent or provider

20  discount is X percent.

21       Blue Cross at that time disclosed their provider fees.

22  There was an actual book that anybody could get that wanted it

23  that showed what the physician discounts were or fees.

24  Q    So maybe I'm misunderstanding your response.

25       If I called Priority Health today and asked would you

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   please provide me with the hospital agreement that you have

2   within Spectrum Health, I want to see what negotiated fees

3   are, would Priority Health just hand that information over to

4   me?

5   A    They would tell you what the hospital discount would be

6   at Spectrum Health.  Because it's pretty well known in the

7   community it's the same discount with all the regionals, so it

8   is public knowledge.

9   Q    Does a TPA have a contingency reserve?

10  A    Not to my knowledge.

11  Q    Okay.  Now you talked to Mr. MacGuidwin a little bit

12  about a particular episode between your Blue Cross sales staff

13  and the City of Grand Rapids; is that correct?

14  A    Yes.

15  Q    Okay.  I think that you, after reviewing a document that

16  you said refreshed your recollection, testified that that

17  episode must have occurred prior to 2004.

18       Am I correct about that?

19  A    Yes.

20  Q    Okay.  And so the City of Grand Rapids, if you remember,

21  were they asking for a break out, a dollar amount break out of

22  the components of the Access Fee?

23  A    Yes.

24  Q    That the component, the dollar amount of those components

25  of the Access Fee was not something that Blue Cross routinely

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   disclosed to groups; is that correct?

2   A    That's correct.

3   Q    What if the group had said we'd like to know what we're

4   paying in access fees; would that question have been yielded

5   differently from by your sales staff?

6   A    If a group like the City had asked for what it was and

7   broken out, it was a large self-funded customer, we would have

8   gotten that information.

9   Q    Okay.  But am I correct that the -- that the level of

10  involvement with the City of Grand Rapids was as a result of a

11  request for specific dollar amounts attributable to the

12  components of the Access Fee?

13  A    Yes.

14  Q    Okay.  And if a group had asked just how much do we pay

15  in Access Fees, do you believe that is a very different

16  question?

17  A    I guess I don't -- I don't see the distinction.

18  Q    Say if you group said how much do we way in O.T.G.

19  subsidy versus how much do we pay in Access Fees for the prior

20  period.

21      Was there, you know, was there different treatment of

22  those sort of questions by your sales people or do you not

23  remember?

24  A    Well I'm just trying to put it in context.

25      If a large account had come forth and said like the City,

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1  we want to know how much exactly we're paying -- this was the

2  point in time the City of Grand Rapids was the first instance

3  of this happening.

4      So after that point time, if somebody would have asked,

5  we would have gone back to get that information.

6  Q    Okay.  So prior to this period earlier then 2004, you

7  have no memory of any group asking for a break out of the

8  Access Fee components?

9  A    I do not.  I just -- no.

10 Q    I want to ask to you take a look at a joint exhibit.  So

11 they're another set of binders that say joint on them.  Joint

12 Exhibit 54.

13     Okay, Miss Brawdy, I am looking at what is -- Page 6, the

14 actual Page 6 there which it actually has a little number in

15 the bottom right hand corner.  It says MOO833.

16     Do you see the heading at the top of that page which it

17 says Administrative Fee?

18 A    Yes.

19 Q    Are you familiar with what this document is, what type of

20 Blue Cross document this is?

21     Perhaps looking at the first page -- I apologize.  I

22 jumped forward.

23     Would that help you identify the document?

24 A    It looks like it's part of the renewal for that timeframe

25 of 2001 to two or three, so it would have been part of the

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

 1  renewal information.

 2  Q    In your capacity as the Regional Sales Manager of Blue

 3  Cross, you would have been familiar with the renewal packet

 4  format during this time period?

 5  A    Yes.

 6  Q    Okay.  The sixth page I was looking at that is titled

 7  Administrative Fee at the top.

 8       Are you back to that page now?  Do you see that heading?

 9  A    Yes.

10  Q    Do you know what this page was supposed to accomplish or

11  what information it was supposed to convey to the group?

12  A    It would have been basically for -- looks like part of

13  the renewal information, what their Administrative Fee was,

14  what their stop loss fees were.

15  Q    See it says:

16       BCBSM Administrative Fee is all inclusive.

17       Your fee includes all of these advantages and

18       more.

19       They're bulleted items?

20  A    Yes.

21  Q    What was that trying to convey to the group?

22  A    That everything was included in your Administrative Fee.

23  Q    And that those bulleted items are included in the

24  Administrative Fee?

25  A    Yes.

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1  Q    And more.  Says "and more" in that sentence.

2       Am I correct about that?

3  A    That's what it said, yes.

4  Q    Now if a group had come to one of your sales staff people

5  and said, you know, I'm self-funded, but I'm ABC Printing

6  Press Corporation and I can print documents of negligible cost

7  so I don't want you to print benefit books for me, I'll do it

8  myself.

9       Can we scratch that from the Administrative Fee?  Can you

10 give me a lower fee?  Would Blue Cross have done something

11 like that?

12 A    We tended -- at that point in time, they didn't really

13 unbundle the Administrative Fee.

14 Q    The bullet points were not an *ala cart* menu?

15 A    No.

16 Q    Do you understand what I mean by that?

17 A    Yeah, no.

18 Q    It was not intended to be *ala cart* menu where the

19 customer could pick and choose --

20 A    Yes.  That's correct.

21 Q    -- what services.  I'm correct about that?

22 A    Yes.

23 Q    So the customer couldn't go through this list and

24 eliminate things and thereby accomplish some sort of automatic

25 reduction in its administrative fee; is that fair to say?

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   A    That's correct.

2   Q    Okay.  Can we go look at an exhibit you've already seen

3   today Plaintiff's Exhibit 512.

4        I want to ask you a few more questions about this, but I

5   don't know if we clarified it on direct examination.

6        Mr. Darryl Newsone who sent you that email, who was he?

7   A    He was the manager -- well, at that point in time, he may

8   have been the account manager.  He was Regional Sales Manager

9   at that time.

10  Q    So Mr. Newsone was somebody that reported to you?

11  A    Yes.

12  Q    If there was information about a particular group that

13  Mr. Newsome was reporting to you, would it have been your

14  understanding that that information would come directly from

15  the group or from a sales representative under Mr. Newsome?

16  A    Could have been either.

17  Q    Okay.  The subject line of the second email in that first

18  page, do you see that says Goodrich Theaters?

19  A    Yes.

20  Q    What was Mr. Newsome telling you about Goodrich Theaters?

21  A    Basically that the -- they had raised the issue that they

22  were getting charged fees that weren't that were withheld and

23  not disclosed.

24  Q    Okay.  And is there a reference made to the City of Grand

25  Rapids in this email?

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1    A    Yes.

2    Q    So Mr. Newsome, am I correct, was telling you that an

3    agent for Goodrich Theaters had in his possession information

4    that Mr. Newsone knew to be specific to the City of Grand

5    Rapids?

6    A    Yes.

7    Q    And information he believed was from the negotiation with

8    City of Grand Rapids relative to Retention Reallocation Fees;

9    is that correct?

10   A    That's correct.

11   Q    Okay.  Now, ultimately, the City of Grand Rapids did

12   receive the Access Fee information that they requested; am I

13   right?

14   A    Yes.

15   Q    They received both additional information about what the

16   fees were and they received dollar information about the

17   Access Fee and about all its components.

18        Am I correct about that?

19   A    That's correct.

20   Q    Okay.  Now you looked earlier at the fourth page of this

21   document which is an attachment to this email.

22   A    Burrough's at the bottom?

23   Q    Yes.  That's a Bate stamp number.  But yes.

24   A    Okay.

25   Q    You were asked some questions about this, but I have to

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   ask you, Miss Brawdy, do you have any idea who -- first let me

2   ask you does this documentation appear to be a red lined

3   version of something?

4   A     It does.

5   Q     And do you understand what a red lined document is?

6   A     It's a draft maybe.

7         I mean, generally speaking, this looks like something on

8   Microsoft Word that's being changed.

9   Q     Do you have -- do you know who struck out or added any of

10  the language on this document?

11  A     I do not.

12  Q     Okay.  Go to the third page of the document which is the

13  page behind the fax cover sheet.

14        Now this document at the top it says Aegis Affiliated

15  Group Insurances LLC.  Do you see that?

16  A     Yes.

17  Q     Do you know who Aegis is?

18  A     Looks to be an agency.

19  Q     Okay.  If I told you that it was an agency in Grand

20  Rapids, does that sound correct to you?

21  A     Yes.

22  Q     And am I correct that this document appears to be an

23  analysis of Blue Cross' amounts billed compared to Activa

24  benefits?

25        THE COURT:  Compared to what?  I'm sorry.

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

 1       MS. O'REILLY:  I guess it's fourth column.  It says

 2  Activa benefits.

 3       THE COURT:  Yes.  Thank you.

 4       THE WITNESS:  Yes.  Activa was a third-party

 5  administrator company in town.

 6  BY MS. O'REILLY:

 7  Q    So Activa benefits was a TPA third-party administrator?

 8  A    Correct.

 9  Q    Just like the TPA we were talking about earlier; is that

10  correct?

11  A    That's correct.

12  Q    Okay.  Now can I ask you can see that there's a row where

13  it says Network Fees, right?

14  A    Yes.

15  Q    And under the Activa benefits column it says not

16  applicable.

17       Do you see that?

18  A    I do.

19  Q    And if you look down to where the row that says Disclosed

20  Administrative Fee.

21       Could you identify to me which numbers are the per

22  contract per month Administrative Fees for in those three

23  columns?

24       Let me say this.  Am I right when I look at this document

25  and I see 38.30 times 147 times 12?

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

 1        Would $38 times 147 being the number of contracts times

 2   12 months for the year?

 3        Does that sound correct to you?

 4   A    Yes.

 5   Q    Okay.  So if I'm trying to figure out what here is

 6   reporting the Administrative Fee for Activa benefits or Blue

 7   Cross, I can look here in this row and see that Blue Cross in

 8   2002 was 38, in 2003 was $39, and Activa benefits is $26?

 9   A    Correct.

10        MR. MACGUIDWAN:  Objection, Your Honor.  Foundation.

11   This isn't the author of the document.

12        THE COURT:  Well, she can answer if she knows.

13   BY MS. O'REILLY:

14   Q    That $26 -- if you were from -- with your sales

15   background, if you were assessing this analysis and you see

16   that it says not applicable for network fees and has $26

17   Administrative Fee, with your background, your decades of

18   experience in sales in this industry, would you understand

19   that there would be a network contracting with Activa benefits

20   that would be charging something for access to the network?

21   A    I would believe it could be separate or it could be

22   included in their admin fee.  I can't tell by looking at this.

23        I mean it said N.A. network fees under Activa not

24   applicable.  So either there was no network or it was part of

25   Activa's program at that time.

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1        THE COURT:  No network or what?  I'm sorry.

2        THE WITNESS:  Either there wasn't a separate network or

3    the network was part of Activa and was included in their admin

4    fee.  You really can't tell from looking at this.

5    BY MS. O'REILLY:

6    Q    Could it have been the case when you look at this and you

7    see Administrative Fee that is more than $10 per month lower

8    then the Blue Cross fee, that the network that Activa would

9    contract with was either charging a separate network fee

10   itself or including it in claims?

11   A    They could have been doing either or could have been

12   included in this because the TPAs at that time were so --

13   their administrative fees could be 15 to $19 up to 25 or six.

14        So it could have been a number of things.  I mean, I

15   can't narrow it down with this document.

16   Q    Now if we look back to some of the rows in the middle of

17   this page, the first column identified network fees,

18   contingency fees, cross transfers to somebody, scribbled it

19   out.

20        I won't try to read it.  Total described not disclosed

21   fees and true claims costs.

22        Do you see those rows?

23   A    Yes.

24   Q    Was it your understanding when you received this from

25   Mr. Newsome, that the agent for Goodrich Theaters was able to

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   perform this analysis because he had acquired financial

2   information about these components from somebody related to

3   the City of Grand Rapids?

4   A     That's possible.

5   Q     So I want to ask you about some of the other numbers on

6   this page.

7         Do you see the row where it says Claims After

8   Reimbursements?

9   A     Yes.

10  Q     That number for 2002 for Blue Cross is 637,000.

11        Am I correct about that?

12  A     Yes.

13  Q     Make sure we're looking at the same thing.

14        For 2003 the Blue Cross number is 717,000.

15        Do you see that?

16  A     Yes.

17  Q     Okay.  And then the Activa benefits number is 592,000.

18  Am I identifying the right number?

19  A     Yes.

20  Q     Now based on this document where it shows close claims

21  and stop loss reimbursement, am I correct claims after

22  reimbursements would convey those gross claims less the stop

23  loss reimbursement.

24        Would that have been your understanding as a salesperson

25  reviewing this analysis?

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1    A    Well, they subtract.

2         If you look at the gross claims line minus the stop loss

3    reimbursement, it looks like it does.

4    Q    Okay.

5    A    Equal to be the claims after stop loss reimbursement you

6    subtract the line two from line one.

7    Q    None of the subsequent rows network fees, contingency

8    fees, cost transfer have yet been subtracted from that claims

9    after reimbursement number; is that correct?

10   A    Correct.

11   Q    Okay.  And the Activa benefits number, am I correct, is

12   lower than both the 2002 and 2003 Blue Cross numbers.

13        Am I right about that?

14   A    Yes.

15   Q    Okay.  So would a group need to know anything about

16   network fee, contingency fee or cost transfer, those dollar

17   amounts, to know what the claims after reimbursement amount

18   would be?

19   A    I don't know how to answer that question.

20   Q    If we removed the subsequent analysis after that claims

21   reimbursement row, could you still subtract stop loss

22   reimbursement from gross claims and reach the numbers in the

23   third row, the row entitled Claims After Reimbursement?

24   A    I'm still not following.

25        I mean all they're saying -- this is not a, b, c sheet.

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1    This is an agencies evaluation.

2         So the first line is claims, the second line is stop loss

3    reimbursement, what does that equal.  And then you subtract.

4         I don't understand your question as it relates to the

5    fees below it.

6    Q    Well my question is, if you're a group or salesperson at

7    Blue Cross and you want to know what gross claims less stop

8    loss reimbursement is, what that number is, so the number that

9    appears in the third row of this document you would not need

10   to know what the dollar amount is for network fee, contingency

11   fee or cost transfer.

12        Am I correct about that?

13        All you would need to know is the gross claims and stop

14   loss reimbursement amount.

15        You could subtract the second number from the first and

16   get the claims after reimbursement?

17   A    Well, except for the fact that at that time the Provider

18   Access Fee was included in the -- was under the claims cost

19   header.

20        So you could have a situation where those -- just

21   subtracting that on the value, it was not really a true

22   difference because there were additional fees in the hospital

23   claims cost for the Access Fee.

24   Q    So that --

25        THE COURT:  Ms. O'Reilly, there was an earlier objection

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   to the question about this document and I am sustaining that

2   objection now.

3        MS. O'REILLY:  Okay.

4        Can I ask one more question, Your Honor, I do think is

5   important about the very -- the very last number on this

6   document that shows total plan costs.

7   BY MS. O'REILLY:

8   Q    Do you see those numbers?  I'll circle them, maybe that

9   will help.  Looking at mine up here will help you understand

10  what I'm asking.

11       So the document as I've altered it, do you see?  To know

12  what the total plan costs are, all the information I blacked

13  out here does not -- you can still perform the math that

14  reaches the total plan costs can still be performed without

15  any of the information that's now been redacted from this

16  document.

17       Am I correct about that?

18       MR. MACGUIDWAN:  Your Honor, same objection.

19       THE COURT:  Sustained.

20       MS. O'REILLY:  Your Honor, the document was prepared for

21  a salesperson.

22       THE COURT:  Sustained.

23       MS. O'REILLY:  All right.

24  BY MS. O'REILLY:

25  Q    The City of Grand Rapids decided to ultimately cancel

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1    Blue Cross.

2         Who did they end up going to?

3    A    It was an out of state company TPA.

4    Q    Do you remember what network that TPA contracted with?

5    A    No, I don't recall now.  Actually, I think it was PPOM is

6    my recollection.

7    Q    I think that you testified during your deposition that

8    after this episode with City of Grand Rapids, that every agent

9    out here was talking about Access Fees.

10        Did you testify to that?

11   A    Yes.

12   Q    Could you explain what you meant by that?

13   A    Well, the agent for the City of Grand Rapids, Pat

14   Coleman, put together the documents from the City's meeting

15   and pretty widely circulated throughout the agent community.

16        So we were hearing back from a number of agents.  It

17   really got to be pretty widespread information.

18        And, of course, the counties, the cities, they're they

19   all talk as well.  So ...

20   Q    So your understanding, then am I correct, that there was

21   general knowledge in West Michigan about Blue Cross' retention

22   reallocation?

23   A    There became general knowledge in the agent community and

24   then they did raise it to some customers.

25   Q    Now beginning -- you said earlier in the early 1990's,

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   you were the Regional Sales Manager for West and Northern

2   Michigan.  Is that correct?

3   A    Correct.

4   Q    Okay.  And when the new pricing arrangement, the

5   retention reallocation pricing arrangement was ruled out, did

6   any of your superiors at Blue Cross communicate to you in any

7   way that your sales staff were to hide Retention Reallocation

8   Fees from customers?

9   A    No.

10  Q    Okay.  I think that you testified during your deposition

11  that people and I think you clarified later, sales staff were

12  told early on to communicate with groups about Access Fees.

13  Is that correct?

14  A    They were when our rates went down at that time, yes.

15  Q    And you testified earlier that when the admin fee went

16  down, it was a significant drop.

17       Am I correct about that?

18  A    Correct.

19  Q    I think your testimony was it was a third to maybe even a

20  half of that fee?

21  A    Yes.

22  Q    So that would mean in the very first renewal after

23  retention reallocation became effective, that renewal

24  document, the group would have seen up to maybe 50 percent

25  reduction in that admin fee.  Is that correct?

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   A    Yes.

2   Q    Can you flip to Plaintiff's 557 which you looked at

3   earlier today.  Maybe you didn't.  Maybe you didn't look at it

4   earlier today.  Can you turn to it nonetheless?

5   A    Okay.

6   Q    This document is an email.

7        You are one of the recipients of this email chain.  Am I

8   correct about that?

9   A    Yes.

10  Q    And if you look to the email that's at the bottom of this

11  first page, it identifies an ASC Access Fee presentation.

12       Am I correct about that?

13  A    Yes.

14  Q    You may need to take a moment to read the whole thing.

15       Am I correct it identifies at least two presentations

16  that occurred; one in Lansing on Tuesday and then another

17  paragraph it says Metro Sales Team July 11?

18  A    Yes.

19  Q    Would you have attended either of those presentations?

20  A    Well, each of the underwriting departments will be

21  responsible for giving the presentation to the sales area they

22  support, so that would have included West Michigan.

23  Q    So underwriting was giving its presentation to West

24  Michigan.

25       You would have been a person to whom this presentation

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

 1  was made.  Am I correct about that?

 2  A    Yes.

 3  Q    Who would have been -- if you can remember, the

 4  underwriting person who would have made this presentation to

 5  you?

 6  A    Most likely it was Dave Gay was the manager.  I don't

 7  recall who came out.

 8  Q    Do you see in the front line of the email at the bottom

 9  of the first page it's from Ken Krisan.

10       Am I right about that?

11  A    He was the other underwriting manager.  Dave Gay and Ken

12  Krisan were peers.

13  Q    If you'd turn to the next page.

14       Am I correct the attachment to this email and appears to

15  be a power point presentation you said would have been made to

16  you and other sales managers in your position.

17       Am I correct about that?

18  A    Yes.

19  Q    Now at that time and by time I mean in 2005 when the

20  presentation and emails are dated, were there people on your

21  sales staff that had not been working at Blue Cross?

22       Back to before 1994, were there people who had become

23  sales representatives at Blue Cross after, you know, 1994 and

24  later?

25  A    I'm sure there were.

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1  Q    If you can remember, maybe give me a ballpark estimate

2  about what you think the percentage of your sales staff in

3  2005 would have been that had been hired or came from some

4  other area at Blue Cross after 2004.  I'm sorry.  1994.

5  A    You know, I just couldn't, I couldn't venture to guess

6  accurately.

7  Q    But you're saying there's certainly some representatives

8  that had joined.

9       Were there some sales reps that had joined your sales

10 staff later then 2000?

11 A    I'm sure there were.

12 Q    Okay.  If you turn to the third page of this power point

13 presentation.  It says history at the top of the slide.

14      One of the bullet points on this page says:

15      At the time of implementation, all Reps

16      completed form confirming discussion with

17      accounts.

18      Do you see that is this discussing the

19      implementation of retention reallocation?

20 A    Yes.

21 Q    And do you have any recollection about reps going out and

22 completing forms confirming discussion with accounts?

23 A    I do know that they were supposed to discuss it with

24 their accounts and turn in a form.

25      And I don't recall that we did too good of a job of

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   getting those forms back, but that was the plan.

2   Q    The accounts are the customers, right?

3   A    Yes.

4   Q    The individual groups?

5   A    Yes.

6   Q    Now when you were at Blue Cross, I believe still today at

7   Priority, you worked and continue to work with Mr. Ron

8   Crofoot.

9        Am I correct about that?

10  A    Yes.

11  Q    Back in 1993-94 was Mr. Crofoot a sales representative in

12  West Michigan?

13  A    Yes.

14  Q    So he was a person that reported to you.

15       Am I correct about that?

16  A    Yes.  Uh-huh.

17  Q    If Mr. Crofoot testified that he had just such a

18  confirming discussion with Hi-Lex Corporation, the plaintiff

19  in this case, would you have any reason not to believe him?

20  A    Well if Ron told me that, and I don't recall if he did or

21  not, but I mean he's a credible person.

22  Q    So if he testified in court here that he did, that would

23  you have and reason to disbelieve his testimony?

24  A    No.

25       THE COURT:  I'm sorry, Miss O'Reilly, what was your

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   question?  If he did what?

2       MS. O'REILLY:  If he testified that he had this

3   confirming -- the meeting discussion that's identified in this

4   slide with Hi-Lex.

5       THE COURT:  Thank you.

6   BY MS. O'REILLY:

7   Q    Something else I wanted to ask you about these slides.

8       On top of -- I'm going to count the pages for you.

9   Including the cover page of presentation it would be one, two,

10  three, four, five.  It has a Bate stamp number that ends in

11  611491.

12      Do you see that?

13  A    Yes.

14  Q    It's blurry, but it says ASC Access Fee at the top?

15  A    Correct.

16  Q    At the bottom of that slide it says:

17      Don't confuse ASC Access Fee with BlueCard

18      Access Fees.

19      Do you see that?

20  A    Yes.

21  Q    What was the BlueCard Access Fee?

22  A    Out of state claims that were billed to Blue Cross of

23  Michigan.

24      In other words, if you were traveling or somebody lives

25  out of state, they go to the blue plan in that state.

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1    That blue plan would bill Blue-Cross of Michigan for

2  those fees.  And there was a fee that that plan charged Blue

3  Cross of Michigan to obtain their discount.

4  Q    That's a fee charged by another Blue Cross plan in

5  another state?

6  A    Correct.

7  Q    This was something that was completely distinct from the

8  ASC Access Fee.  Am I correct about that?

9  A    Yes.

10  Q    So this presentation which I think you testified was

11  something that would have been presented to you as a sales

12  manager, is it your understanding that you're being told not

13  to confuse these two type of fees?

14  A    Correct.

15  Q    Okay.  And is that something that you would have, would

16  have been within your job duties as the regional manager for

17  sales in West Michigan to make sure that the sales staff

18  people that are underneath you also understood the distinction

19  between these fees?

20  A    Correct.

21  Q    Do you believe that your sales staff did understand the

22  distinction between these fees?

23  A    They should have.

24  Q    Okay.  When I use the terms "Local ASC groups or NASCO

25  ASC Groups" do you understand what those terms are?

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   A    Yes.

2   Q    Could you tell me what is NASCO?

3   A    NASCO is a claims system used for national groups.  It's

4   owned by the Blue Cross Association versus Blue Cross of

5   Michigan.

6   Q    And NASCO'S an acronym n-a-s-c-o?

7   A    Right.

8   Q    How does that differ from an ASC local group?

9   A    A local group would have been on the Michigan claims

10  system.

11       It would have been a Michigan based group basically with

12  a majority of their people in Michigan.  So it's a different

13  claims system.

14  Q    Okay.  You've anticipated my next question.

15       These two NASCO and local ASC, they both pertain to

16  self-funded groups but they were operating on two totally

17  separate systems?

18  A    Correct.

19  Q    That's correct.  Okay.

20       And do you remember an initiative in 2005 in the years

21  immediately preceding your separation from Blue Cross where

22  there was an initiative to combine those systems?

23  A    Yes.

24  Q    The result would have been, am I correct, that there

25  would have been a unified system for all ASC groups?

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   A     Correct.

2   Q     Would that system unification have required some

3   adjustments to how Access Fees were collected from the local

4   ASC groups, if you know?

5   A     I don't know how to answer that question.  Restate it one

6   more time.

7   Q     Would unifying the local and NASCO systems so everybody's

8   operating on a new system have required adjustments or changes

9   to the manner in which Access Fees had been collected from

10  local ASC groups?

11  A     I don't know.

12  Q     Okay.  That's fine.  Can we go back to Plaintiff's 511

13  real quick?

14        On the second page of that document -- you may have to

15  scan it for a second.  This is -- do you see a couple spots

16  where the term national is used?

17        Maybe I can help you find one of them.  At least in the

18  middle of the first large paragraph second paragraph it says

19  -- I think this was read to you earlier.

20        Ken we rework the language to be consistent

21        with our contract this lack or language

22        something National uses.

23        Now do you see that?

24  A     Uh-huh, yes.

25  Q     Was national referring the NASCO system that you

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

 1  described a moment ago?

 2  A    Yes.

 3  Q    Okay.  Thank you.

 4       That's all -- now you testified earlier today about a

 5  discussion that you recall in the mid 2000's, the years

 6  immediately preceding your separation from Blue Cross about

 7  alternative methods for calculating and reporting Access Fees.

 8  Is that correct?

 9  A    Correct.

10  Q    I'm under the impression that you were you personally

11  were a big proponent of having the Access Fee be fixed per

12  contract per month fee.

13       Am I correct about that?

14  A    That's correct.

15  Q    Per contract per month, that meaning is that the same

16  thing as saying per employee per month?

17  A    Yes.

18  Q    So that would have meant the Access Fee would have been a

19  fixed dollar amount.  Am I correct about that?

20  A    Yes.  That's correct.

21  Q    That would have been a fixed dollar amount just like the

22  Administrative Fee?

23  A    Correct.

24  Q    And the Administrative Fee was a per contract per month

25  fee.  Am I right about that?

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   A    Yes.

2   Q    Now that fixed -- the Access Fee was a fixed per contract

3   per month fee would that have been allowed for some

4   prospective reporting of the exact dollar amount of the fee?

5   A    Yes, it would.

6   Q    Is that one of the things you liked about it?

7   A    Yes.

8   Q    Whereas if the Access Fee is a calculated available

9   amount based on hospital utilization prospective reporting of

10  dollar amounts would not be possible.

11       Am I correct about that?

12  A    That's correct, because you wouldn't know which hospital

13  they were going to have their services at, whether it was Peer

14  One, Two, Three or Four, which indicates the size of the

15  hospital the peer groups.

16  Q    The additional disclosure that I think you testified that

17  you advocated in favor of was to disclose the precise dollar

18  amount of the Access Fees.

19       Am I correct about that?

20  A    Correct.

21  Q    You were not saying that you -- that there was no

22  disclosure at that time of the fee itself, what it was, as

23  opposed to the dollar amount associated with it?

24  A    Well, the disclosure was more of a general statement, you

25  know, retention reallocation.

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1      If there was a disclosure, it was a general statement

2  versus a, you know.

3      The self-funded customers wanted to know what they were

4  going to pay up front in advance, which most of us want to

5  know up front in advance what we're going to pay for something

6  rather than a general statement that you're going to pay a

7  fee.

8  Q    All right.  Let's take a look at a few documents.

9  Exhibit -- Joint Exhibit 1.

10      Is this the administrative services contract that you

11  testified about earlier?

12  A    Yes.

13  Q    Okay.  And if you could turn to Page 7.  I'm looking at

14  there's a little seven at the bottom of the page.

15      Do you see that?

16      In fact, I'm going to ask to you go back to Page 6 real

17  quick.  Bottom of Page 6, do you see where it says Article III

18  Financial Responsibilities?

19  A    Yes.

20  Q    So when we go to page seven, the items identified on page

21  seven until we get to Article IV are items that fall under

22  those financial responsibilities.

23      Am I correct about that?

24  A    Yes.

25  Q    Okay.  And immediately above where Article IV starts do

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1  you see a paragraph that begins "the provider"?

2  A    Yes.  After number nine.

3  Q    Can you read that paragraph for me?

4  A

5       The Provider Network Fee, contingency, and

6       any cost transfers, subsides or surcharges

7       ordered by the state insurance commissioner

8       is authorized pursuant to TPA 350 will be

9       reflected in the hospital claims cost.

10 Q    Contained in amounts billed?

11 A    Yes.

12 Q    Is that correct?

13 A    Yes.

14 Q    Is that paragraph describing retention reallocation that

15 you testified about today?

16 A    Yes.

17 Q    Okay.  And if you turn back to the second page of this

18 document -- actually I'm getting ahead of myself.

19      The first page of the contract, do you see the Article I

20 is definitions?

21 A    Yes.

22 Q    Okay.  And if we follow those definitions down on to Page

23 2, do you see Item L?

24 A    Yes.

25 Q    Can you read that to me?

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1    A

2         Provider Network Fee means the amount

3         allocated to Group for the expenses incurred

4         by BCBSM in the establishment, management and

5         maintenance of its participating hospital,

6         physician and other health care provider

7         networks.

8    Q    Does this answer the question that was posed earlier

9    about where in the documents or contracts Provider Network Fee

10   was identified?

11   A    Yes.

12   Q    So this is the Provider Network Fee?

13   A    It is.

14   Q    Thank you.  Could you turn to Joint Exhibit 5?  Could you

15   identify for me what this document is.

16   A    It's an attachment to the -- well, it's a renewal

17   document for self-funded group giving their new Administrative

18   Fee for the coming contract year.

19   Q    Is this what Blue Cross calls a Schedule A?

20   A    Yes.

21   Q    Okay.  On the second page of this Schedule A, do you see

22   that there's a paragraph numbered 11 that is immediately

23   before the signature pages?

24   A    Yes.

25   Q    Okay.  And that paragraph -- that paragraph says:

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1       Your hospital claims cost reflects certain

2       charges for Provider Network Fee access

3       contingency and other subsides as

4       appropriate.

5       Did I read that correctly?

6   A   Yes.

7   Q   Is that also identifying the Retention Reallocation Fee

8   you discussed today?

9   A   Yes, it is.

10  Q   All right.  Could you look at Joint Exhibit 6, please.

11      Am I correct this is also Blue Cross Schedule A?

12  A   Yes, it is.

13  Q   You look at the second page of this document.

14      Do you see a paragraph 11 immediately above the signature

15  blocks?

16  A   Yes.

17  Q   Does paragraph 11 say:

18      A portion of your hospital savings has been

19      retained by BCBSM to cover costs associated

20      with the establishment, management and

21      maintenance of BCBSM's participating

22      hospital, physician and other health provider

23      networks.

24      The ASC Access Fee also covers subsides,

25      surcharges and contributions to reserves

1     ordered by state commissioner pursuant to TPA

2     350.

3     Did I read that correctly?

4  A   Yes.

5  Q   Does that identify the Retention Reallocation Fee or what

6  we call Access Fee?

7  A   Yes, it does.

8  Q   Look at Joint Exhibit 7.  Is this also a Schedule A?

9  A   Yes.

10 Q   Look to the second page.

11    Do you see paragraph 11 that is immediately above the

12 signature blocks?

13 A   Yes.

14 Q   Does that paragraph say:

15    A portion of your hospital savings has been

16    retained by BCBSM to cover the ASC Access

17    Fee.

18    The ASC Access Fee covers, a, costs

19    associated with the establishment, management

20    and maintenance of BCBSM's participating physician

21    and other health provider networks.

22    B, charges to help maintain Blue Cross-Blue

23    Shield of Michigan surplus at an appropriate

24    level in compliance with regulatory and Blue

25    Cross-Blue Shield Association standards.

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1       And, C, costs transfer, subsidies or

2       surcharges authorized pursuant to 1980 TPA

3       350, such as the group conversion fee and

4       other than group subsidy.

5       Did I read that correctly?

6   A   Yes.

7   Q   Is this also identifying Retention Reallocation Fees we

8   discussed today?

9   A   Yes, it is.

10  Q   These Schedule A's we look at three of them.

11      Is this something a self-funded group would have been

12  presented and signed every year?

13  A   Yes.

14  Q   Okay.

15      THE COURT:  Every year beginning when?

16      THE WITNESS:  Beginning with their first renewal from the

17  time they came on.

18      THE COURT:  I'm talking about the language that

19  specifically says a portion has been retained by.

20      THE WITNESS:  I couldn't answer what the first time that

21  language was used without seeing all the contracts that went

22  back.

23      THE COURT:  Look at number five renewal for December of

24  '05.  Look at the language in paragraph 11.

25      And then if you look at paragraph -- Exhibit 6 paragraph

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1    11, the language is different.

2         THE WITNESS:  Yes.

3         THE COURT:  Yes.

4         THE WITNESS:  Yes.

5         THE COURT:  So does that mean that 2006 was perhaps the

6    first time it specifically said a portion has been retained?

7         THE WITNESS:  Well, I agree the language changed.

8         Five says:

9         Your hospital claims costs reflects certain

10        charges.

11        Whereas the next year it said it has been retained the

12   language changed it got more descriptive.

13        MS. O'REILLY:  Your Honor, may I?

14        THE COURT:  Yes, please go ahead.

15   BY MS. O'REILLY:

16   Q    Let's look at that.  Exhibit 5.  You just had it open.

17        It says:

18        Your hospital claims costs reflects certain charges.

19   Does that -- do you understand that to mean that those charges

20   are included in hospital claims costs?

21   A    Well, that's what it's meant to say.

22   Q    Okay.

23        Can you look at in the joint exhibits books you have

24   there's.  One numbered 80.

25

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1       If you look at the last two pages of Exhibit 80.  I'll
2   wait until you get to the last two pages.
3   A    The last two pages.
4   Q    Last two.
5       You see that am I correct that this is a blank not filled
6   out Blue Cross Schedule A form?
7   A    Yes.
8   Q    That Schedule A form is the same type of Blue Cross form
9   we just looked at Joint Exhibits 6 and 7 that were specific
10  the Hi-Lex corporation.
11      Am I correct about that is it the same form?
12  A    I don't know if it's exactly the same, but it's a
13  schedule -- it s a format of the Schedule A.
14  Q    It's a format of the Schedule A; is that correct?
15  A    Correct.
16  Q    Okay.  And if you turn to the second page of this form
17  Schedule A.
18      Do you see paragraph that's numbered nine?
19  A    Yes.
20  Q    That is immediately above the empty signature blocks?
21  A    Yes.
22  Q    That's paragraph nine says:
23      Effective with your current renewal, your
24      hospital claims costs will reflect certain
25      charges for Provider Network Fee, Access

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1        Fees, and other subsidies as appropriate?

2   A    Yes.

3   Q    Is that paragraph identifying the retention reallocation

4   fees you discuss today?

5   A    Yes.

6   Q    Thank you.

7        Could you look at Joint Exhibit Number 58.  Can you

8   identify what type of Blue Cross document this is?

9   A    It's part of the renewal package.

10  Q    So this is something that would have been given to

11  groups.  Am I correct about that?

12  A    Yes.

13  Q    Okay.  And if you look at -- I wish there was earlier pay

14  to identify page numbers.  There's a page 125 at the bottom of

15  it.

16  A    Yes.

17  Q    Do you see -- do you see the row on that page that is

18  number four says benefit payments?

19  A    Yes.

20  Q    Is there an asterisk next to the term "Benefit Payments"?

21  A    There is.

22  Q    Does that correspond to a notation at the bottom of the

23  page?

24  A    Yes, it does.

25  Q    Okay.  And the asterisk that at the bottom of the page

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   says:

2        A portion of your hospital savings has been

3        retained by Blue Cross-Blue Shield of

4        Michigan to cover costs associated with the

5        establishment, management and maintenance of

6        BCBSM's participating hospital, physician and

7        other health provider networks.

8        The ASC Access Fee also covers any subsidies

9        surcharges and contributions to reserves

10       ordered by commissioner as authorized

11       pursuant to TPA 350.

12       Did I read that correctly?

13  A    You did.

14  Q    Does that identify the Reallocation Fees we discussed

15  today?

16  A    Yes, it does.

17  Q    So the disclosures that we've gone through that were in

18  the Schedule A's and this renewal package are something that

19  would have been provided to the group.

20       Am I correct about that?

21  A    Yes.

22  Q    Thanks.  Can we look at Joint Exhibit 17?

23       I think you testified earlier that one of the reasons you

24  liked affixed PSPM because it reported the precise dollar

25  amount of Access Fee paid?

Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
                     Volume 2

1    A    Correct.

2    Q    In the mid 2000's that you were an advocate for

3    disclosing dollar amounts of Access Fees to groups.

4         Am I correct about that?

5    A    Yes.

6    Q    Now if you turn to the last page of this -- actually

7    first, based on the first page.

8         Identify what type of Blue Cross document this is.

9    A    This is a settlement that comes after the renewal.

10   Q    So is it an annual settlement; am I correct about that?

11   A    This is an annual, yes.

12   Q    Is this document something that would have been provided

13   to the group?

14   A    Yes.

15        MR. MACGUIDWAN:  Objection, Your Honor, foundation.

16        This document was provided after the witness left Blue

17   Cross-Blue Shield.

18        THE COURT:  What's the date of it?

19   BY MS. O'REILLY:

20   Q    Based on your experience at Blue Cross-Blue Shield, was

21   the annual settlement a document -- that would be provided to

22   the group?

23   A    Yes.

24   Q    Okay.  And can you look at the last page of this annual

25   settlement.

                  Hi-Lex v Blue Cross 11-12557

Paula Brawdy-Cross Exam/Ms. O'Reilly 4-24-2013
Volume 2

1   A    Pie chart.

2   Q    Yes, the pie chart.

3        Do you see where the pie chart says Access Fees $652,760?

4   A    Yes.

5        MR. MACGUIDWAN:  Your Honor, same foundational objection.

6        THE COURT:  Sustained.

7   BY MS. O'REILLY:

8   Q    Let me ask you do you know whether after you were

9   separated from Blue Cross that an exhibit was created for the

10  annual sentiment that was designed to report the precise

11  dollar amount of Access Fees?

12  A    I do not know what happened after I left.

13  Q    Do you have any reason to believe that such an exhibit

14  was not created?

15  A    I don't know either way I just don't know.

16  Q    Now do you know whether during your tenure at Blue Cross

17  subsequent to the adoption of retention reallocation, whether

18  there were different options for collecting Access Fees from

19  groups?

20  A    State that again, please?

21  Q    During your tenure with the company after retention

22  reallocation was developed, were there nonstandard Access Fees

23  that a group could request?

24  A    Not to my knowledge.

25  Q    So you don't know whether or not a group could request a

1    hire fixed PCPM Administrative Fee in lieu of the variable

2    Access Fee?

3    A    I don't recall that.

4    Q    Do you recall groups opting to have available Access Fee

5    with a cap that it was measured as a percentage of amounts

6    billed?

7    A    No, I don't recall.

8    Q    During your time at Blue Cross, was there somebody on

9    your sales staff under you named Steve Hartnett?

10   A    Yes.

11   Q    What was Steve Harnett's job?

12   A    He did -- well he had two jobs.

13        In the beginning, he was an account manager so he handled

14   accounts directly and then he became a new business

15   salesperson.  Then he became a new business sales manager.

16   Q    So was Steve Hartnett somebody that would have reported

17   to you?

18   A    Yes.

19   Q    And so if a presentation was made to you such these power

20   point presentation we looked at earlier and was Steve Hartnett

21   somebody that you were in charge of making sure that he

22   understood that material that was being presented to you?

23   A    Yes.

24   Q    Okay.  And if somebody told you that Steve Hartnett went

25   out to groups or agents and denied flatly the existence of any

 1   Retention Reallocation Fee, would you believe that?

 2   A    No.

 3   Q    Okay.  I've a couple questions just about agents in

 4   general.

 5        So I think you testified during your deposition that the

 6   agent represents the customer.

 7        Can you explain -- is that correct?

 8   A    Correct.

 9   Q    Can you explain to me how that works?

10   A    Well, the agents -- what they do is they go to an account

11   and they became their agent of record.

12        If the account trusts them to do their shopping for

13   health insurance, they become the agent of record.

14        Then the health insurance company reimburses the agents,

15   the commission or pays the agent for the services they provide

16   for the customer.

17   Q    So your understanding that the agents, they're

18   representing the interests of the customer?

19   A    Yes.

20   Q    And is it your understanding that when the -- that agents

21   communicate with Blue Cross on behalf of their customers?

22   A    That's correct.

23   Q    And when there's -- when there's an agent appointed when

24   a carrier like Blue Cross or Priority Health communicates to

25   that agent about group information, is it your understanding

Paula Brawdy-Redirect Exam/Mr. MacGuidwin 4-24-2013

```
 1    that the carrier understands the agent will convey that
 2    information to the group?
 3    A    Yes.
 4         MS. O'REILLY:  I'm finished.  Thank you.
 5         THE COURT:  Thank you.
 6                        REDIRECT EXAMINATION
 7    BY MR. MACGUIDWAN:
 8    Q    Ms. Brawdy, one you the items you testified to earlier
 9    was the internal debate going on at Blue Cross between 2004
10    and 2007 when you left about how to disclose these fees.
11         What was what discussion occurred about what customers
12    actually knew about the these Retention Reallocation Fees?
13    A    What was the period of time again?
14    Q    From 2004 until you left.
15    A    Well, they knew they existed, obviously, from the
16    contracts, the language and had a general awareness of the
17    fees, but not any direct knowledge of what the amount of money
18    was for the fees.
19    Q    Before you came to testify at trial today, were you aware
20    that there was language in these contract documents that
21    referred to retention reallocation?
22    A    I knew we had general, you know, references in the
23    contract to other ties.
24    Q    Did you understand what those general references meant?
25    A    I'm not sure what you mean.
```

Paula Brawdy-Redirect Exam/Mr. MacGuidwin 4-24-2013

1    I mean in the contracts that we just reviewed, there's
2    general information to the Provider Network Fees.
3    Q   By "general information" you mean that's not specific?
4    A   I mean it doesn't tell you what it is.  It doesn't tell
5    you how much money it is that they're referring to, it just
6    refers to fees.
7    Q   It also wouldn't tell you the formula for calculating
8    those fees?
9    A   Correct.
10   Q   Now during your deposition, you testified that not only
11   was the amount of the fees not disclosed, but the very
12   existence was also not disclosed.
13       Do you remember that?
14   A   In the beginning that --
15       MS. O'REILLY:  I'm going to object.  I think --
16       THE COURT:  I'm sorry?
17       MS. O'REILLY:  I'm going to object.  I think the
18   deposition testimony has been misstated.
19       THE COURT:  What's the timeframe that you're talking
20   about here?
21   BY MR. MACGUIDWAN:
22   Q   Between -- well, for the entire time that you were at
23   Blue Cross-Blue Shield?
24   A   You know in the beginning it was not clear, clearly
25   disclosed.

Bench Trial  4-24-2013  Vol. 2

1      And I think over time as objections, you know, came up,

2   particularly around the City of Grand Rapids it, you know, the

3   language became clear on contracts about the existence of the

4   fees.

5   Q    When precisely did become clear to your customers?

6   A    You know, I don't know precisely you know.

7        Certainly there's an evolution of language in the

8   documents that we just looked at but I don't know what year it

9   became clear.

10       Obviously, it was after the City of Grand Rapids that it

11   became -- it got the attention to put better language in

12   documents.

13   Q    And you testified that this debate about how to disclose

14   the fees still hadn't ended by the time you left Blue Cross in

15   2007?

16   A    In terms of disclosing exact amounts of money or, you

17   know, exactly how much time that money amounted to in advance,

18   at the renewal, that had not been resolved.

19       MR. MACGUIDWAN:  Nothing further.

20       THE COURT:  Recross?

21       MS. O'REILLY:  I've nothing more, Your Honor.

22       THE COURT:  Thank you, Miss Brawdy.

23           (Whereupon the witness was excused at 12:55 p.m.)

24       THE COURT:  What would you do next, counsel?

25       MR. PHELPS:  Your Honor, Your Honor, we propose reading

Walter Martyniek-Deposition Read 4-24-2013 Vol. 2

1    the Wally Martyniek transcript.

2        Your Honor, before I read the three introductory remarks

3    for Mr. Martyniek --

4        THE COURT:  Are your objections to the deposition the

5    same as the objections to the Young?

6        MR. PHELPS:  They are.

7        THE COURT:  All right.  Thank you.

8        MR. BERNARD:  Your Honor on one of the objections,

9    there's going to be a different set of circumstances, but the

10   contract documents involved in this deposition.  And the

11   counter-designations by Blue Cross we appreciate when we get

12   to that point we can deal with specifically.

13       THE COURT:  All right.  Thank you.

14       MR. PHELPS:  Mr. Martyniek's affidavit.

15           My name is Walter Martyniek.  I'm the

16           managing partner of Spector Benefits.

17           I began working there in 1998 as the managing

18           partner and currently still employed there.

19           I've been with Spectrum Benefits continually

20           since 1998.

21           And in my capacity at Spectrum Benefits, I've

22           been the agent of record for several

23           companies self-funded health benefit plans

24           and I specifically assisted clients in

25           deciding whether to hire Blue Cross-Blue

Walter Martyniek-Deposition Read 4-24-2013 Vol. 2

1          Shield Michigan as a third party

2          administrator for their health benefit plans.

3               (Whereupon the witness was then sworn)

4               (Whereupon the deposition of Walter Martyniek

5               was then read into the record)

6      THE COURT:  Counsel, can we stop there for today?

7      MR. BERNARD:  Sure, Your Honor.

8      THE COURT:  So we will resume tomorrow at nine o'clock.

9  Thank you, Ms. Sapala.

10

11              (Whereupon court was in recess for

12              the day at 12:59 p.m.)

13

14              CERTIFICATE OF COURT REPORTER

15

16

17

18     I certify that the foregoing is a correct transcript

19     from reported proceedings in the above-entitled matter.

20

21

22

23  s/Carol S. Sapala, FCRR, RMR        June 19, 2013

24

25